# Exhibit B

# FRANCHISE DISCLOSURE DOCUMENT

La Rosa Franchising, LLC,
a Florida limited liability company
1420 Celebration Blvd., Suite 200



Celebration, FL 34747
Phone: 321-939-3748
Fax: 407-566-2017
Info@larosafranchising.com
www.JoinLaRosa.com

La Rosa Franchising, LLC offers franchises for the operation of a business offering real estate brokerage services to both residential and commercial real property purchasers and sellers.

The total investment necessary to begin operation of a franchise ranges from $23,700.00 to $278,000.00. This includes an Initial Franchise Fee of $10,000 that must be paid to the Franchisor. If you desire to open one or more Branch Offices within your Territory from which to operate your La Rosa Realty business, your investment for each additional Branch Office you open may be similar, but there is no additional Initial Franchise Fee for Branch Offices.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the Franchisor or a Franchisor Affiliate in connection with the proposed franchise sale.  **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact La Rosa Franchising, LLC at 1420 Celebration Blvd., Suite 200, Celebration, FL 34747, and call 321-939-3748.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract.  Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

**The issuance date:  July 19, 2019**

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in Exhibit D for information about the Franchisor or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1.　　　THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY ARBITRATION ONLY IN FLORIDA EXCEPT FOR CERTAIN DISPUTES, WHICH MUST BE LITIGATED IN FLORDA. OUT-OF-STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE WITH US IN FLORDA THAN IN YOUR OWN STATE.

2.　　　THE FRANCHISE AGREEMENT STATES THAT FLORIDA LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTION AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3.　　　YOUR SPOUSE MUST SIGN A GUARANTY AND SPOUSAL CONSENT MAKING YOUR SPOUSE INDIVIDUALLY LIABLE FOR YOUR FINANCIAL OBLIGATIONS UNDER THE AGREEMENT. THE GUARANTY AND CONSENT WILL PLACE YOUR SPOUSE'S MARITAL AND PERSONAL ASSETS AT RISK IF YOUR FRANCHISE FAILS.

4.　　　FRANCHISOR'S FINANCIAL CONDITION, AS REFLECTED IN ITS FINANCIAL STATEMENTS (see Item 21, Exhibit A) CALLS INTO QUESTION THE FRANCHISOR'S FINANCIAL ABILITY TO PROVIDE SERVICES AND SUPPORT TO YOU.

5.　　　THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Effective Date:  See the next page for state effective dates.

DocuSign Envelope ID: B95FB5BD-FBB7-4D9E-B76F-B12C252B19A0

**FRANCHISE DISCLOSURE DOCUMENT EFFECTIVE DATES**
**IN DESIGNATED STATES**

The following states require that the Disclosure Document be registered or filed with the state or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is registered, on file, exempt from registration, or otherwise effective in the following states with franchise registration and disclosure (or business opportunity*) laws as of the dates listed:

| | |
|---|---|
| California | Not Filed |
| Florida | July 19, 2019 |
| Georgia | To Be Determined |
| New York | Not Filed |
| South Carolina | To Be Determined |
| Texas | July 19, 2019 |

In all other states, the effective date of this Franchise Disclosure Document is **July 19, 2019.**

3

# TABLE OF CONTENTS

ITEM 1: THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES ................... 1

ITEM 2: BUSINESS EXPERIENCE ....................................................................................... 3

ITEM 3: LITIGATION ........................................................................................................ 4

ITEM 4: BANKRUPTCY ..................................................................................................... 4

TEM 5: INITIAL FEES ...................................................................................................... 4

ITEM 6: OTHER FEES ...................................................................................................... 4

ITEM 7: ESTIMATED INITIAL INVESTMENT ....................................................................... 10

ITEM 8: RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ............................... 12

ITEM 9: FRANCHISEE'S OBLIGATIONS ............................................................................. 14

ITEM 10: FINANCING ..................................................................................................... 15

ITEM 11: FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS,
AND TRAINING ............................................................................................................. 15

ITEM 12: TERRITORY ..................................................................................................... 22

ITEM 13: TRADEMARKS .................................................................................................. 24

ITEM 14: PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION ............................. 25

ITEM 15: OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
FRANCHISE BUSINESS ................................................................................................... 26

ITEM 16: RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ..................................... 27

ITEM 17: RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ..................... 27

ITEM 18: PUBLIC FIGURES ............................................................................................. 29

ITEM 19: FINANCIAL PERFORMANCE REPRESENTATIONS ................................................. 29

ITEM 20: OUTLETS AND FRANCHISEE INFORMATION ...................................................... 30

ITEM 21: FINANCIAL STATEMENTS .................................................................................. 34

ITEM 22: CONTRACTS .................................................................................................... 34

ITEM 23: RECEIPTS ....................................................................................................... 34

**EXHIBITS:**

Exhibit A:      Financial Statements
Exhibit B:      Franchise Agreement
Exhibit C:      List of Current Franchisees and Franchisees Who Have Left the System
Exhibit D:      List of State Agencies and Agents for Service
Exhibit E:      State-Specific Addenda
Exhibit F:      Operations Manual Table of Contents
Exhibit G:      Nondisclosure and Noncompetition Agreement
Exhibit H:      Statement of Franchisee
Exhibit I:      General Release
Exhibit J.      APSA Purchase Agreement
Exhibit K:      Receipt

## ITEM 1: THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

To simplify the language in this Franchise Disclosure Document, "La **Rosa Realty**" or "**we**" or "**us**" or "**Franchisor**" means La Rosa Franchising, LLC. "**You**" or "**Franchisee**" means the person, corporation, partnership or other business entity that buys the Franchise. If you are a business entity, "you" includes your owners.

**The Franchisor, Predecessor and Affiliates**

La Rosa Franchising, LLC is a Florida limited liability company formed on November 11, 2017. We do not do business under any other name. Our principal business address is 1420 Celebration Blvd., Suite 200, Celebration, FL 34747. We intend to begin offering franchises for La Rosa Realty businesses in the states of California, Florida, Georgia, New York, South Carolina and North Carolina in 2019. We have not offered franchises in other lines of business. While we do not operate a La Rosa Realty franchise, some of our Affiliates (described below) operate La Rosa Realty businesses located throughout the states of California, Florida, Georgia, New York, South Carolina and North Carolina. Currently, twenty-eight (28) non-franchised locations are in operation. We do not have a parent.

We currently have the following affiliates ("**Affiliates**").

La Rosa Development Corp. ("**Development Corp**") is a Florida corporation formed on July 9, 2004 between Joseph La Rosa and Michael La Rosa (Joseph La Rosa's brother). Development Corp develops and owns separate properties and does not operate La Rosa Realty businesses.

La Rosa Realty, LLC ("**Realty LLC**") is a Florida limited liability company formed on August 18, 2004. Realty LLC is a real estate brokerage business operating in the state of Florida similar to the business you will operate.

La Rosa Coaching, LLC ("**Coaching LLC**") is a Florida limited liability company formed on January 18, 2017. Coaching LLC provides real estate brokerage training and related services to real estate brokerage businesses, including our franchisees.

Advantage International Title, LLC ("**Title LLC**") is a Florida limited liability company formed on February 18, 2014. Title LLC is a title agency. Title LLC provides title, escrow and related services to real estate brokerage businesses, including our franchisees.

La Rosa CRE, LLC ("**CRE**") is a Florida limited liability company formed on May 2, 2019. CRE provides commercial real estate brokerage services and related commercial training and management services to real estate brokerage businesses, including our franchisees.

La Rosa Insurance, LLC ("**Insurance LLC**") is a Florida limited liability company, formed December 27, 2012. Insurance LLC provides homeowner's, auto, and health insurance and related services to real estate brokerage businesses, including our franchisees.

La Rosa Property Management LLC ("**Property Management LLC**") is a Florida limited liability company, formed September 5, 2014. Property Management LLC provides residential and commercial

Next Generation Advanced Commissions, LLC ("**Next Generation**") is a Florida limited liability company formed July 23, 2015. Next Generation provides Agents the opportunity to request an advance on upcoming commissions from future transactions and related services to real estate brokerage businesses, including our franchisees.

La Rosa Realty Network, LLC ("**Realty Network**") is a Florida limited liability company formed July 21, 2005. Realty Network holds licensed real estate Sales Associates licenses in Florida to maintain active status in the State of Florida and ancillary services to real estate brokerage businesses, including our franchisees.

La Rosa Realty New York, LLC ("**Realty New York**") is a New York limited liability company formed June 1st 2012. Realty New York operates a real estate brokerage business in the State of New York substantially similar to the business you will operate.

La Rosa Realty California, LLC ("**Realty California**") is a California limited liability company formed April 10, 2017. Realty California operates a real estate brokerage business in the State of California substantially similar to the business you will operate.

La Rosa Realty South Carolina, LLC ("**Realty South Carolina**") is a South Carolina limited liability company formed January 31, 2018. Realty South Carolina operates a real estate brokerage business in the State of South Carolina substantially similar to the business you will operate.

La Rosa Realty Georgia, LLC ("**Realty Georgia**") is a Georgia limited liability company formed July 10, 2018. Realty Georgia operates a real estate brokerage business in the State of Georgia substantially similar to the business you will operate.

We share an address with all of our Affiliates.

Our agent and address for service of process in Florida is 1420 Celebration Blvd., Suite 200, Celebration, FL 34747, **Joseph La Rosa, 321-939-3748**. Our other agents for service of process are disclosed on Exhibit D.

**The Business**

We offer franchises for the use of our "La Rosa Realty" trademarks, trade names, service marks and logos ("**La Rosa Marks**" or "**Marks**") in the operation of La Rosa Realty businesses ("**La Rosa Realty businesses**"). The La Rosa Realty business is operated under a business format per a unique system, including our valuable know-how, information, Trade Secrets, methods, Operations Manual, standards, designs, methods of trademark usage, copyrights, sources and specifications, confidential electronic and other communications, methods of Internet usage, marketing programs, and research and development connected with the operation and promotion of La Rosa Realty businesses ("System"). We reserve the right to change or otherwise modify the System at any time. Each La Rosa Realty business offers residential and commercial real property purchasers and sellers a variety of services in the real estate industry.

You must operate your La Rosa Realty business per our standard business operating practices and sign our standard franchise agreement ("**Franchise Agreement**"). We reserve the right to add, modify, or delete any Services that you must offer or sell at your La Rosa Realty business at any time. You must also obtain all necessary permits, licenses and approvals to operate your La Rosa Realty business, including a license to operate as a real estate broker as required by each state in which your La Rosa Realty business is located.

As a franchise operator, you may operate one La Rosa Realty business for each Franchise Agreement you sign with us. However, you will be permitted to open branch offices ("**Branch Offices**") in your Territory as part of your La Rosa Realty business. As such, unless stated otherwise, the fees listed below apply to each La Rosa Realty business for which you sign a Franchise Agreement rather than each Branch Office you open under the same Franchise Agreement.

**Regulations**

There are specific regulations pertaining to operating in the commercial and residential real estate industry and you must comply with all local codes, regulations and licensing requirements. Local and state authorities may require you to obtain a real estate broker's license to operate a La Rosa Realty business. Some states also require franchised real estate brokers to identify themselves as franchised real estate brokers when offering Services to the public. You should consult with local agencies and/or your attorney. You must obtain all required licenses and permits and ensure that your employees, agents, and others providing commercial and residential real estate services to customers on behalf of your La Rosa Realty business have all required licenses and permits. The failure to maintain the proper licensing is a material breach of the Franchise Agreement. You should familiarize yourself with these laws before deciding to purchase a franchise and license to operate a La Rosa Realty business from us.

**Market Competition**

The System presently focuses on providing real estate services to the public. You will have to compete with other real estate brokerage businesses including franchised operations, national chains, independent real estate brokers and agents and independently owned real estate companies offering real estate services to residential and commercial customers. You will also face normal business risks that could have an adverse effect on your La Rosa Realty business.

The success of the System is dependent on key personnel, the loss of whom could have an adverse effect on us. Our ability to fulfill our obligations under our Franchise Agreement depends in part on our present and future financial condition. Litigation risks also exist, which may not be foreseeable.

**Existing La Rosa Realty, LLC Business Locations**

It is our intention to initially offer La Rosa Realty business franchises to exiting real estate brokers now working for our affiliate, La Rosa Realty, LLC. Whether or not you are such a broker, if purchasing an existing business from La Rosa Realty, LLC, you shall be required to purchase from La Rosa Realty, LLC the furniture, fixtures and equipment then existing being utilized at the business location being operated by La Rosa Realty, LLC, which location shall be sold, leased, subleased or otherwise transferred and assigned to you in conjunction with you entering into a franchise agreement with us. The form of the purchase agreement with La Rosa Realty, LLC is attached hereto as Exhibit J. Such form is provided as a general guide since each existing business is unique and there are variables that may require divergent terms and conditions.

### ITEM 2: BUSINESS EXPERIENCE President and Founder- Joseph La Rosa

Mr. La Rosa has been our President and Founder since our formation on January 18, 2017. Additionally, he has served as the President of La Rosa, LLC since its formation on August 8, 2004 in Celebration, FL. Mr. La Rosa has also served as the President of U. S. Groundworks Corp., a Florida corporation May 2002 to June of 2004 located at 1012 Banks Rose St., Celebration, FL 34747. Mr. La Rosa is also the President or Vice President of each of the Affiliates listed in ITEM 1, other than Advantage International Title, LLC, which is independently managed and operated by Graciela La Rosa, and Mr. La Rosa is a manager of both of the Affiliates, Realty New York and Realty California.

**Director of Operation – Laverne Grajales**
Laverne has been a part of the La Rosa Realty family since 2013. She started with La Rosa Realty in the position of Recruiting Director. During her time in this role the number of La Rosa Realty agents tripled. Laverne Grajales currently works as the Director of Operations assisting Joe La Rosa oversee the operations of multiple offices in multiple states.  Prior to her time with La Rosa Realty, Laverne worked in a Managing role for a post-secondary college, as an Executive Assistant for 11 years, and a Preschool Director with a team of 11 teachers and 100 students.

**Director of Marketing – Brian David Kirkwood**

Mr. Kirkwood is the current Director of Marketing for Realty LLC since July 2016. Prior to that Mr. Kirkland worked as a  Production Assistant and Tour Facilitator for the Disney Institute from August 2012 through February 2015 and as a Guest Correspondence and Billing Associate for Walt Disney World from July 2013 through August 2014. He has also worked as a freelance Social Media and Blog Content Specialist since September of 2010.

**Comptroller – Stacey H. Stuck**

Ms. Stuck has been the Controller for Realty LLC since September of 2018; was the Accounting Manager for Magic Development LLC from July 2017 until September 2018; and was the Business Manager of New Castle, PA Community YMCA from September 2015 to April 2017. Prior to that Ms. Stuck was an Accounting Specialist and Accounts Payable/Receivable Supervisor for Contessa Premium Foods from July 2012 through March 2016.

**Marketing and I.T. Associate – Ryan Ramesra**

Mr. Ramesra is the current IT Specialist for La Rosa Companies and he has been with the company since October 2012. Prior to that Mr. Ramesra has worked as a real estate marketing assistant From August 2010 to August 2012 and as a Property Manager from 2004 to Present.

**Director of Recruiting & Team Leader – Aileen Guzman**

Ms. Guzman has been a Licensed Real Estate Associate since August of 2001 and is currently a Team Leader for Realty LLC having started in April of 2015 and took on the additional role of Director of Recruiting in June of 2018. Before that she was a Licensed Real Estate Associate for Charles Rutenberg Realty from February 2012 to August of 2013.

## ITEM 3: LITIGATION

No litigation is required to be disclosed in this Item.

## ITEM 4: BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5: INITIAL FEES

You must pay us an initial franchise fee ("**Initial Franchise Fee**") of $10,000 for your first La Rosa Realty franchise business, which is payable when you sign a Franchise Agreement and is not refundable under any circumstances. We will negotiate with you before you sign your Franchise Agreement regarding the size of your Territory and the number of Branch Offices you may open in the Territory. During our last fiscal year, no franchised outlets were opened and we collected no Initial Franchise Fees.

## ITEM 6: OTHER FEES

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fees (2)† | The Royalty Fee you pay us is calculated as the greater of:<br><br>(i) 10% of the aggregate total of: the net monthly fees and - other transaction fees charged to Agents by Franchisee (including any La Rosa Coaching Fees, if received by Franchisee), payable each month or partial month of the Initial Term of the Franchise Agreement and any Interim Period;<br><br> or<br><br>(ii) $500 per month. | Payable monthly on or before the 10th of each month. | Calculated on the any and all fees or charges paid by Agents to Franchisee, excluding (a) the Annual Membership Fee, (b) the La Rosa Coaching Fee if payable to Franchisor, and (c) the Commercial Real Estate Transaction Fee payable to La Rosa CRE. |

DocuSign Envelope ID: B95FB5BD-FBE7-4DAE-B76F-D12C259B10AA

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Annual Membership Fee(3) † | Annual Membership Fee of $50 (prorated for any partial year) to be paid by each of your Agents. but we reserve the right to increase this amount by no more than $10 per Agent per year. | Due annually on or before the 10th day of January (prorated for any partial year and payable within 10 days after each agent commences his or her association with you if other than January 10th. | We reserve the right to increase the Annual Membership Fee annually, but such increase will not exceed $10 per year. If any agent fails to pay an Annual Membership Fee when due, then you will pay such fee on demand from us. |
| La Rosa Coaching Fee † | 20% of Gross Commission Income of an Agent on 1st three (3) Real Estate Transactions | At Closing of Transactions | Paid by Franchisee's Agents either to Franchisor or to Franchisee, whichever party has provided La Rosa Coaching to Agents.<br><br>Gross Commission Income is defined in Note 1 below. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Additional Assistance (7)† | $500-$1000 per person per day plus travel expenses, lodging and meals. | Payable 10 days after billing. | If requested, we can provide additional assistance on site. |
| Training for Administrative Personnel(8)† | $250 - $500 per person. | Payable before the beginning of the Initial Training Program. | Training for two (2) people is included in the Initial Franchise Fee. Franchisees administrative personal may attend the Initial Training and will be charged $500 per person for a full week of attendance and/or $250 per person attending training 3 days or less. For all subsequent trainings during the Initial Term and/or Successor Terms of the Agreement at Franchisor's training facility, each person in attendance will be charged at a rate of $500 per person for 4 days or more and $250 per person for 3 days or less. |
| Transfer Fee† | $1,000. | Before acceptance of transfer. | Payable before you transfer your franchise. |
| Successor Franchise Fee† | $5,000. | Upon signing the Successor Franchise Agreement. | For each renewal option. |
| Audit† | Cost of audit plus late fee of 5% interest per month on understated amount. | 30 days after billing. | Payable only if audit shows an under-statement of at least $1,000.00 of Gross Commission Income for any month. |
| Indemnification† | Will vary under circumstances. | As incurred. | You must reimburse us if we are held liable for claims arising from your La Rosa Realty franchise business |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Cost of Enforcement or Defense† | All costs including accounting and attorney's fees. | Upon settlement or conclusion of claim or action. | You must reimburse us if we are required to incur any expenses in enforcing our rights against you under the Franchise Agreement. |
| Late Fee | 5% of the amount of any late payments. | As incurred. | Applies after any payments are due and unpaid. |
| Interest† | 1½% per month on the late amount. | As incurred. | Begins to accrue after any payments are due and unpaid. |
| Late Report Fee† | The higher of 5% of the reported amount or $100 per violation. | As incurred. | Payable only if a required report or financial statement is not delivered when due. |
| Technology Fee† | Currently $14 per month per Agent for access to customer relationship management online software, but we reserve the right to increase this amount by no more than $10 per Agent per month each year. | Payable monthly on or before the 10th of each month. | This fee may be increased by us when we add new technology or services. |
| Commercial Real Estate Transaction Fee † | Currently $10 per month per Agent for all Agents generating a commercial transaction, plus a current $300 per transaction, plus 10% of the GCI on each transaction | Payable monthly and/or at the close of a transaction | Payable to our Affiliate, La Rosa CRE, LLC, which fees may be increased or otherwise modified as determined by La Rosa CRE, LLC |
| MLS/RETS Fee† | Estimated at $250 per MLS Per calendar quarter for each Central and Branch Office operated by you. | Payable each calendar quarter on or before the 10th of each calendar quarter. | Payable for each calendar quarter from and after the Opening Date. |
| Local Advertising (5) | Will vary under circumstances | As incurred. | You must agree to spend moneys for local advertising and promotions in the Territory in accordance with local marketing standards and practices. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Domain Name Fee | Equal to our expense in securing and maintaining your franchise specific domain name. | Payable annually or per domain registration terms. | We will only charge you what we pay to secure and maintain your domain name. |
| Additional Computer Training | Will vary based on length and type of course. | Prior to training. | You must take a computer training class at a local computer school (which may be an Affiliate of ours) if we determine that you do not have sufficient skills to operate your computer, understand how to use the software, and access e-mail and the Internet. |
| Seminars, Conventions or Programs(9) | The estimated range of costs is $500-$1,000 plus materials estimated at $100. | As incurred. | We reserve the right to conduct periodic meetings of all Franchisees. |

†       Denotes fees that are imposed and payable to us or our Affiliates, vendors and suppliers. All fees paid to us or our Affiliates are non-refundable under any circumstances once paid except as provided. Fees paid to vendors or other suppliers may or may not be refundable depending on your vendors and suppliers. We reserve the right to require you to pay fees and other amounts due to us via electronic funds transfer or other similar means, as described in the Franchise Agreement. If payments are required in this method, you must comply with our procedures and perform all acts and deliver and sign all documents, including authorization (in the form attached to the Franchise Agreement as **Attachment 6** or any other form that we may accept) for direct debits from your business bank operating account, which may be necessary to assist in or accomplish payment by this method. Under this procedure, you will authorize us to initiate debit entries and/or credit correction entries to a designated checking or savings account for payments of fees and other amounts payable to us and any interest that may be owed. You must make the funds available to us for withdrawal by ACH electronic transfer no later than the payment due date. If you have not timely reported your La Rosa Realty business's Gross Commission Income to us for any reporting period, then we will be authorized, at our option, to debit your account for (a) the fees transferred from your account for the last reporting period for which a report of the La Rosa Realty business's Gross Commission Income was provided to us, or (b) the amount due based on information retrieved from the electronic data polling of your computer systems.

**Notes:**

(1)     **Gross Commission Income**. In this Disclosure Document, Gross Commission Income means the total of all commissions, transaction fees, property management fees, and monthly fees collected or receivable by Franchisee and Franchisee's independent sales associates, agents, representatives, contractors, employees, partners, directors, officers, Owners, or Franchisee's Affiliates, regardless of whether or not such individuals or Affiliates are entitled to retain all or part of such Gross Commission Income, directly or indirectly, in connection with the Business (earned in compliance with all applicable laws) including, but not limited to, transactions and provision of services for which a real estate or auctioneer's license (including appraisal, title or escrow services) is required, the sale or provision of products or services that we or any of our Affiliates develop or make available to you directly or through a third party, monthly fees or additional transaction fees charged to agents by the Franchisee (such as, but without limitation, Transaction Fees and Coaching Fees), Property Management Services, and/or any transaction, sale and/or service in which the Marks or the System is used in any manner, without deducting any of your multiple listing fees, advertising costs, commissions, overrides, bonuses, salaries, gifts, or any other costs or expenses and other receipts and fees from its Agents and from all other sources (including but not limited to referral fees and finder's fees received from brokers or agents in other brokerage companies) which are derived from the sale, lease, transfer or other disposition (including like-kind exchanges, barter exchanges, or other exchanges of property not involving money) of Real Property, including any note, obligation, lien or other consideration given to Franchisee in lieu of a commission and insurance claims for lost profits if a claim is paid by the insurer.

a. Gross Commission Income does not include: (1) any commissions and referral fees paid to cooperating or referring brokers in other brokerage companies; (2) the amount of any tax imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers, provided that the amount of any tax is shown separately and in fact paid by the Franchisee to the appropriate governmental authority; and (3) fair market rent paid by Franchisee's Agents for the lease of office space at Franchisee's Central Office or Branch Office locations; and

Gross Commission Income will be deemed received at the earlier of the closing of any transaction described above or when payment for any Services is received by Franchisee or an Agent. Gross Commission Income consisting of property or services will be valued at the fair market value of the property or services at the time that they are received.

(2) **Royalty Fees**. Your payment of the Royalty Fees to Franchisor based on Gross Commission Income as, subject to appropriate exclusions and deductions as follows:

a monthly royalty fee ("**Royalty Fee**") equal to the greater of:

(a) 10% of Gross Commission Income for each month or partial month of the Initial Term of the Franchise Agreement and any Interim Period (as defined in the Franchise Agreement), after deduction of:

(i) the amount of the commissions or other fees actually paid to or received by Franchisee's Agent, and

(ii) the other minimum monthly fees or charges [such as, but not limited to, Annual Membership Fee, Marketing Fees (as defined in Section 12.1of the Franchise Agreement), Domain Name Fee, MLS/RETS Fee and Technology Fee] payable to Franchisor by Franchisee or by its Agents pursuant to the Franchise Agreement; or

(b) $500 per month.

For purposes of clarification, the amount of any fees charged to Agents by Franchisee in excess of the minimum of such fees or charges payable to Franchisor, shall be included in Gross Commission Income.

(3) **Annual Membership Fee**. Franchisee shall pay to us an annual membership fee ("Annual Membership Fee") for each Agent retained by you. We reserve the right to increase the Annual Membership Fee on an annual basis. The Annual Membership Fee will be payable by each of your Agents, although if your Agents do not pay the Annual Membership Fee when due, you will be required to pay this fee on demand from us.

(4) **Branch Office Fee**. You may, in a manner consistent with your Franchise Agreement, open Branch Offices in your Territory. At some point in the future, we anticipate initiating an Branch Office annual fee ("Annual Branch Office Fee") although we do not anticipate initiating that fee in 2019.

(5) **Local Advertising**. We will provide guidelines for Local Advertising. Local Advertising expense does not include the costs of advertising homes or commercial property for sale by your La Rosa Realty business, costs for recruiting agents or other advertising expenses related directly to the sale of residential or commercial property.

(6) **Cooperatives**. Cooperatives will be composed of all franchised and company-operated La Rosa Realty businesses located in a designated market area. If a Cooperative is established, contributions to the Cooperative will be determined by a vote of the members of the Cooperative. We anticipate that each franchisee will have one vote for each Central Office and Branch Office of the La Rosa Realty business operated by the member in the designated market. No Cooperatives have been established as of the date of this Franchise Disclosure Document.

(7) **Additional Assistance**. The Initial Franchise Fee includes between two (2) and three (3) business days of initial training for you or, if you are a legal or business entity and one additional person such as a Designated Business Manager. You will be responsible for all wages, benefits, and travel expenses for all participants attending the initial training program including airfare, lodging, meals, ground transportation and personal expenses. The training will be at our Florida headquarters or another location designated by us. After completion of the initial

training, we will provide additional telephone assistance to you at no cost. If you require or request additional on-site assistance beyond what is provided by us, you can request that we send a representative to provide further assistance to you. If we provide additional assistance at your request, we must agree in advance to the charges you will pay and the length of the visit. The cost of additional assistance will depend on your needs and the amount of assistance you desire. We may also require you to receive additional assistance if you are not meeting our requirements or if we determine pre- opening assistance is required, or if we determine that it is necessary for us to provide additional assistance to you to keep the System competitive. This additional assistance will be at your expense as described above. Our current published rate in our Operations Manual for additional assistance is $500-$1000 per person per day plus the cost of travel and room and board, but we reserve the right to adjust that rate periodically in our Operations Manual.

(8)       **Training for Administrative Personnel**. We provide initial training for two people for between two (2) and three (3) business days with no additional training fee. If you want administrative personnel to attend the initial training program, we will charge a training fee of $500 per person for (3) business days of training or$250 per person for two (2) days or less of training. Training fees can be increased or decreased by us at any time. You will also need to pay for airfare, lodging, ground transportation, meals, salary and benefits, and other personal expenses for each person attending the initial and recurring training program.

(9)       **Seminars, Conventions or Programs**. This figure is an estimate of the conference fees that you will pay to us (estimated to be between $250-$500 per person) to attend seminars, conventions or programs that we put on. This does not include the travel and living expenses that you and your representatives incur in attending these seminars, conventions or programs.

(10)     "**Opening Date**" means the first of the following to occur on or after the date on which we sign the Franchise Agreement:  you begin to offer any Services, you collect any Gross Commission Income, you use any Mark, you open any Office, 120 days after the date on which we sign the Franchise Agreement; or, you otherwise engage in a La Rosa Realty business.

ITEM 7: ESTIMATED INITIAL INVESTMENT YOUR ESTIMATED INITIAL INVESTMENT

STANDARD FRANCHISE – CENTRAL OFFICE

| Type of Expenditure(1) | Low Amount | High Amount | Method of Payment | When Due | To Whom Payment is to be Made |
|---|---|---|---|---|---|
| Initial Franchise Fee(2) | $10,000 | $10,000 | Lump sum | Upon signing the Franchise Agreement | Franchisor |
| Travel and living expenses while training(3) | $2,000 | $3,000 | As incurred | As incurred during training | Airlines, hotels, restaurants |
| Computer hardware and software(4) | $100 | $25,000 | Lump sum | At delivery | Franchisor ,Suppliers, Vendors |
| Supplies(5) | $1,500 | $5,000 | Before opening and as needed | At delivery | Suppliers |
| Opening promotional expense (6) | $1,000 | $35,000 | As incurred | Varies times | Vendors |
| Office Lease(7) | $1,000 | $10,000 | As incurred | As negotiated | Landlord |
| Leasehold Improvements/ Construction(8) | $100 | $150,000 | Negotiable | Negotiable | Landlord and Contractors |
| Furniture, Fixtures, and Equipment(9) | $5,000 | $20,000 | Lump Sum Negotiable | As Invoiced | Vendors |

| Insurance, Security and Utilities Deposits, Dues, Licenses(10) | $2,500 | $10,000 | Lump Sum Negotiable | As Incurred | Landlord/ Utilities |
|---|---|---|---|---|---|
| Exterior Office | $500 | $10,000 | As incurred | At delivery | Vendors |
| Additional Funds– (11) | $5,000 | $25,000 | As incurred | Varied times | Suppliers, Utilities |
| TOTAL(12) | $23,700 | $278,000 | | | |

**Notes:**

(1)     **Estimated Expenses.** The high and low ranges in the table are based on an average for a one office La Rosa Realty business for the first three months of operations. If you open Branch Offices, your costs for opening each Branch Office will be similar to these costs. Fees and expenses paid to vendors or other third parties may or may not be refundable depending on the arrangements you make with them.

(2)     Initial Franchise Fee. The Initial Franchisee Fee is $10,000 for a standard franchise. The Initial Franchise Fee is due when you sign the Franchise Agreement. This fee is non-refundable once paid except as provided in Item 5.

(3)     **Travel and Living Expenses** While Training. We provide training for two (2) people for between two (2) to three (3) business days at our corporate office located in Celebration, Florida or at another location designated by us. You must pay for airfare, meals, transportation costs, salaries, benefits, lodging and incidental expenses for all initial training program attendees. You will be required to pay a training fee (See Item 5) to us if you request that we provide training to more than two (2) people.

(4)     **Computer Hardware and Software.** The estimated initial investment includes costs related to the purchase of specified computer Hardware and Software. If we require, you must provide us with electronic access to certain daily information.

(5)     **Supplies.** Your initial supplies will typically include form contracts, signs, and marketing materials. We have the right to change the supplies at any time.

(6)     **Opening Promotional Expenses.** These figures represent an estimate of the costs associated with opening and promoting your La Rosa Realty business and include business cards, stationary, nametags, pre-event kick-off dinner, promotional event, promotional materials, catering, entertainment, etc.

(7)     **Office Lease.** You must lease space in a commercial office building from which to operate your La Rosa Realty business. We do not provide you with any site selection assistance in this process. We must approve your proposed Central Office and any Branch Office locations.

(8)     **Leasehold Improvements/Construction.** Your office space must satisfy appearance and size standards that we have established and meet the requirements necessary to conduct a La Rosa Realty business. You must open the Central Office within 120 calendar days from the date you sign the Franchise Agreement, unless we otherwise approve additional time in writing. The actual cost of the office space and improvements will depend on whether you lease or purchase the space, the size, condition and location of the Central Office premises, the demand for the premises among prospective lessees and the type of tenant finish or improvement you choose.

(9)     **Furnishings, Fixtures and Equipment.** You will have to purchase or lease furnishings, fixtures and equipment for your office location. We do not provide you with any assistance in this process, and we do not have any relationships with vendors that may be of use to you in this process.

(10)     **Insurance, Security and Utilities Deposits, Dues, Licenses.** These amounts include the cost of insurance, estimated security deposit for your office (equal to one months' rent) and utility deposits. The actual amount of your insurance and these deposits will vary depending on local landlord practices and other factors. These amounts also

include the estimated cost of obtaining a license from a state agency to act as a real estate broker and dues to local, state and national real estate organizations.

(11)     **Start-Up Expenses and Working Capital.** This is for budgeting purposes only to account for unanticipated expenses. This amount includes estimated operating expenses you should expect to incur during the first three months of operations, not including any revenue generated by your La Rosa Realty business. It includes Office lease expenses, royalties, advertising, payroll costs, deposits, fees for city, state and local business licenses, business entity organization expenses, other prepaid expenses, accounting and professional fees, and other operational expenses. These figures do not include any taxes that you may pay. You should check with your local and state governmental agencies for any taxes that may be assessed.

(12)     **Total Estimated Initial Investment.** These figures are estimates only and reflect only the first three months of operations. You should review these figures carefully with a business advisor before making any decision to purchase the La Rosa Realty business. You may incur additional expenses starting your La Rosa Realty business. Your costs depend on several factors, including how well you follow our methods and procedures; your management skill, experience and business acumen; local economic conditions; the local market for our Services; the prevailing wage rate; competition; and sales levels reached by your La Rosa Realty business during the initial period.

The figures above are estimates of your initial investment and are based on our estimate of nationwide costs and market conditions prevailing as of the date of this Franchise Disclosure Document. You must bear any deviation or escalation in costs from the estimates that we have given. You should review these figures carefully with a business advisor before making any decision to purchase a franchise. Many factors that are unique to your location can make a dramatic difference in the estimates provided. The availability and terms of financing depend on several factors, including the availability of financing generally, your creditworthiness, collateral you may have and lending policies of financial institutions.

### ITEM 8: RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

We have standards and specifications for your Office, equipment, dress code, supplies, forms, Services, advertising and marketing materials, signage, and most other services and Products used in, sold or provided through your La Rosa Realty business. To maintain our standards of consistent, high quality Services, customer recognition, advertising support, value and uniformity in La Rosa Realty businesses, you must purchase or lease all of your required equipment, Software, Hardware, supplies, fixtures, Services and Products used in or sold through your La Rosa Realty business, per our specifications and standards, only from us or our Approved Suppliers and distributors. With the exception of the arts graphics package that we will provide you, we are not an approved supplier, but we reserve the right to become an approved supplier at any time. One of our officers owns an economic interest in:(a) CRE, LLC, an approved provided of commercial real estate services and educational offerings; (b) Coaching LLC, an approved supplier of real estate education services; (c)Property Management LLC is an Approved Supplier of residential and commercial property management services; (d) Insurance LLC is an Approved Supplier of Insurance services;(e) Advanced Commissions, LLC, an approved supplier of offering Advanced Real Estate Commissions services; (f) Title Insurance, LLC, an approved supplier of Title Insurance services; We may derive revenue from your purchases or leases of computer related Hardware, Software, goods, services, supplies, fixtures, equipment, inventory and Products from our Approved Suppliers and distributors. You must buy computers, Software, Hardware, computer related services, Products, equipment, supplies, fixtures, inventory, goods and services ("Required Products and Services") that meet our requirements as detailed in the Operations Manual. In some instances, you will be required to purchase certain Required Products and Services from us or from specific suppliers previously approved by us. ("Approved Suppliers") and/or specific providers designated by us, including us and our Affiliates ("Designated Suppliers"). Approved Suppliers and Designated Suppliers will be identified in the Operations Manual. If we have appointed Approved Suppliers or Designated Suppliers with respect to Required Products or Services, you may not purchase such Product or Service from anyone other than an Approved Supplier or Designated Supplier without prior written approval. We will respond to requests for approval to do so within 30 days from the date the request is received. You must submit all information, specifications, and samples that we may request regarding a supplier, service, or Product proposed by you. The general criteria we apply in approving a proposed supplier involve the ability of the supplier to provide sufficient quantity of Product at a competitive price and the proposed supplier's dependability and general reputation. We may revoke approval of an Approved Supplier if that supplier no longer meets these general criteria.

We estimate that the purchase of these computers, Software, Hardware, computer related services, supplies, equipment, inventory, fixtures, goods, services and Products from us or our designated or approved sources, or those meeting our standards and specifications, will be approximately 5% to 15% of your total cost to establish a La Rosa Realty business and 5% to 25% of your total cost of operating a La Rosa Realty business (not including amortization, depreciation, or replacement of worn or obsolete improvements, equipment or fixtures). We did not derive any revenues from sales of goods and services to franchisees during 2017 or 2018.

Franchisees must license from us or our Affiliates, Approved Suppliers, or Designated Suppliers certain proprietary computer programs and related materials developed for use in the operation of La Rosa Realty business ("Software"). We may require you to pay a separate license fee for the Software, as set forth in Item 11. We also charge you a Technology Fee with respect to the Software and other technology employed at your La Rosa Realty business.

You may use the Software only on computer equipment and Hardware purchased through our Affiliates, Designated Suppliers, Approved Suppliers, or obtain our written approval to purchase other equipment. We will respond to requests for approval to purchase equipment other than the Computer System within 30 days from the date the request is received.

We do not have any purchasing or distribution co-operatives as of the date of this Franchise Disclosure Document. We may negotiate purchase arrangements with suppliers and distributors of approved Products for the benefit of our franchisees and we reserve the right to receive rebates and other payments or volume discounts based on your purchases from these suppliers and distributors and from our purchase of Products that we may re-sell to you. We do not provide material benefits, such as renewing or granting additional franchises to franchisees, based on their use of our Affiliates, Designated Suppliers, or Approved Suppliers.

**Insurance**

You must procure and maintain, at your own expense, insurance policies protecting you, us, our designated Affiliates, and the owners, officers, directors and employees of us and our designated Affiliates against any loss, liability, errors and omissions, business interruption, personal injury, death, property damage, or expense resulting from the operation of your La Rosa Realty business and all services you provide in connection with the operation of your La Rosa Realty business as we may require for your and our protection in amounts set forth in the Operations Manual and Franchise Agreement (which may be adjusted periodically). You must carry, at all times, no less than $1,000,000 per occurrence/$2,000,000 aggregate in Commercial General Liability ("CGL") insurance coverage and add Franchisor, its officers, directors, employees, agents, and contractors as additional insureds to those policies. You must also procure and maintain all other insurance required by state or federal law, including workers compensation insurance and unemployment insurance. The policies must also stipulate that we receive a 30-day prior written notice of cancellation or non-renewal and must contain endorsements by the insurance companies waiving all rights of subrogation against us. Original or duplicate copies of all insurance policies, certificates of insurance, or other proof of insurance acceptable to us including original endorsements affecting the coverage required by us will be furnished to us together with proof of payment within 10 days of issuance. You will also furnish us with certificates and endorsements evidencing this insurance coverage within 10 days after each of the following events: at all policy renewal periods, no less often than annually, and at all instances of any change to, addition to, or replacement of any insurance. The certificates and endorsements for each insurance policy are to be signed by a person authorized by that insurer to bind coverage on its behalf. All certificates and endorsements are subject to approval by us. If you fail to procure and maintain the required insurance coverage, we have the right and authority to procure the insurance coverage on your behalf and charge you, which charges, together with a reasonable fee for our expenses incurred in this procurement, you will pay immediately upon notice.

**Brokerage Training**

You must use our Affiliate, **Coaching LLC**, for the purposes of training all new Agents and/or those Agents who have closed less than three (3) transactions within a preceding twelve (12) month period.  Coaching LLC charges a fee equal to 20% of the Agent's Gross Commission for the Agent's first three (3) transactions.

**Title Work**

DocuSign Envelope ID: B95FB5BD-FBBF-4DAE-B76F-D12C252B10AA

You are not required to, but it is recommended that, refer clients to our Affiliate, **Title LLC**, to act as the title agency for title and closing of transaction in which you are involved. You may not promote any other title company.

**Commercial Real Estate**

You must contract with our Affiliate, **CRE**, to oversee and assist in all commercial real estate transaction in which you are involved.

**Home Mortgage Lenders**

You are not required to, but it is recommended that, you refer clients to our then approved lender for home mortgages to your clients. You may not promote any home mortgage lender not approved by us.

**Insurance**

You are not required to, but it is recommended that, refer clients to our Affiliate, **Insurance LLC**, to provide homeowner's, auto, and health insurance coverages to your clients. You may not promote any other insurance company.

**Property Management**

You must contract with and use our Affiliate, **Property Management LLC**, to provide all residential and commercial property management services to your clients.

**Advance Commissions**

You are not required to use **Next Generation**, but you may be able to utilize the opportunity to request an advance on upcoming commissions from future transactions and related services to real estate brokerage businesses, including our franchisees. You may not promote any other company that competes with Next Generation.

## ITEM 9: FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.

| Obligation | Section in Franchise Agreement | Disclosure Document |
|---|---|---|
| a.  Site selection and acquisition/lease | Section 1 and Section 9 | ITEM 11 |
| b.  Pre-opening purchases/leases | Sections 9 and 10 | ITEM 8 & ITEM 11 |
| c.  Site development and other pre-opening requirements | Section 9 | ITEM 6, ITEM 7 & ITEM 11 |
| d.  Initial and ongoing training | Sections 8 and 9 | ITEM 11 |
| e.  Opening | Section 9 | None |
| f. Fees | Sections 6, 7 and 12 | ITEM 5 & ITEM 6 |
| g.  Compliance with standards and policies/Operations Manual | Section 9 | ITEM 11 |
| h.  Trademarks and proprietary information | Section 11 | ITEM 13 & ITEM 14 |
| i. Restrictions on services offered | Sections 9 and 10 | ITEM 8 & ITEM 16 |
| j. Warranty and customer service requirements | None | None |

18

| | | |
|---|---|---|
| k. Territorial development | Section 5 | ITEM 11 & ITEM 12 |
| l. Ongoing purchases | Section 9 and 10 | ITEM 16 |
| m. Maintenance, appearance and remodeling requirements | Sections 4 and 9 | ITEM 7 |
| n. Insurance | Section 13 | ITEM 8 |
| o. Advertising | Section 12 | ITEM 11 |
| p. Indemnification | Sections 11 and 13 | None |
| q. Owners participation/Management/ staffing | Section 9 | ITEM 15 |

| Obligation | Section in Franchise Agreement | Disclosure Document |
|---|---|---|
| r. Records/reports | Section 7 | ITEM 6 & ITEM 17 |
| s. Inspection/audits | Sections 7, 8 and 9 | ITEM 6 |
| t. Transfer | Section 16 | ITEM 17 |
| u. Renewal | Section 4 | ITEM 17 |
| v. Post-termination obligations | Sections 11 and 18 | ITEM 17 |
| w. Non-competition covenants | Section 15 | ITEM 17 |
| x. Dispute resolution | Section 20 | ITEM 17 |

## ITEM 10: FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease, or obligation.

## ITEM 11: FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

Except as listed below, Franchisor is not required to provide you with any assistance.

**Pre-opening Obligations**

Before you open your La Rosa Realty business, we (or our designee) will provide the following assistance and services to you.

Designate your Territory. (Section 8.3(a) of the Franchise Agreement and **Attachment 1** to the Franchise Agreement).

Furnish you with (or provide you with the ability to acquire from approved vendors or suppliers) specific items for the design and physical appearance of your Office and the supplies required for the operation of the business.(Section 8.3(c) of the Franchise Agreement).

Within 90 days of your signing the Franchise Agreement and your receipt of all required licenses and permits, we will conduct a two (2) to three (3) business days training course for you and one additional person in Celebration, Florida or at your Office. The training program may or may not be conducted on consecutive days. If you are not an

individual, we will conduct a two (2) to three (3) day business training course for your Designated Business Manager in Celebration, Florida or at another location designated by us. (Section 8.3(d) of the Franchise Agreement).

Approve the renovations to your Office necessary to comply with our standards and specifications and your compliance with the opening procedures for your Office, as described in the Operations Manual. (Section 9.2(b) of the Franchise Agreement).

**Continuing Obligations**

During the term of the Franchise Agreement, we (or our designee) will provide the following assistance and services to you:

Make a representative available to speak with you on the telephone during regular business hours to discuss your operational experiences and support needs. Provided, however, that questions regarding technological support will be referred to third parties (including but not limited to our Affiliates) who may charge a fee for providing you with these technological support services (Section 8.4(a) of the Franchise Agreement).

Inform you of mandatory specifications, standards and procedures for the operations of your La Rosa Realty business. (Section 8.4(d) of the Franchise Agreement).

Research new services and methods of doing business and provide you with information concerning developments of this research. (Section 8.4(e) of the Franchise Agreement).

Maintain the FMF once established and use these funds to develop promotional and advertising programs and public relations support for La Rosa Realty businesses. (Sections 8.4(f) and 12.1 of the Franchise Agreement).

Provide advertising materials to you in the form of an arts graphics package, which is included in your

Operations Manual.(Section 8.4(g) of the Franchise Agreement).

Our representatives will have the right but not the obligation to provide additional assistance. (Section

8.4(h) of the Franchise Agreement). There may be additional charges for these services. If we provide additional assistance, we must agree in advance on the charges you will pay and the length of the visit.

We may choose to provide you with continuing national, regional or local workshops and seminars. You must pay the conference fee, if any, and all travel and living expenses. We require that you or your Designated Business Manager attend these conferences. These conferences will be held at our Celebration, Florida headquarters, your Office, or at a location chosen by us. (Section 8.4(b) of the Franchise Agreement).

We may provide you with a monthly newsletter. (Section 8.4(i) of the Franchise Agreement).

**Operations Manual**

You must establish and operate your La Rosa Realty business in compliance with your Franchise Agreement and the standards and specifications contained in the La Rosa Realty confidential operations manual ("**Operations Manual**") loaned to you by us. The Operations Manual consists of one or more manuals, technical bulletins or other written materials and may be modified by us periodically. The Operations Manual may be in printed or in an electronic format. We reserve the right to require you to use an electronic version of the Operations Manual. We also reserve the right to require you to access the document using the Internet or an intranet created and supported by us. You will have the opportunity to view the Operations Manual at our headquarters before purchasing a franchise, provided you agree in writing to keep its content confidential. The Operations Manual contains approximately 55 pages. The Table of Contents for the Operations Manual is attached to this Franchise Disclosure Document as **Exhibit F.**

**Training**

We provide an initial training program lasting between three (3) and five (5) business days. The initial training program is usually conducted at our corporate headquarters located in Celebration, Florida, but the training course may be held elsewhere in the future.

Under the Franchise Agreement, before you begin operating your La Rosa Realty business, you or, if you are not an individual, a "**Designated Business Manager**," must attend and successfully complete to our satisfaction our initial training program. If the Designated Business Manager's employment with you is terminated, you must designate a new Designated Business Manager who must successfully complete our initial training program within 90 days after the termination of the initial Designated Business Manager. If we do not hold an initial training program during that 90-day period, the replacement Designated Business Manager must attend and successfully complete the first available initial training program held by us. You may be charged a training fee for a replacement Designated Business Manager. You must also pay the costs for airfare, ground transportation, lodging, meals, personal expenses, and the Designated Business Manager's salary and benefits.

There is no tuition or fee for the initial training program for you and one additional representative such as a Designated Business Manager or business partner, etc. If you desire to have additional people attend the initial training program, there will be a $500 per person training fee. We do not pay any travel expenses, lodging, meals, ground transportation or other personal expenses.

Our training program consists of between two (2) to three (3) business days, which may or may not be consecutive days, of training as follows:

### TRAINING PROGRAM

| Subject | Hours of Classroom Training | Hours of On- The-Job Training | Location |
|---|---|---|---|
| Overall view of standard Operations | — | 4 | Celebration, Florida or your Central Office (in our discretion) |
| Marketing Training | — | 4 | Celebration, Florida or your Central Office (in our discretion) |
| Agent Leadership Management | — | 4 | Celebration, Florida or your Central Office (in our discretion) |
| Technology Training | — | 4 | Celebration, Florida or your Central Office (in our discretion) |
| Business Development and Planning | — | 4 | Celebration, Florida or your Central Office (in our discretion) |
| TOTAL | — | 20 | |

The initial training program and other on-going training will be conducted by training personnel under the direction of our President, Joseph La Rosa who has been with La Rosa LLC from its inception and has been involved in real estate industry since 2002. We may change or substitute training personnel as necessary. We may delegate our duties and share our responsibilities with regard to training. Training classes are generally held every other month or as needed. The hours of classroom training are estimates and may, in certain circumstances, be slightly shorter or slightly longer than the actual classroom training.

Our Operations Manual and workbook serve as the primary instructional materials during the training program. We may present seminars, conventions or continuing development programs for the benefit of Franchisees. Your attendance is mandatory. You must pay for any conference fee and your travel and living expenses incurred in attending any seminar.

## ADVERTISING PROGRAMS

**Franchise Marketing Fund ("FMF")**

We may establish a Franchise Marketing Fund. If established, all La Rosa Realty businesses will be required to pay to us a Franchise Marketing Fund Contribution ("**FMF Contribution**"). The FMF Contribution will be 1% of Gross Commission Income provided that the FMF Contribution may be increased up to no greater than 1.5% of Gross Commission Income.

If established, the FMF will be accounted for separately by us but we are not required to maintain the FMF funds in a separate or segregated account at a bank or other financial institution. The FMF would be administered by us. Any unused funds in any fiscal year will be applied to the following fiscal year's funds. We reserve the right to contribute or loan additional funds to the FMF on any terms we deem reasonable. Each company- owned or Affiliate-owned outlet offering Products and services similar to the La Rosa Realty business you will operate will make contributions to the FMF equal to the contributions required of La Rosa Realty businesses within the System. This fund will be unaudited and we will make available to you once a year, upon request by telephone or written correspondence, an unaudited annual accounting for the FMF that shows how the FMF proceeds have been spent for the previous year within 120 days after our fiscal year end. We will not provide a periodic accounting of how Marketing Fees are spent.

If established, we may use the Marketing Fees we collect from Franchisees to create marketing materials relating to the System and the services sold by our Franchisees; to pay for public relations projects intended to enhance the goodwill and public image of the System; to assist Franchisees in developing local marketing programs; to pay for the cost of placing marketing materials in various print, broadcast and Internet media; to undertake any other marketing efforts we deem necessary or beneficial to the System; and to reimburse us or our Affiliates for salaries and overhead expenses related to the marketing services provided to Franchisees and to cover part of the cost of maintaining the Internet website. No advertising expenditures from the FMF are devoted principally to the sale of new franchises. We will attempt to spend monies contributed to the FMF in such a way as to provide advertising benefits to all participating La Rosa Realty businesses, but we make no guarantees that you will benefit pro rata or at all from your contributions to the FMF. We reserve the right to allocate Marketing Fees to various permitted uses as we see fit and we do not guarantee that you will receive equal benefits or identical coverage. Neither we nor our Affiliates receive payment for providing goods or services to the FMF, except for reimbursement of expenses as described above.

During the 2018 fiscal year, no FMF was established and no Marketing Fees were collected or expended.

**Local Advertising**

You must agree to spend money for local advertising and promotions in your Territory ("**Local Advertising**") in accordance with local real estate brokerage marketing standards and practices. All Local Advertising by you must be conducted in a dignified manner and will conform to the standards and requirements set forth in the Franchise Agreement and Operations Manual or otherwise for use of the Marks. You must promptly discontinue use of any advertising or promotion plans or materials that do not meet the requirements of the Franchise Agreement or Operations Manual, whether or not previously approved, upon notice from us. You may, at your sole expense, plan and carry out a grand opening promotion relating to the opening of your La Rosa Realty business. Within 30 days after written request from us, you must submit a report showing the amount you spent for Local Advertising during the preceding year and documents substantiating that you incurred and paid particular expenditures during the year. None of the Local Advertising payments made by you will be used by us in the advertising or promotion of individual franchise sales.

**Cooperatives**

We also may designate any geographic area in which two or more La Rosa Realty businesses are located as a region for establishing an advertising cooperative ("**Cooperative**"). The members of a Cooperative will consist of all La Rosa Realty businesses, whether franchised or operated by us, or other Affiliates that operate in an area determined by us. We will determine in advance how each Cooperative will be organized and governed, who will administer it, when it must start operation. Each Cooperative will be organized for the sole purposes of administering advertising

programs and developing, subject to our approval, promotional materials for use by the members in Local Advertising. If a Cooperative has been established for a geographic area where your La Rosa Realty business is located when the Franchise Agreement is signed, or if any Cooperative is established during the term of the Franchise Agreement, you must become a member of the Cooperative and abide by the rules of the Cooperative. We reserve the right to form, change, dissolve or merge any Cooperative.

If we have established a Cooperative for your area, you must contribute to the Cooperative the amounts required by its written governing documents. All contributions to the Cooperative will be maintained and administered in accordance with the written documents governing the Cooperative. If there are Company- owned and Affiliate-owned outlets in your area offering Products and Services similar to the La Rosa Realty business, they will make contributions to the Cooperative equal to the contributions required of the La Rosa Realty businesses within that area. The Cooperative will be operated solely as a conduit for collecting and spending Cooperative fees for the purposes outlined above. The Cooperative may not use any advertising or promotional plans or materials without our prior approval.

The amount of contribution, and whether other franchisees must contribute the same amount or at the same rate, will be determined by the members of the Cooperative, subject to our approval. We anticipate that each member will have one vote for each Central Office and Branch Office of the La Rosa Realty business operated by the member within the geographic area subject to the Cooperative. You will be obligated by the Franchise Agreement to pay any increased contributions even if you vote against the increase. Each Cooperative will have to prepare an annual financial statement reporting its expenditures for the previous year to its members. If a Cooperative is established, we will provide you with a copy of the governing documents and its financial statements.

We have not created any Cooperatives as of the date of this Franchise Disclosure Document.

**Franchise Owners Advisory Council**

We may establish a Franchise Owners Advisory Council ("**Council**") in the future. The Council will have up to three (3) representatives who will be appointed by the Franchisor. Once an initial Council is appointed by us, the Council will be tasked with creating a program for electing new Council representatives on a regular basis. The Council will serve in a purely advisory capacity on many matters, including advertising. We will have the power to change or dissolve the Council.

**Office Location**

You must operate the La Rosa Realty business from a conventional office located outside of any personal residence. The office must be located within your Territory and must exist solely and exclusively for the operation of the La Rosa Realty business. These requirements apply to both your Central Office and any Branch Office. If we approve any office location, such approval indicates only that we believe the office falls within the acceptable criteria we have established as of the approval date.

Based on the requirements of the Franchise Agreement, the factors we consider for such approval are: whether the office is located in your Territory; if it is located in a conventional office located outside of any personal residence; if it is used solely and exclusively for the operation of the La Rosa Realty business; and if it is located sufficiently far enough away from any office of another La Rosa Realty franchisee as we determine. We do not select your Office Location, assist you in conforming it to local ordinances and building codes, assist you with constructing or decorating it, or provide for any necessary equipment, signs or fixture. It is your obligation to locate a site for your Central Office and any Branch Office(s) and to provide us with all necessary information in accordance with the timing requirements established in the Franchise Agreement so that we may approve such office in time for you to open your La Rosa Realty business in accordance with the requirements established in the Franchise Agreement. Specifically, if you fail to open your Central Office within 4 months of executing the Franchise Agreement, we may terminate the Franchise Agreement.

You must comply with all applicable ordinances, building codes and permit requirements and with lease requirements and restrictions. You must apply for all required real estate or brokerage licenses and permits within 10 business days after signing the Franchise Agreement. If you do not receive all required licenses and permits within 6 months of executing the Franchise Agreement, we may terminate the Franchise Agreement.

You may not operate out of a virtual, temporary, or short term office location (a "Short Term Location") (defined as any location where you have secured the location for less than one (1) year) unless you receive prior written permission from the Franchisor. Franchisor may, in its sole discretion, approve or disapprove of such an arrangement provided that, under no circumstances, shall such arrangement be approved for a period of time exceeding six months.

You must secure an Office Location for at least one (1) year in order to establish a Territory (See Item 12). The opening of a Short Term Location will not establish a Territory.

**Schedule for Opening and Site Selection Requirements**

We estimate that the typical length of time between the signing of the Franchise Agreement and the opening of your La Rosa Realty business will be 1 to 4 months. However, we may grant you an extension up to a total of 180 days. Some factors which may affect this timing are: your ability to acquire an office location through lease negotiations; your ability to secure any necessary financing; your ability to comply with local zoning and other ordinances; your ability to obtain any necessary permits and certifications; the timing of the delivery of equipment, tools and inventory; and the time to convert, renovate or build your office. You must open your Central Office within 4 months after signing the Franchise Agreement unless we otherwise consent in writing (Section 9.12, Franchise Agreement).

You may not open your Central Office or any Branch Office until: we notify you in writing that all of your pre-opening obligations have been fulfilled; initial training is completed to our satisfaction; all amounts due to us have been paid; we have been furnished with copies of all insurance policies and certificates required by the Franchise Agreement, or other documentation of insurance coverage and payment of premiums that

we request; you notify us that all approvals and conditions set forth in the Franchise Agreement have been met; you have received all required permits and licenses; you have ordered, received and installed your equipment, supplies, inventory and Computer System; and you have provided evidence that your agents are licensed to sell real estate in your state. However, you are not required to immediately associate with or hire licensed real estate agents upon the establishment and opening of your La Rosa Realty business. You must be prepared to begin operating your La Rosa Realty business immediately after we state that your La Rosa Realty business is ready for opening.

For each Branch Office that you desire to open, you will propose a location for the Office, which we must approve.

**Software and Computer Equipment**

You must purchase and use computer Hardware and Software required by us in conjunction with the operation of your La Rosa Realty business. Currently, you must purchase at least one desktop computer (or a similar machine with similar specifications) for your administrative computers and at least one additional computer for your general Agent computers ("**Hardware**"), each of which must run an operating system capable of running the Software we designate and connecting to the Internet. The Hardware and the Software associated with these systems are referred to collectively as the "**Computer System.**" The estimated total cost of purchasing the Computer System is $5,000 to $30,000. The Computer System will store basic industry-required information including but not limited to housing addresses, transactional details, and other information required by multiple listing services and the state in which you operate your La Rosa Realty business. Your agents will be responsible for obtaining their own Hardware and Software.

Currently, you must pay a license fee for the use of the Software and other technology that we provide to you ("**Technology Fee**") equal to $14 per month (for a total of $168 per year) per Agent. We reserve the right to increase the Technology Fee during each year of the Initial Term, and any Successor Term and Interim Period by any amount determined by us. You may purchase additional Software and support as they become available. We will require you to upgrade your Computer System or incur costs related to the maintenance of your Computer System as prescribed in the Operations Manual and as modified periodically by us. Such upgrades, in some cases, may only be available through our suppliers or Affiliates. We may change the Designated Suppliers or Affiliates periodically on written notice to you.

We provide you with a technological service that incorporates the data generated by your multiple listing service ("**MLS**") into your Software. You must also pay to us a fee for this service ("**MLS/RETS Fee**"), which is currently

$250 per calendar quarter for each Central and Branch Office per. You are also responsible for any initial, testing or ongoing connection fees charged by your local MLS for the provisioning of data outside the scope of the purpose of the MLS/RETS Fee.

You must have sufficient computer skills to be able to operate your Computer System and to access e-mail and the Internet. You must have access to the Internet and maintain an email account that allows us to communicate with you on a regular basis. You must check your email account several times every business day. If we determine that you require additional computer training, you must take and pay for, at your own expense, a computer training course at a local computer training school (which may be our Affiliate). You must complete this training within 90 days of the day we advise you of this requirement, and you must present us with a certificate acceptable to us to show that you passed the course.

We have the right to independently access your electronic information and data through our proprietary Software. We also have the right to collect and use your electronic information and data in any manner we choose in order to promote the development of the System and the sale of franchises. There is no contractual limitation on our right to receive or use information through our proprietary data management and intranet system.

You are solely responsible for protecting yourself from viruses, computer hackers, and other communications and computer-related problems, and you may not sue us for any harm caused by these communications and computer-related problems.

## ITEM 12: TERRITORY

You will be granted a territory ("Territory") in which to locate your Central Office(s) and Branch Office Locations. Franchisor agrees not to locate or permit another franchisee to locate an office in the Territory. We will negotiate the size of your Territory and the number of Branch Offices you must open in your Territory, if any, before executing the Franchise Agreement. Your Territory may be based on geographic or political boundaries (including but not limited to city, zip code, county or state boundary lines) and other characteristics including natural boundaries, and the amount and size of urban, suburban and rural areas. We have the exclusive right to determine the boundaries of your Territory.

During the Initial Term of the Franchise Agreement, once you have identified a Central Office for your La Rosa Realty business and secured that location for no less than one (1) year so long as you comply with all of your obligations under the Franchise Agreement, and subject to our reservation of rights, neither we nor any Affiliate will open or allow any others to open a competing La Rosa Realty business within your Territory.

For each Branch Office that you desire to open, you will propose a location for the Branch Office to us, and we have the right to approve or deny the location you propose to use. You may relocate a Branch Office within your Territory after we approve the location you propose to use.

We have the right to approve or deny the relocation of that Branch Office based on the following factors: whether the office is located in your Territory; if it is located in a conventional office located outside of any personal residence; if it is used solely and exclusively for the operation of the La Rosa Realty business; and if it is located sufficiently far enough away from any office of another La Rosa Realty franchisee as we determine.

The grant of the license to you does not in any way prohibit other franchisees or us and our agents and Affiliates from listing and selling real property in your Territory (at no compensation to you). Also, the grant of the license does not prohibit you from listing or selling real property in a Territory granted to another franchisee or anywhere else outside of your Territory. You may use other channels of distribution to market outside of your Territory, as long as the rights to those channels are not currently reserved by us, as described below. For soliciting or selling Products or Services to customers outside of your Territory via the Internet or e-commerce, you may not independently market on the Internet, or use any domain name, address, locator, link, metatag, or search technique, or otherwise establish any presence on the Internet without our prior written approval. You may also not directly solicit real estate agents employed by other La Rosa Realty businesses. General Agent recruiting programs not directed specifically at other franchisee agents are permissible.

You will not receive an exclusive territory other than that for the location of your Central and Branch Offices. You may face competition from other franchisees outside of the Territory, from outlets that we own outside of the Territory, or from other channels of distribution or competitive brands that we control. Customers from your Territory may purchase or obtain Services from other franchisees and from us and our Affiliates or designees over the Internet, or in other reserved channels of distribution, at no compensation to you.

Under your Franchise Agreement, you do not receive any options for additional franchises, any rights of first refusal to acquire additional franchises, or any similar rights to buy additional franchises.

For each Branch Office you want to open, you must propose a location, which is subject to our approval.

We reserve the right, among others: (i) to own, franchise, or operate La Rosa Realty businesses at any location outside of the Territory, regardless of the proximity to your La Rosa Realty business; (ii) to use the Marks and the System to sell any Products or services, similar to those, which you will sell, through any alternate channels of distribution within or outside of the Territory at no compensation to you. This includes, but is not limited to other channels of distribution such as television, mail order, catalog sales, or over the Internet. We exclusively reserve the Internet as a channel of distribution for us, and you may not independently market on the Internet or conduct e-commerce; (iii) to use and license the use of other proprietary and non-proprietary Marks or methods which are not the same as or confusingly similar to the Marks, whether in alternative channels of distribution or in the operation of a real estate brokerage business, at any location, including within the Territory, which may be the same as, similar to or different from the La Rosa Realty business operated by you; (iv) to purchase or be purchased by, or merge or combine with, any business, including a business that competes directly with your La Rosa Realty business, wherever located; (v) to acquire and convert to the System operated by us any businesses offering real estate brokerage services including those businesses operated by competitors or otherwise operated independently or as part of, or in association with, any other system or chain, whether franchised or corporately owned and whether located inside or outside of the Territory; and (vi) to implement multi-area marketing programs which may allow us or others solicit or sell to customers anywhere at no compensation to you. We also reserve the right to issue mandatory policies to coordinate these multi-area marketing programs.

## ITEM 13: TRADEMARKS

The Franchise Agreement grants you the nonexclusive right to use our Marks, including the service mark "LA ROSA REALTY", and various designs and logo marks associated with our services. You may also use our other current or future Marks as we may designate to operate your La Rosa Realty business.

We have the following pending trademark applications before the United States Patent and Trademark Office ("USPTO"):

| Mark | Filing or Registration Date | Serial No. or Registration No. | Status |
|---|---|---|---|
| LA ROSA REALTY | July 17, 2018 | 88040434 | Pending |
|  | October 19, 2018 | 88161630 | Pending |

We may also use a number of unregistered, common law trademarks. You must follow our rules when you use our Marks. You may not use any of the Marks alone or with modifying words, designs or symbols as part of a corporate or business name or in any form on the Internet, including but not limited to URLS, domain names, e-mail addresses, locators, links, metatags or search techniques. You must get our prior written approval of your company name before you file any registration documents. You must indicate, as required in the Franchise Agreement and specified in the Operations Manual, that you are an independent real estate broker. Guidelines regarding proper trademark use and

notices are in the Operations Manual and will be updated periodically. You may not use our Marks with an unauthorized product or service, or in a manner not authorized in writing by us.

All applications and application affidavits have been filed with the USPTO.

There are no currently effective material determinations of the USPTO, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, any pending infringement, opposition or cancellation proceedings or any pending material litigation involving any of our Marks that are relevant to the use of these Marks. No currently effective litigation affects our use or ownership rights in any Mark. No currently effective agreement limits our right to use or license the use of our Marks.

You must notify us immediately when you learn about an infringement of or challenge to your use of our Marks. We may take the action necessary to protect the unauthorized use of our Marks. We are not obligated to defend you against a claim involving your use of or right to use the Marks, nor to take affirmative action against any infringement. We have the sole right to control any administrative or legal proceedings concerning the Marks.

The Franchise Agreement does not require us to participate in your defense and/or indemnify you for expenses or damages if you are a party to an administrative or judicial proceeding involving a trademark licensed by us to you, or if the proceeding is resolved unfavorably to you.

You must modify or discontinue the use of a trademark if we modify or discontinue the Mark. You must not directly or indirectly contest our right to our Marks, Trade Secrets or business techniques that are part of our business. The Franchise Agreement does not provide you with any specific rights if we require you to modify or discontinue the use of any Marks.

From time to time in the ordinary course of business, we encounter third parties that are using and/or promoting confusingly similar brands. You should understand that there could be businesses using trademarks, trade names, or other commercial symbols similar to our Marks with superior rights to our rights. Before opening your La Rosa Realty business, you should research this possibility, using telephone directories, trade directories, Internet directories, or otherwise to avoid the possibility of having to change your La Rosa Realty business name.

### ITEM 14: PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

The information contained in the Operations Manual is proprietary and is protected by copyright and other laws. The Operations Manual and the limitations of the use of it by you and your employees are described in this Disclosure Document and the Franchise Agreement. The designs contained in the Marks, the layout of our advertising materials, the content and format of any other writings or copyright and other laws also protect recordings in print or electronic form. Although we have not filed an application for copyright registration for the Operations Manual, the advertising materials, the content and format of any other writings and recordings, we claim common law and federal copyrights in these items. We grant you the right to use this proprietary and copyrighted information ("Copyrighted Works") in connection with your operation of your La Rosa Realty business, but these copyrights remain our sole property.

There are currently no effective determinations of the United States Copyright Office or any court regarding any Copyrighted Works of ours, nor are any proceedings pending, nor are there any currently effective agreements between us and third parties pertaining to the Copyrighted Works that will or may significantly limit your use of our Copyrighted Works.

Our Operations Manual, electronic information and communications, sales and promotional materials, certain Software used in the La Rosa Realty business, the development and use of our System, standards, specifications, policies, procedures, information, concepts and systems on, knowledge of and experience in the development, operation and franchising of La Rosa Realty businesses and Services sold at La Rosa Realty businesses, information concerning Service sales, operating results, financial performance and other financial data of La Rosa Realty businesses and other related materials are proprietary and confidential ("Confidential Information") and are considered to be our property to be used by you only as described in the Franchise Agreement or the Operations Manual. Where appropriate, certain information has also been identified as trade secrets ("Trade Secrets"). You must maintain the confidentiality of our Confidential Information and Trade Secrets and adopt reasonable procedures to prevent unauthorized disclosure of our Trade Secrets and Confidential Information.

We will disclose parts of the Confidential Information and Trade Secrets to you as we deem necessary or advisable for the development of your La Rosa Realty business during training and in guidance and assistance furnished to you under the Franchise Agreement, and you may learn or obtain from us additional Confidential Information and Trade Secrets during the term of the Franchise Agreement. The Confidential Information and Trade Secrets are valuable assets of ours and are disclosed to you on the condition that you, and your owners, if you are a business entity, and employees agree to maintain the information in confidence by entering into a confidentiality agreement that we can enforce. Nothing contained in the Franchise Agreement will be construed to prohibit you from using the Confidential Information or Trade Secrets in the operation of your La Rosa Realty business during the term of the Franchise Agreement.

You must notify us within five (5) days after you learn about another's use of language, a visual image, or a recording of any kind, that you perceive to be identical or substantially similar to one of our Copyrighted Works or use of our Confidential Information or Trade Secrets or if someone challenges your use of our Copyrighted Works, Confidential Information or Trade Secrets. We will take whatever action we deem appropriate to protect our rights in and to the Copyrighted Works, Confidential Information or Trade Secrets, which may include payment of reasonable costs associated with the action. However, the Franchise Agreement does not require us to take affirmative action in response to any apparent infringement of or challenge to your use of any Copyrighted Works, Confidential Information or Trade Secrets or claim by any person of any rights in any Copyrighted Works, Confidential Information or Trade Secrets. You must not directly or indirectly contest our rights to any of our Copyrighted Works, Confidential Information, or Trade Secrets. You may not communicate with anyone except us and our counsel with respect to any infringement, challenge, or claim. We will have the right to take action as we deem appropriate regarding any infringement, challenge or claim, and the sole right to control exclusively any litigation or other proceeding arising out of any infringement, challenge or claim under any Copyrighted Works, Confidential Information or Trade Secrets. You must sign all instruments and documents, give the assistance, and do acts and things that may, in the opinion of our counsel, be necessary to protect and maintain our interests in any litigation or proceeding or to protect and maintain our interests in the Copyrighted Works, Confidential Information, or Trade Secrets.

No patents are material to us at this time.

We have the right to inspect, copy and use all records with respect to the customers, suppliers, and other services providers of, and related in any way to, your La Rosa Realty business. This includes all databases (whether in print, electronic, or other form), including all names, addresses, phone numbers, e-mail addresses, and customer purchase records. We may use or transfer the records in any way we wish, both before and after any termination, expiration, repurchase, transfer or otherwise. We may contact any or all of your customers, suppliers, and other service providers for quality control, market research, and any other purposes, as we deem appropriate.

You must disclose to us all ideas, techniques and products concerning the development and operation of the La Rosa Realty business you or your employees conceive or develop during the term of the Franchise Agreement. You must grant to us and agree to obtain from your owners or employees a perpetual, non-exclusive and worldwide right to use these ideas, techniques and products concerning the development and operation of La Rosa Realty business that you or your employees conceive or develop during the term of the Franchise Agreement in all real estate sales-related product and service businesses that you operate. We will have no obligation to make any lump sum or on-going payments to you with respect to any idea, concept, method, technique or product. You must agree that you will not use nor will you allow any other person or entity to use any of these ideas, techniques or products without obtaining our prior written approval.

### ITEM 15: OBLIGATION TO PARTICIPATE IN THE ACTUAL
### OPERATION OF THE FRANCHISE BUSINESS

If you are an individual, you must directly supervise the La Rosa Realty business at your initial and primary franchised location ("**Central Office**"). If you are a business entity, the direct, on-site supervision of your Central Office must be done by a Designated Business Manager. Each Branch Office must also be managed by a Designated Business Manager.

If we believe you lack sufficient business experience, you must designate a Designated Business Manager to act as the operating manager for your La Rosa Realty business. We must approve the selection of the Designated Business

Manager before signing the Franchise Agreement. The Designated Business Manager must attend and successfully complete the initial training program, and must abide by the obligations in the Franchise Agreement and the Operations Manual. The Designated Business Manager must agree to assume and guarantee performance of all of your obligations, including, among others, confidentiality and non-competition.

If you are a legal or business entity, each individual who owns, directly or indirectly, a 5% or greater interest in you (and, if you are an individual, your immediate family defined as your spouse and adult children) must sign the Guaranty and Assumption of Franchisee's Obligations assuming and agreeing to discharge all of your obligations and comply with all restrictions under the Franchise Agreement and our Nondisclosure and Noncompetition Agreement attached to this Franchise Disclosure Document as Exhibit G.

Your spouse must sign a Guaranty Agreement and Consent of Spouse Agreement making your spouse individually liable for your financial obligations under the agreement. The guaranty and consent will place your spouse's marital and personal assets at risk if your franchise fails.

## ITEM 16: RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must provide specified services. The services include offering residential and commercial real estate brokerage services to real property purchasers and sellers ("**Services**"). We reserve the right to require that you sell additional Services in your La Rosa Realty business on 30 days' prior written notice to you. You must provide the Services per our specifications and standards. We reserve the right to change standards and specifications on 30 days' prior written notice to you.

You must refrain from using or permitting the use of your La Rosa Realty business for any other purpose or activity at any time without first obtaining our written consent.

You must sell or offer for sale only those Services which are authorized by us and which meet our standards and specifications. You must follow our policies, procedures, methods of doing business, and techniques. We may change or add to our required Services with prior notice to you. You must discontinue selling and offering for sale any Services, which we may disapprove in writing at any time.

## ITEM 17: RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Franchise Disclosure Document.

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provision** | **Section in Franchise Agreement** | **Summary** |
| Length of the franchise term | Section 4 | 5 years |
| Renewal or extension of the term | Section 4 | If you are in good standing you can add one (1) additional term of 5 years |
| Requirements for you to renew or extend | Section 4 | You may renew the Franchise Agreement if you: are not in default of any terms of the Franchise Agreement; you have given notice of renewal to us; sign a new Franchise Agreement (which may contain materially different terms and conditions than your original Franchise Agreement); are current in payments due and owing to us and your trade creditors; sign a release; and pay to us a Successor Franchise Fee. "Renew" or "renewal" means the continuation of your franchise relationship. |
| Termination by you | Not Applicable | |

| Termination by us without cause | Not Applicable | |
|---|---|---|
| Termination by us with cause | Section 18 | We can terminate upon certain violations of the Franchise Agreement by you |
| "Cause" defined - defaults which can be cured | Section 18 | You have 30 days to cure the defaults listed in Section 18.2 |
| "Cause" defined - defaults which cannot be cured | Section 18 | Non-curable defaults: the defaults listed in Section 18.1 |
| Your obligations on termination/non-renewal | Sections 11, 13, 15 & 18 | Obligations include complete de-identification, payment of amounts due and return of Operations Manual, all Confidential Information, trade secrets and records |
| Assignment of contract by us | Section 16.1 | No restriction on our right to assign |
| "Transfer" by you | Section 16 | Includes transfer of contract or assets or ownership change |
| Our approval of transfer by franchisee | Section 16 | We have the right to approve all transfers |
| Conditions for our approval of transfer | Section 16 | New franchisee qualifies, Transfer Fee paid, purchase agreement approved, training arranged, release signed by you and current agreement signed by new franchisee |
| Our right of first refusal to acquire your business | Section 17 | We can match any offer for your business |
| Our option to purchase your business | Section 17 | We may, but are not required to, purchase your inventory and equipment at fair market value if your franchise is terminated for any reason |
| Your death or disability | Section 16.10 | Your estate or legal representative must apply to us for the right to transfer to the next of kin within 120 days |

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **Provision** | **Section in Franchise Agreement** | **Summary** |
| Modification of Franchise Agreement | Sections 3.3, 4.5 & 21.11 | No modifications of Franchise Agreement during term generally, but Operations Manual subject to change. Modifications permitted on renewal |
| Integration/merger clause | Section 21.5 | Only the terms of the Franchise Agreement are binding (subject to state law). Any representations or promises made outside the Franchise Disclosure Document and Franchise Agreement including addenda or exhibits may not be enforceable. |
| Dispute resolution by arbitration or mediation | Section 20 | Except for certain claims, all disputes must be arbitrated in Florida |
| Choice of forum | Sections 20.1 & 21.1 | Arbitration or litigation must be conducted in Florida, except as provided in a State Specific Addendum |
| Choice of law | Sections 20.1 & 21.1 | Florida law applies, except as provided in a State Specific Addendum |
| Non-competition covenants during the term of franchise | Section 15 | No involvement in competing business anywhere in US |

## ITEM 18: PUBLIC FIGURES

We do not currently use any public figure to promote our franchise.

## ITEM 19: FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in ITEM 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this ITEM 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Aileen Guzman, Sales Director, La Rosa Franchise, LLC, at 1420 Celebration Blvd., Suite 200, Celebration, FL 34747, and 321-939-3748, the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20: OUTLETS AND FRANCHISEE INFORMATION

### Table No. 1
### Systemwide La Rosa Realty business Summary

### For Years 2016 to 2018

| Business Type | Year | Businesses at Start of the Year | Businesses at End of the Year | Net Change |
|---|---|---|---|---|
| Franchised La Rosa Realty Businesses | 2016 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 |
| Affiliate Owned La Rosa Realty Businesses | 2016 | 2 | 3 | 1 |
| | 2017 | 3 | 4 | 1 |
| | 2018 | 4 | 7 | 3 |
| Total Outlets | 2016 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 |

### Table No. 2
### Transfers of La Rosa Realty businesses from Franchisees to New Owners
### (Other than to Franchisor or its Affiliates)

### For Years 2016 to 2018

| State | Year | Number of Transfers(0) |
|---|---|---|
| Florida | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| Total | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |

**Table No. 3**
**Status of Franchised Outlets**

**For years 2016 to 2018**

| | Year | Outlets at Start of the Year | Outlets Added | Terminations | Non-Renewals | Re-acquired by Franchisor | Ceased Operations Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| **California** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Florida** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Georgia** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **New York** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **South Carolina** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Texas** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

DocuSign Envelope ID: B95FB5BD-FBB7-4DAE-B76F-D12C25?B10AA

**Table No. 4**
**Status of Company-Owned\* Outlets**

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| **California** | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table No. 5**
**Projected Openings As Of December 31, 2017**

| Outlet Type | Franchise Agreements Signed but Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year | Projected New Company- Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| California | 0 | 0 | 0 |
| Florida | 0 | 15 | 0 |
| Georgia | 0 | 0 | 0 |
| New York | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 |
| Texas | 0 | 0 | 0 |
| TOTAL | 0 | 15 | 0 |

The names, addresses, and telephone numbers of all current franchisees are listed in Exhibit C, representing all franchisees that operate Central Offices and Branch Offices as of December 31, 2018. Also listed in Exhibit C are the names and last known home address and telephone number of every franchisee who has had an outlet terminated, canceled, transferred, not renewed or otherwise voluntarily or involuntarily ceased to do business under a franchise agreement during the year, or who has not communicated with us within10 weeks of the date of this Franchise

DocuSign Envelope ID: B95FB5BD-FB57-4DAE-B76F-D12C252B10AA

Disclosure Document. If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Certain La Rosa Realty businesses in the future may sign confidentiality clauses with the Franchisor. In some instances, current and former franchisees sign provisions restricting their ability to speak openly about their experience with us. You may wish to speak with current and former franchisees, but be aware not all such franchisees will be able to communicate with you.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

## ITEM 21: FINANCIAL STATEMENTS

Attached to this Franchise Disclosure Document as Exhibit A is our unaudited 'financial statement' for the year ending December 31, 2018, including our balance sheet, related statements of operations, changes in stockholders' equity and cash flows for the year ended 2018. We have not been in business of franchising for three (3) years or more and cannot include all financial statements required by law at this time, but will do so as each new year becomes available.

## ITEM 22: CONTRACTS

Attached are the following agreements proposed for use in connection with our offering of franchises:

**Exhibits:**

B.      Franchise Agreement
E.      State-Specific Addenda
G.      Non-Disclosure and Non-Competition Agreement
H.      Statement of Franchisee
I.      General Release

## ITEM 23: RECEIPTS

The last two pages of the Franchise Disclosure Document (following the exhibits and attachments) are receipt pages acknowledging your receipt of the Franchise Disclosure Document. One copy is for your records, and one copy must be signed and dated by you and returned to us.

**Exhibit A to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC FINANCIAL STATEMENTS**

**THESE FINANCIAL STATEMENTS ARE PREPARED WITHOUT AN AUDIT. PROSPECTIVE FRANCHISEES OR SELLERS OF FRANCHISSES SHOULD BE ADVISED THAT NO CERTIFIED PUBLIC ACCOUNTANT AUDITED THESE FIGURES OR EXPRESSED HIS/HER OPINION WIT REGARD TO THE CONTENT OR FORM.**

## La Rosa Franchising LLC
## Balance Sheet
Accrual Basis as of January 17, 2017

Jan 17, 2017 – May 30, 2019

| | |
|---|---|
| ASSETS | 0.00 |
| LIABILITIES & EQUITY | 0.00 |

Exhibit A
Financial Statements

**Exhibit B to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC FRANCHISE AGREEMENT**

LA ROSA FRANCHISING, LLC
Exhibit B
2019 Franchise Agreement

DocuSign Envelope ID: B95FB5BD-FBE7-4DAE-B76F-D12C259B10AA

## FRANCHISEE AGREEMENT

**Please print and sign two copies and return both full, original copies to LA ROSA FRANCHISING, LLC. Signature required on the following pages:**

1.      Franchise Agreement

2.      Legal Representation

3.      Witness

4.      Attachment 1 Territory

5.      Attachment 2 Guaranty and Assumption of Franchisee's Obligations

6.      Attachment 3 Consent of Spouse

7.      Attachment 4 Acknowledgement

8.      Attachment 5 Statement of Ownership

9.      Attachment 6 Direct Debits

10.     Attachment 7 Telephone Numbers, Listings & Internet Addresses

11.     Attachment 8 Branch Office Authorization (not required at signing of Agreement)

**LA ROSA FRANCHISING, LLC**
1420 Celebration Blvd., Suite 200
Celebration, FL 34747

## FRANCHISEE INFORMATION SHEET

| | |
|---|---|
| Franchise #: | 26. |
| Effective Date: | 12/3/2019 |
| Legal Entity Name: | La Rosa Realty Puerto Rico, PSC |
| Tax I.D. #: | 66-0935580 |
| Principal Contact: | Ana Ivelisse Morales |
| Address: | P.O. Box 361390 |
| City, State, Zip | San Juan, Puerto Rico 00936-1390 |
| Primary Phone #: | 787-765-1504. |
| Secondary Phone #: | 787-765-1504. |
| Email Address: | larosapuertorico@gmail.com |
| Fax Number: | 1-888-753-6415. |
| Territory | San Juan, Puerto Rico |

DocuSign Envelope ID: B95FB5BD-FB57-4DAE-B76F-D12C2F9B10A9

## TABLE OF CONTENTS

DEFINITIONS .................................................................................................................... 2

COVENANTS, REPRESENTATIONS, AND WARRANTIES OF FRANCHISEE .................. 4

GRANT OF LICENSE ......................................................................................................... 6

TERM OF THE AGREEMENT AND LICENSE .................................................................. 6

TERRITORY ....................................................................................................................... 8

FEES ................................................................................................................................... 10

ACCOUNTING, RECORDS, AUDITS AND LATE PAYMENT CHARGES ........................ 11

SERVICES AND ASSISTANCE .......................................................................................... 14

FRANCHISEE'S DUTIES, OBLIGATIONS AND OPERATING STANDARDS .................. 16

PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES ......................................... 20

MARKS, COPYRIGHTED WORKS AND OWNERSHIP OF IMPROVEMENTS ............... 21

ADVERTISING AND PROMOTION ................................................................................... 24

INSURANCE AND INDEMNITY ....................................................................................... 26

RELATIONSHIP ................................................................................................................. 27

RESTRICTIVE COVENANTS ............................................................................................. 28

ASSIGNMENT .................................................................................................................... 30

OPTION TO PURCHASE □ RIGHT OF FIRST REFUSAL ................................................. 34

DEFAULT AND TERMINATION ........................................................................................ 35

NOTICES ............................................................................................................................ 40

ARBITRATION ................................................................................................................... 41

MISCELLANEOUS ............................................................................................................ 42

ACKNOWLEDGEMENT .................................................................................................... 44

**ATTACHMENTS TO FRANCHISE AGREEMENT:**

1.   Territory, Branch Offices & Initial Fees
2.   Guaranty and Assumption of Franchisee's Obligations
3.   Statement of Ownership
4.   Authorization Agreement for Prearranged Payments
5.   Collateral Assignment of Telephone Numbers, Telephone Listings and Internet Addresses
6.   Branch Office Authorization

DocuSign Envelope ID: B95FB5BD-FBB7-4DAE-B76F-D12C252B10AA

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Agreement") is made this 16th day of September 2019 2019, by and between **LA ROSA FRANCHISING, LLC** a Florida limited liability company, 1420 Celebration Blvd., Suite 200, Celebration, FL (**"Franchisor"**) and La Rosa Realty Puerto Rico, PSC located in San Juan Puerto Rico ("**Franchisee**").

## RECITALS

**WHEREAS**, the Franchisor has developed a comprehensive system for the operation of a business offering both residential and commercial real estate brokerage services.

**WHEREAS**, the real estate brokerage businesses are operated under a business format with a unique system of high standards of service, including valuable know-how, information, Trade Secrets, Confidential Information, methods, confidential Operations Manual, standards, designs, methods of trademark usage, copyrights, sources and specifications, confidential electronic and other communications, methods of Internet usage, marketing programs, and research and development.

**WHEREAS**, the distinguishing characteristics of the System include the trademark "LA ROSA REALTY" and other trademarks and trade names, confidential operating procedures, confidential Operations Manual, standards and specifications for equipment, services and products, method of Internet usage, methods of service, management and marketing programs and sales techniques and strategies. All of these distinguishing characteristics may be changed, improved, and further developed by the Franchisor from periodically. They are Franchisor's Confidential Information and Trade Secrets and are designated by and identified with the Marks described in this Agreement.

**WHEREAS**, the Franchisor continues to use, develop and control the use of the Marks to identify for the public the source of services and products marketed under the System, and which represent the System's high standards of quality, service and customer satisfaction.

**WHEREAS**, Franchisee acknowledges the benefits to be derived from being identified with the System, and also recognizes the value of the Marks and the continued uniformity of image to Franchisee, the Franchisor, and other franchisees of the Franchisor.

**WHEREAS**, Franchisee acknowledges the importance to the System of the Franchisor's high and uniform standards of quality, service and customer satisfaction, and further recognizes the necessity of opening and operating a real estate brokerage business in conformity with the System.

**WHEREAS**, Franchisee recognizes that to enhance the value of the System and goodwill associated with it, this Agreement places detailed obligations on Franchisee, including strict adherence to the Franchisor's reasonable present and future requirements regarding the types of services offered, advertising used, operational techniques, marketing and sales strategies and related matters.

**WHEREAS**, Franchisee is aware of the foregoing and desires to obtain the right to use the System and in association with the System, the right to use the Marks, and wishes to be assisted, trained, and franchised to operate a real estate brokerage business within the Territory specified in this Agreement and subject to the terms and conditions contained in this Agreement.

The parties therefore agree as follows:

## 1.      DEFINITIONS

For the purposes of this Agreement, the following terms are hereby defined:

1.1. **"Affiliate"** - means any person or entity that controls, is controlled by, or is in common control with, the Franchisor or Franchisee.

1.2. **"Agent"** – means a person or group of persons licensed to sell real estate within the Territory who are affiliated with the Real estate brokerage business and uses services provided by Franchisee pursuant to this Agreement. An Agent may be Franchisee's independent sales associates, agents, representatives, independent contractors, employees, partners, directors, officers, Owners, or Franchisee's Affiliates.

1.3. **"Agreement"** - means this agreement, and all exhibits, schedules, attachments, instruments and amendment.

1.4. **"Branch Office(s)"**- means any additional Office at an approved location or locations where Franchisee operates the Real estate brokerage business that is opened by Franchisee after its initial Office.

1.5. **"Business"** or "**real estate brokerage business**" - means the business operations conducted or to be conducted by Franchisee pursuant to this Agreement and consisting of a business offering commercial and residential real estate brokerage services.

1.6. **"Confidential Information"** - means all knowledge, know-how, standards, methods and procedures related to the establishment and operation of the System and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, Franchisee's Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, manuals, promotional and marketing materials, marketing strategies and any other data which the Franchisor designates as confidential or Franchisee reasonably should know Franchisor would consider confidential.

1.7. **"Franchise"** - means the business operations, including the real estate brokerage business, conducted or to be conducted by Franchisee using the Franchisor's System and in association with the Marks.

1.8 **"Franchisor's System"** or "**System**" - means the standards, systems, concepts, identifications, methods, and procedures developed or used by the Franchisor, or which may hereafter be developed or used by the Franchisor, including the trademark "**LA ROSA REALTY**" and other trademarks and trade names, confidential operating procedures, confidential Operations Manual, standards and specifications for equipment, services and products, method of Internet usage, training methods, methods of service, management and marketing programs and sales techniques and strategies for the sale and marketing of the Franchisor's Services.

1.9 **"Gross Commission Income"** - Gross Commission Income means the total of all commissions, transaction fees, property management fees, and monthly fees collected or receivable by Franchisee and Franchisee's independent sales associates, agents, representatives, contractors, employees, partners, directors, officers, Owners, or Franchisee's Affiliates, regardless of whether or not such individuals or Affiliates are entitled to retain all or part of such Gross Commission Income, directly or indirectly, in connection with the Business (earned in compliance with all applicable laws) including, but not limited to, transactions and provision of services for which a real estate or auctioneer's license (including appraisal, title or escrow services) is required, the sale or provision of products or services that we or any of our Affiliates develop or make available to you directly or through a third party, monthly fees or additional transaction fees charged to agents by the Franchisee (such as, but without limitation, Transaction Fees and Coaching Fees), Property Management Services, and/or any transaction, sale and/or service in which the Marks or the System is used in any manner, without deducting any of your multiple listing fees, advertising costs, commissions, overrides, bonuses, salaries, gifts, or any other costs or expenses and other receipts and fees from its Agents and from all other sources (including but not limited to referral fees and finder's fees received from brokers or agents in other brokerage companies) which are derived from the sale, lease, transfer or other disposition (including like-kind exchanges, barter exchanges, or other exchanges of property not involving money) of Real Property, including any note, obligation, lien or other consideration given to Franchisee in lieu of a commission and insurance claims for lost profits if a claim is paid by the insurer.

a.      Gross Commission Income does not include: (1) any commissions and referral fees paid to cooperating or referring brokers in other brokerage companies; (2) the amount of any tax imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers, provided that the amount of any tax is shown separately and in fact paid by the Franchisee to the appropriate governmental authority; and (3) fair market rent paid by Franchisee's Agents for the lease of office space at Franchisee's Central Office or Branch Office locations.

b.      Gross Commission Income will be deemed received at the earlier of the closing of any transaction described above or when payment for any Services is received by Franchisee or an Agent. Gross Commission Income consisting of property or services will be valued at the fair market value of the property or services at the time that they are received.

1.10.   Reserved.

1.11.   "**Lease**" - means any agreement (whether oral or written) under which the right to occupy an Office has been obtained, and any amendment made to the lease periodically, including, any offer to lease, license or lease agreement.

1.12.   "**Marks**" - means the trademark "**La Rosa Realty**", to the extent of the Franchisor's rights to the same, together with those other trade names, trademarks, symbols, logos, distinctive names, service marks, certification marks, logo designs, insignia or otherwise which may be designated by the Franchisor periodically as part of the System for use by Franchisees, and not withdrawn.

1.13.   "**Office(s)**" - means the approved location or locations where Franchisee operates the real estate brokerage business.

1.14.   "**Opening Date**" - means the first of the following to occur on or after the Effective Date: Franchisee begins conducts business using the Marks, offers any Services to the public, Franchisee collects any Gross Commission Income, Franchisee uses any Mark, Franchisee opens any Office, one hundred twenty (120) days after the Effective Date; or, Franchisee otherwise engages in a real estate brokerage business.

1.15.   "**Operations Manual**" - means, but is not limited to, collectively, all directives, books, pamphlets, bulletins, memoranda, order forms, invoices, letters, e-mail, Internet or intranet data, or other publications, documents, Software programs, video tapes, transmittances or communications, in whatever form (including electronic form) prepared by or on behalf of the Franchisor for use by the franchisee generally or for Franchisee in particular, setting forth information, advice and standards, requirements, marketing information and procedures, operating procedures, instructions or policies relating to the operation of the Business or the operation of Franchises, as same may be added to, deleted or otherwise amended by the Franchisor periodically.

1.16.   "**Products**" - means all supplies and other materials used by Franchisee or provide to Franchisee's customers in connection with the Business and associated with the Marks.

1.17.   "**Real Property**"– means single and multiple unit residential housing, commercial property, farm houses, vacant land to be used for residential, agricultural, recreation or commercial purposes; condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership and time share residential units, and mobile home when affixed to the ground.

1.18.   "**Services**" - means any and all assistance, guidance, recommendations, marketing and other services for the sale, transfer or other disposition of Real Property conducted or otherwise provided by Franchisee and the Agents in connection with the Business or associated with the Marks.

1.19.   "**Trade Secret(s)**"- means information, including a formula, pattern, compilation, program, device, method, technique or process related to the System that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can

DocuSign Envelope ID: B95FB5BD-EB57-4DAE-B76F-F12C252B10AA

obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.


## 2.   COVENANTS, REPRESENTATIONS, AND WARRANTIES OF FRANCHISEE

Franchisee covenants, represents and warrants as follows and acknowledges that the Franchisor is relying upon these covenants, representations and warranties in making its decision to enter into this Agreement.

2.1.   Franchisee acknowledges that it has received, has had ample time to read, and has read this Agreement, the Disclosure Document, and all related agreements with the Franchisor. Franchisee acknowledges that the Franchisor has advised it to obtain independent legal and accounting advice with respect to this Agreement and the transactions arising out of this Agreement. Franchisee further acknowledges that it has had an adequate opportunity to be advised by legal, accounting and other professional advisors of its own choosing regarding all pertinent aspects of the Business, the Franchisor and this Agreement.

2.2.   Franchisee has, or has made firm arrangements to acquire, funds to commence, open and operate the Business. Franchisee is financially and otherwise able to accept the risks attendant upon entering into this Agreement.

2.3.   All statements made by Franchisee in writing in connection with its application for the Franchise were true when made and continue to be true as of the date of this Agreement.

2.4.   There are no material financial obligations of Franchisee whether actual or contingent, which are outstanding as of the date of this Agreement other than those, disclosed to the Franchisor by Franchisee in writing.

2.5.   Franchisee is not a party to or subject to any court or administrative order or action of any governmental authority that would limit or interfere in any way with the performance by Franchisee of its obligation hereunder.

2.6.   Franchisee is not a party to any litigation or legal proceedings other than those that have been disclosed to the Franchisor by Franchisee in writing.

2.7.   Franchisee represents that it is not a party to or subject to agreements or arrangements that might conflict with the terms of this Agreement and agrees not to enter into any conflicting agreements or arrangements during the Initial Term or any Interim Period.

2.8.   Franchisee agrees and acknowledges that it has not been induced to enter into this Agreement in reliance upon, nor as a result of, any statements, representations, warranties, conditions, covenants, promises or inducements, whatsoever, whether oral or written, and whether directly related to the contents of this Agreement or collateral thereto, made by the Franchisor, its officers, directors, agents, employees or contractors except as provided herein. Franchisee acknowledges that the Franchise has been granted in reliance upon the information supplied to the Franchisor in Franchisee's application for a Franchise.

2.9.   Franchisee represents that it, its owners, or one of its employees, is a licensed real estate broker under the laws of the state or states where each Office is located; is familiar with the real estate laws and regulations of the state or states; has previous experience in Real Property transactions; and, the Franchise is being acquired to use the System and the Marks in the operation of a real estate brokerage business and not for speculative or investment purposes.

2.10.   Franchisee and its owners agree to comply with and/or to assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with Anti-Terrorism Laws (as defined below). In connection with this compliance, Franchisee and its owners certify, represent, and warrant that none of their property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its owners are not otherwise in violation of any of the Anti-Terrorism Laws.

DocuSign Envelope ID: B95FB5BD-FBBF-4DAE-B76F-B12C259B10AA

a. Franchisee and its owners certify that they, their respective employees, and anyone associated with Franchisee are not listed in the Annex to Executive Order 13224 *(http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html)*. Franchisee agrees not to hire (or, if already employed, retain the employment of) any individual who is listed in the Annex.

b. Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee, its owners, their employees, or anyone associated with Franchisee to be listed in the Annex to Executive Order 13224.

c. Franchisee is solely responsible for ascertaining what actions it must take to comply with the Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that its indemnification responsibilities set forth in this Agreement pertain to its obligations under this Section 2.10.

d. Any misrepresentation under this Section or any violation of the Anti-Terrorism Laws by Franchisee, its owners, agents, or its employees constitutes grounds for immediate termination of this Agreement and any other agreement Franchisee has entered with Franchisor or any of its Affiliates.

e. "**Anti-Terrorism Laws**" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control and any government agency outside the U.S.) addressing or in any way relating to terrorist acts and/or acts of war.

## 3. GRANT OF LICENSE

3.1. Subject to all the terms and conditions of this Agreement, the Franchisor hereby grants to Franchisee, and Franchisee accepts, for the Initial Term of this Agreement and any Interim Period, the right and license ("License") to:

a. Operate a real estate brokerage business at one (1) approved Central Office location and additional, if any, Branch Office locations at approved locations in the geographic are set forth in Attachment 1 to this Agreement ("Territory") upon the terms and conditions of this Agreement.

b. Use the Marks and the System; and

c. Offer and market ONLY the Franchisor's approved Services and Products, unless the Franchisor approves in writing Franchisee's request to offer and market complementary and non- competing services or products.

3.2 Franchisee recognizes that variations and additions to the System may be required periodically to preserve and/or enhance the System. Therefore, Franchisor expressly reserves the right to add to, subtract from, revise, modify or change periodically the System or any part thereof, and Franchisee agrees to promptly accept and comply with any addition, subtraction, revision, modification or change and to make those reasonable expenditures as may be necessary to comply pursuant to Section 9.

3.3. Franchisee recognizes that the rights granted to Franchisee hereunder are for the specific Territory defined in Section 5.1 below and **Attachment 1** and no other, and cannot be transferred to an alternate Territory without the prior written approval of Franchisor, which approval may be granted or withheld by Franchisor.

## 4. TERM OF THE AGREEMENT AND LICENSE

4.1.    This Agreement and the License granted hereunder will continue for a period of five (5) years ("**Initial Term**"). This Initial Term begins on the date this Agreement is signed by the Franchisor, subject, however, to termination in accordance with the provisions of this Agreement. When the Initial Term and any Interim Period expires, Franchisee will have the option, as determined by Franchisor, to extend its rights to operate the Business for one additional term ("**Successor Term**") of five (5) years. If Franchisee's rights to operate the Business are extended, Franchisee must pay the Franchisor the Successor Franchise Fee set forth in Section 4.4(b).

4.2.    The Franchisor may refuse to extend Franchisee's rights to operate the Business if Franchisee has:

      a.    Failed to remedy any breach of this Agreement by Franchisee specified by the Franchisor in a written notice to Franchisee as per Sections 18.1 or 18.2; or

      b.    Committed and received notice of two (2) or more breaches of this Agreement in the twenty-four (24) months before the end of the Initial Term, even if those breaches were timely remedied; or

      c.    Failed to meet the Annual Agent Quota, as set forth in Section 5.4 for any year during the Initial Term or any Interim Period; or

      d.    Franchisee has not given the Franchisor a written notice of intent to extend Franchisee's rights to operate the Business no less than six (6) months or more than nine (9) months before the expiration of the Initial Term; or

      e.    Franchisee is not current in all its payment obligations to the Franchisor or to Franchisee's trade creditors.

4.3.    If the Franchisor agrees to extend Franchisee's rights to operate the Business at the end of the Initial Term or any Successor Term, Franchisee will sign a successor franchise agreement ("**Successor Franchise Agreement**") and all other agreements in the form then being used by the Franchisor in granting new franchises and pay the Successor Franchise Fee set forth in Section 4.4(b). The Franchisor reserves the right to change any term(s) of the Successor Franchise Agreement form to be signed by Franchisee upon the extension of Franchisee's rights to operate the Business (except as specified below). There will not, however, be another Initial Franchise Fee charged in connection with the extension of Franchisee's rights to operate the Business. **IN FRANCHISOR'S SOLE DETERMINATION, THE FRANCHISEE MAY BE DEEMED TO HAVE IRREVOCABLY DECLINED TO RENEW THE FRANCHISE (AND ITS OPTION WILL THEREUPON TERMINATE) IF IT FAILS TO SIGN AND RETURN TO THE FRANCHISOR THE SUCCESSOR FRANCHISE AGREEMENT AND OTHER DOCUMENTS REQUIRED BY THE FRANCHISOR WITHIN THIRTY (30) DAYS AFTER THEIR DELIVERY TO THE FRANCHISEE, OR FAILS TO COMPLY IN ANY OTHER WAY WITH THE PROVISIONS OF THIS SECTION 4.**

4.4.    As additional conditions to the extension of Franchisee's rights to operate the Business, the Franchisor reserves the right to require Franchisee to:

      a.    Sign a general release of all claims Franchisee may have against the Franchisor, its officers, directors, members, shareholders, agents, Affiliates, and employees, whether in their corporate and/or individual capacities. This release will include all claims arising under any federal, state, or local law, rule, or ordinance arising out of or concerning this Agreement (to the fullest extent permitted by law) and will be in a form satisfactory to the Franchisor;

      b.    Pay the successor franchise fee ("**Successor Franchise Fee**") equal to Five Thousand Dollars ($5,000.00), which is due and payable to the Franchisor at the time of signing the Successor Franchise Agreement;

      c.    Agree to give the Franchisor not less than six (6) months nor more than nine (9) months prior written notice of Franchisee's election to extend (or not to extend) Franchisee's rights to operate the Business.

DocuSign Envelope ID: B95FB5BD-FB5F-4DAF-B76F-D12C259B10AA

Failure to give timely notice of Franchisee's intention to extend its rights to operate the Business will be deemed an election not to extend Franchisee's rights to operate the Business;

d.    Upgrade the Computer System and any related Software used in operations of the Business to Franchisor's then-current standards and specifications;

e.    Comply with all other provisions contained in the Operations Manual, as modified periodically by Franchisor; and

f.    Provide proof of current certificates, authorizations, licenses, insurance and permits.

4.5.    Franchisee shall have the continuing right to open additional Branch Offices during the Successor Term.

4.6.    If Franchisee does not sign a Successor Franchise Agreement before the expiration of this Agreement and continues to accept the benefits of this Agreement and the License after the expiration of this Agreement and the License, then at the option of Franchisor, this Agreement and the License may be treated either as (i) expired as of the date of expiration with Franchisee then operating without a franchise to do so and in violation of Franchisor's rights; or (ii) continued on a month-to-month basis ("**Interim Period**") until one party provides the other with written notice of the party's intent to terminate the Interim Period, in which case the Interim Period will terminate thirty (30) days after receipt of the notice to terminate the Interim Period. In the latter case, all obligations of Franchisee will remain in full force and effect during the Interim Period as if this Agreement and the License had not expired, and all obligations and restrictions imposed on Franchisee upon expiration of this Agreement and the License will be deemed to take effect upon termination of the Interim Period.

## 5.    TERRITORY

5.1.    During the Initial Term and for so long as Franchisee is in compliance with all of its obligations hereunder, except as otherwise provided in this Agreement, and subject to Franchisor's reservation of rights as set forth in Section 5.2 and as provided in Section 5.4 below, neither Franchisor nor any Affiliate of the Franchisor will open or license another person or entity to open or allow any others to open a competing La Rosa Realty businesses using the Marks licensed to Franchisee within the Territory encompassed by the boundaries set forth in **Attachment 1**, attached and incorporated by reference. The rights granted to Franchisee in this Section do not prohibit other franchisees and agents of Franchisor from listing and selling Real Property in Franchisee's Territory nor is Franchisee prohibited from listing or selling Real Property in a territory granted to another Franchisee, provided that Franchisee is licensed to sell Real Property in that area.  Except as otherwise specifically provided in this Agreement, this Agreement does not restrict the Franchisor or its Affiliates and does not grant rights to Franchisee to pursue any of Franchisor's or its Affiliates other business concepts other than the real estate brokerage business.

5.2.    Franchisee acknowledges that the Franchise granted hereunder is non-exclusive and that the Franchisor and its Affiliates retain the exclusive right to, among others:

a.    Use, and to license others to use, the Marks and System for the establishment of Real estate brokerage businesses at any location or Office other than in the Territory, regardless of proximity to the Territory;

b.    Use, license and franchise the use of trademarks or service marks other than the Marks, whether in alternative channels of distribution or at any location including within the Territory, in association with operations that are the same as, similar to or different from the Business;

c.    Use the Marks and the System in connection with the provision of other services and products or in alternative channels of distribution such as those described in Section 5.2(d), at any location including within the Territory;

d.    Offer the Services or Products, or grant others the right to offer the Services or Products, whether using the Marks or other trademarks or service marks, through alternative channels of distribution, including

46

without limitation, distribution outlets other than Real estate brokerage businesses, or by Internet commerce (e-commerce), mail order or otherwise, whether inside or outside the Territory;

        e.      Use any websites utilizing a domain name incorporating one or more of the words "La Rosa" or "La Rosa Realty" or similar derivatives. The Franchisor retains the sole and exclusive right to market on the Internet and use the Marks on the Internet, including all use of websites, domain names, URL's, directory addresses, metatags, linking, advertising, and co-branding and other arrangements. Franchisee may not independently market on the Internet, or use any domain name, address, locator, link, metatag, or search technique, with words or symbols similar to the Marks or otherwise establish any presence on the Internet without Franchisor's prior written approval. The Franchisor intends that any Franchisee website be accessed only through the Franchisor's home page. Franchisee will provide the Franchisor with content for the Franchisor's Internet marketing, and will sign Internet and intranet usage agreements, if any. The Franchisor retains the right to approve any linking or other use of its website; and

        f.      To acquire businesses that are the same as or similar to the Real estate brokerage business and operate those businesses regardless of where the businesses are located, including inside the Territory, and to be acquired by any third party which operates businesses that are the same as or similar to the Real estate brokerage business regardless of where those businesses are located, including inside the Territory.

5.3.    In determining the Territory, as set forth in **Attachment 1**, Franchisor will use geographic or political boundaries (including but not limited to city, county, or state boundary lines) and other characteristics including natural boundaries, and the amount and size of urban, suburban and rural areas. In addition, Franchisor will consider the most recent data available from the National Association of Realtors to determine the number of licensed Agents within the proposed Territory. Franchisee acknowledges and agrees that once the Territory has been established, it will not be changed regardless of any increase or decrease of the number of licensed Agents within in the Territory.

5.4.    To maintain the Territory, Franchisee must:

        a.      Secure a Central Office location with a term of no less than one (1) year in the Territory. This obligation is a continuing obligation that begins on the Effective Date of the Franchise Agreement and continues throughout the term of the Franchise Agreement provided that, as provided in Section 9.12 of the Franchise Agreement, Franchisee shall have six (6) months from the Effective Date to secure its first Central Office in the Territory.

        b.      Meet the Annual Agent Quota which number of Agents that must be employed by or associated with Franchisee during each year of the Initial Term and any Interim Period.

        c.      Franchisee's failure to satisfy the Annual Agent Quota may result in the reduction or elimination of Franchisee's Territory or the termination of this Agreement, as Franchisor determines.

## 6.    FEES

6.1.    Franchisee will pay a non-recurring initial franchise fee of $10,000 ("Initial Franchise Fee") to the Franchisor upon the execution of this Agreement, plus, if due and payable, all applicable federal, state or municipal taxes. The Initial Franchise Fee will be paid by means of cashier's check, money order or wire transfer. The Initial Franchise Fee is deemed fully earned by the Franchisor when paid. The Initial Franchise Fee is non-refundable once paid except as provided for in Section 6.1. Any fee paid by Franchisee to Franchisor in connection with Franchisee's application to Franchisor for approval to become a franchisee will be credited, in full, towards the Initial Franchise Fee. The Initial Franchise Fee will be non-refundable unless the Franchisor elects to refund all or a portion of the Initial Franchise Fee to Franchisee.

6.2.    Franchisee shall not be required to pay a fee for each Branch Office that Franchisee opens.

6.3.    For each month from and after the Opening Date, Franchisee will pay to Franchisor a monthly royalty fee ("**Royalty Fee**") equal to the greater of:

(i) 10% of Gross Commission Income for each month or partial month of the Initial Term of the Franchise Agreement and any Interim Period, after deduction of:

>   (a) the amount of the commissions or other fees actually paid to or received by Franchisee's Agent, and

>   (b) the minimum monthly fees or charges [such as, but not limited to, Annual Membership Fee, Marketing Fee (as defined in Section 12.1], Domain Name Fee, MLS/RETS Fee and Technology Fee, but expressly excluding the Royalty Fee) payable to Franchisor by Franchisee or by its Agents pursuant to this Agreement; or

(ii) $500 per month.

For purposes of clarification as to 6.3(i)(b) above, the amount of any fees charged to Agents by Franchisee in excess of the minimum of such fees or charges payable to Franchisor, shall be included in Gross Commission Income.

6.4.    For each month from and after the Opening Date, Franchisee will pay to Franchisor a license fee for the use of all Software and other technology provided by Franchisor ("**Technology Fee**") equal to $14.00 per Agent per month. Franchisor reserves the right to increase the Technology Fee during each year of the Initial Term, and any Successor Term and Interim Period. For each month, Franchisee shall also pay to Franchisor a fee for the integration of MLS generated data by Franchisor into Franchisee's Company and Agent Websites (the "**MLS/RETS Fee**"). The current MLS/RETS fee is $100 per month per MLS integrated into the Franchisee's Company and Agent Websites. We reserve the right to increase the MLS/RETS Fee by any amount determined by Franchisor to be reasonable based on third party charges for such services.

6.5.    Franchisee's Agents shall each pay to Franchisor an annual membership fee ("**Annual Membership Fee**") for the right to participate in Franchisor's System currently set at $50.00 per annum (prorated for any partial years). The Annual Membership Fee is payable to Franchisor on or before January 10th of each year (or within ten (10) days after each agent commences his or her association with Franchisee if after January 10th) and annually, thereafter. Once established, Franchisor reserves the right to increase the Annual Membership Fee annually. If any agent fails to pay an Annual Membership Fee when due, then Franchisee must pay such fee on demand from Franchisor.

6.6.    Franchisor may require Franchisee to utilize a La Rosa Realty specific domain name and to pay an annual (or other fiscal period required by the domain registrar) fee to Franchisor in exchange for the right to use the La Rosa Realty specific domain name (the "**Domain Name Fee**") with its La Rosa Realty business. The Domain Name Fee will be equal our expense in securing and maintaining the domain name associated with your La Rosa Realty business. The domain name will, at all times, be our property but we will allow Franchisee, as long as Franchisee complies with the Franchise Agreement, to utilize the domain name in the operation of the La Rosa Realty business.

6.7.    The Royalty Fee, Annual Membership Fee, Marketing Fees (as defined in Section 12.1) , Domain Name Fee, MLS/RETS Fee and Technology Fee (collectively "**Fees**") are payable to Franchisor on or before the 10th day of each month for the preceding calendar month and are payable through the entire Initial Term of this Agreement and any Interim Period. Franchisee will pay the Fees monthly or in any other frequency as the Franchisor may require upon written notice to Franchisee by the Franchisor. Franchisee will not subordinate to any other obligation its obligation to pay the Fees, or any other fee or charge hereunder. Each payment of Fees will be accompanied by a report, in a form and substance prescribed by Franchisor. **Each failure to include a fully completed statement of the previous month's Gross Commission Income with your payment of Fees payable to the Franchisor when due constitutes a material breach of this Agreement.**

6.8.    The Franchisor requires Franchisee to remit all fees and other amounts due to the Franchisor hereunder via electronic funds transfer ("**ACH**") or other similar means utilizing a Franchisor approved computer system or otherwise. The ACH authorization is attached to this Agreement as **Attachment 6**. If the Franchisor directs Franchisee to use this payment method, Franchisee agrees to comply with procedures specified by the

Franchisor and/or perform those acts and deliver and sign those documents, including authorization for direct debits from Franchisee's business bank operating account, as may be necessary to accomplish payment by this method. Under this procedure Franchisee will authorize the Franchisor to initiate debit entries and/or credit correction entries to a designated checking or savings account for payments of fees and other amounts payable to the Franchisor, including any interest charged thereon. Franchisee will make funds available to the Franchisor for withdrawal by electronic transfer no later than the due date for payment therefore. If Franchisee has not timely reported the Gross Commission Income to the Franchisor for any reporting period, then the Franchisor is authorized, at the Franchisor's option, to debit Franchisee's account in an amount equal to (a) the fees transferred from Franchisee's account for the last reporting period for which a report of the Gross Commission Income was provided to the Franchisor as required hereunder; (b) the minimum royalty and potential FMA funds (as defined in section 12.1(a)), or (c) the amount due based on information retrieved from the Franchisor approved computer system.

## 7.    ACCOUNTING, RECORDS, AUDITS AND LATE PAYMENT CHARGES

7.1.    Franchisee will keep those complete records of its Business as a prudent and careful businessperson would normally keep. Franchisee must use the accounting system and the pre-formatted template required by the Franchisor, if any. Franchisee will keep its financial books and records as the Franchisor may periodically direct in the Operations Manual or otherwise, including retention of all invoices, order forms, payroll records, check records, bank deposit receipts, sales tax records, commission reports, settlement statements, refunds, cash disbursements, journals, and general ledgers. Franchisee will advise the Franchisor of the location of all original documents and will not destroy any records without the written consent of the Franchisor.

7.2.    Franchisee will prepare, on a current basis, complete and accurate records concerning all financial, marketing and other operating aspects of the Business conducted under this Agreement, as the Franchisor will prescribe periodically. Franchisee will maintain an accounting system which accurately reflects all operational aspects of the Business including uniform reports as may be required by the Franchisor. Franchisee's records will include tax returns, daily reports, statements of Gross Commission Income (to be prepared each month for the preceding month), profit and loss statements (to be prepared at least quarterly by a reputable accountant), and balance sheets (to be prepared at least annually by a reputable accountant).

7.3.    Franchisee will also submit to the Franchisor, Franchisee's current financial statements and other reports as the Franchisor may reasonably request to evaluate or compile research and performance data on any operational aspect of the Business. Franchisee will provide the Franchisor with a copy of its federal tax return for the previous tax year (fiscal or calendar) within forty-five (45) days of submitting its federal tax return. In the event that Franchisee files an extension with the Federal Government to file its federal taxes for the previous year, Franchise must notify Franchisor within ten (10) days of filing such extension in writing.

7.4.    The records required under this Section 7 pertain only to Franchisee's operation of the Business. The Franchisor has no right to inspect, audit or copy the records of any of Franchisee's unrelated business or personal activities. Franchisee will keep the books and records of the Business separate from the records of any unrelated business or personal activity.

7.5.    From the date Franchisee and the Franchisor sign this Agreement until three (3) years after the end of the expiration or termination of this Agreement, the Franchisor or Franchisor's authorized agent will have the right to request, receive, inspect and audit any of the records referred to above wherever they may be located. The Franchisor agrees to conduct its inspections and audits at reasonable times. Franchisee agrees to keep all records and reports for six (6) years from the date these records are created. Should any inspection or audit disclose a deficiency in the payment of any Royalty Fee, potential FMF funds or other amounts required to be paid under this Agreement, Franchisee will immediately pay the deficiency to the Franchisor, without the need for further action or notice on the part of Franchisor and without prejudice to any other remedy of the Franchisor under this Agreement or otherwise. In addition, if the deficiency for any audit period discloses a deficiency in the amount of any Royalty Fee, potential FMF funds or other amounts due by $1,000.00 or more, Franchisee will also immediately pay to the Franchisor the entire cost of the inspection or audit including travel, lodging, meals, salaries, and other expenses of the inspecting or auditing personnel. For the purposes of this Section 7.5, an audit period will be each fiscal year. Should the audit

disclose an overpayment of any Royalty Fees, potential FMF funds, or other amounts due, the Franchisor will credit the amount of the overpayment to Franchisee's payments of Royalty Fees and potential FMF funds next falling due.

7.6.     If Franchisee's records and procedures are insufficient to permit a proper determination of Gross Commission Income, the Franchisor will have the right to either require Franchisee to pay the Minimum Royalty or deliver to Franchisee an estimate, prepared by the Franchisor, of Gross Commission Income for the period under consideration and Franchisee will immediately pay to the Franchisor any amount shown thereby to be owing on account of the Royalty Fee, FMF funds and other sums due on account of any understatement. Any estimate is final and binding upon Franchisee.

7.7.     To encourage prompt payment and to cover the costs and expenses involved in handling and processing late payments, Franchisee will also pay, upon demand, a late charge equal to 5% of the amount of the late payment plus interest of 1.5% per month on the late amount on all payments due to the Franchisor during the period of time said payments are due and unpaid. Each failure to pay Royalty Fees, Annual Membership Fees, FMF funds, and other amounts payable to the Franchisor when due constitutes a material breach of this Agreement. Franchisee acknowledges that this Section 7.7 will not constitute Franchisor's agreement to accept these payments after the same are due or a commitment by Franchisor to extend credit to or otherwise finance Franchisee's operation of the Real estate brokerage business. Further, Franchisee acknowledges that failure to pay all such amounts when due will, notwithstanding the provisions of this Section 7.7, constitute grounds for termination of this Agreement.

7.8.     Any report of the Franchisor's auditor rendered periodically pursuant to this Section 6.7 is final and binding upon all of the parties.

7.9.     Franchisee hereby authorizes the Franchisor to make reasonable inquiries of Franchisee's bank, suppliers and trade creditors concerning the Business and hereby directs those persons and companies to provide to the Franchisor this information and copies of documents pertaining to the Business as the Franchisor may request.

7.10.     Franchisee acknowledges and agrees that the Franchisor owns all business records ("**Business Records**") with respect to customers and other service professionals of, and/or related to, the Real estate brokerage business including, without limitation, all databases (whether in print, electronic or other form), including all names, addresses, telephone numbers, e-mail addresses, customer purchase records, and all other records contained in the database, and all other Business Records created and maintained by Franchisee. Franchisee further acknowledges and agrees that, at all times during and after the termination, expiration or cancellation of this Agreement, Franchisor may access these Business Records, and may utilize, transfer, or analyze these Business Records as Franchisor determines to be in the best interest of the System.

7.11.     To encourage prompt delivery of all Business Records, Certificates of Insurance, Gross Commission Income statements and any other documentation or record that may be requested by Franchisor under this Agreement, Franchisee will pay, upon demand, a late report fee in the amount of the greater of $100 or 5% of the required amount per record or document requested if Franchisee fails to deliver this record or document when due.

7.12.     If Franchisee pays the Royalty Fee or any other sums due to Franchisor under this Agreement with a check returned for non-sufficient funds more than one time in any calendar year, in addition to all other remedies which may be available, Franchisor will have the right to require that Royalty Fee payments and any other sums due to Franchisor under this Agreement be made by certified or cashier's checks. If Franchisee fails to pay the Royalty Fee or any other sums due to Franchisor under this Agreement by the due date two (2) times during the Initial Term or any Interim Period, in addition to all other remedies which may be available, the Franchisor reserves the right to require that Franchisee pay the Royalty Fee or any other sums due to Franchisor under this Agreement on a weekly basis.

7.13.     Franchisee agrees that, during the Initial Term and for the three (3) years after the expiration or termination of this Agreement, Franchisee will supply to the Franchisor Franchisee's home (or Business location, if other than Franchisee's home) address and telephone number.

## 8. SERVICES AND ASSISTANCE

8.1. The Initial Franchise Fee, Royalty Fee, and any Annual Membership Fee are paid for the License, which includes the use of the Marks, the System and the use of the Franchisor's Trade Secrets and Confidential Information provided pursuant to this Agreement and for certain services rendered by the Franchisor.

8.2. The Franchisor will offer Franchisee initial and continuing services, as the Franchisor deems necessary or advisable in furthering Franchisee's Business and the business of the System as a whole and in connection with protecting the Marks and goodwill of the Franchisor. Failure by the Franchisor to provide any particular service, either initial or continuing, will not excuse Franchisee from any of its obligations under this Agreement.

8.3. Currently, prior to Franchisee's opening of the Business, Franchisor will:

a. Agree upon Franchisee's Territory, which will be set forth in **Attachment 1**.

b. Approve Franchisee's proposed Offices. The factors that Franchisor will consider for such approval are whether the Office is located in Franchisee's Territory, if it is located in a conventional office located outside of any personal residence, if it is used solely and exclusively for the operation of the Real estate brokerage business, and if it is located sufficiently far enough away from any office of another La Rosa Realty franchisee, as determined by Franchisor. Franchisee acknowledges and agrees that Franchisor's approval of any Office in no way constitutes a warranty by Franchisor that the Office will achieve any particular level of sales or profits or that the Office satisfies any or all federal, state or local laws, ordinances or regulations for the operation of Franchisee's Real estate brokerage business.

c. Furnish Franchisee with specifications for the design and physical appearance of each Office and a description of the supplies required for the operation of Franchisee's Business as stipulated in Section 10.

d. Within ninety (90) days after the execution of this Agreement and Franchisee's receipt of all required licenses and permits to operate the first Office, provide Franchisee, or if Franchisee is an entity, a person designated to manage the Business ("**Designated Business Manager**") with an initial training program. The initial training program is for between two (2) and three (3) business days at the Franchisor's facilities in Celebration, Florida (or other location designated by the Franchisor). Franchisee must pay for airfare, meals, transportation costs, salaries, benefits, lodging and incidental expenses for all initial training program attendees. Training may include a discussion of the System, techniques, procedures, methods of operation, advertising, sales techniques, promotional ideas, marketing plans, customer relations, instructions on quality standards and practical experience in the operation of the Business.

e. Loan Franchisee, during the Initial Term (including any Interim Period), one (1) copy of the Franchisor's confidential Operations Manual containing mandatory and suggested specifications, standards, operating procedures and rules prescribed periodically by the Franchisor as further stipulated in this Section 8, and containing information relative to other obligations of Franchisee hereunder. Specifications, standards and operating procedures prescribed periodically by the Franchisor in the Operations Manual or otherwise communicated to Franchisee in writing constitutes provisions of this Agreement as if fully set forth herein. Franchisee will operate the Business strictly in accordance with the Operations Manual. Failure to comply with the standards set forth in the Operations Manual constitutes a material breach of this Agreement. The Franchisor reserves the right to provide the Operations Manual and updates to the Operations Manual in electronic form or other form determined by the Franchisor. The Franchisor will have the right to add to, and otherwise modify, the Operations Manual periodically to reflect changes in authorized Services, business image or the operation of the Business; provided, however, none of these additions or modifications will alter Franchisee's fundamental status and rights under this Agreement. Some of the revisions to the Operations Manual may include changes with respect to: (i) sales and marketing strategies; (ii) equipment and supplies; (iii) accounting and reporting systems and forms; (iv) insurance requirements; (v) operating procedures; and (vi) Services. Franchisee agrees to accept, implement and adopt any of these modifications at its own cost. Franchisee will keep its printed copy of the Operations Manual updated with replacement pages and insertions, as instructed by the Franchisor. Franchisee acknowledges that the Operations Manual is loaned to

51

DocuSign Envelope ID: B95FB5BD-FB87-4DAE-B76F-D12C2E9B10AA

Franchisee and will always remain the sole and exclusive property of the Franchisor. Upon termination of this Agreement, for any reason whatsoever, Franchisee will promptly return the Operations Manual together with all copies of any portion of the Operations Manual which Franchisee may have made, to the Franchisor.

8.4.    Currently, after Franchisee opens the Business, Franchisor reserves the right to:

a.    Make a representative reasonably available to speak with Franchisee on the telephone during normal business hours, as Franchisor determines is necessary, to discuss Franchisee's operational issues and support needs; provided, however, that questions regarding technological support will be referred to third parties (including but not limited to Affiliates of Franchisor) who may charge a fee for providing Franchisee with these technological support services.

b.    Hold periodic conferences to discuss sales techniques, new service developments, bookkeeping, training, accounting, performance standards, advertising programs, marketing procedures and other topics. These conferences may be held at the Franchisor's Celebration, Florida headquarters, Franchisee's Office or at a location chosen by the Franchisor, as determined by the Franchisor. Franchisee will be required to pay any conference fee charged by Franchisor and must pay all its travel and living expenses to attend.

c.    Hold a mandatory annual conference to discuss sales techniques, new service developments, training, bookkeeping, accounting, performance standards, advertising programs, marketing procedures and other topics. Franchisee must pay any conference fees charged by Franchisor, and all personal travel and living expenses. These mandatory annual conferences are held at the Franchisor's Celebration, Florida headquarters or at a location chosen by the Franchisor.

d.    Inform Franchisee of mandatory specifications, standards and procedures for the operations of the La Rosa Realty business.

e.    Research new Services and methods of doing business, periodically, and provide Franchisee with information concerning developments of this research.

f.    Maintain the FMF and use these funds to develop promotional, advertising and public relations programs for Real estate brokerage businesses.

g.    Provide advertising materials to Franchisee as Franchisor deems necessary.

h.    A representative of Franchisor may provide additional assistance. There may be additional charges for this additional assistance. If Franchisor provides additional assistance, the Franchisor and Franchisee must agree in advance on the charges for the visit and the length of the visit.

i.    Provide Franchisee with a monthly newsletter.

8.5    If Franchisee believes Franchisor has failed to adequately provide pre-opening services to Franchisee as provided in Section 8.3, Franchisee will notify Franchisor in writing within thirty (30) days following the opening of the Business. Absent the timely delivery of this notice to Franchisor, Franchisee is deemed to conclusively acknowledge that all pre-opening and opening services required to be provided by Franchisor were sufficient, timely, and satisfactory to Franchisee.

8.6.    Franchisor is not obligated to perform services set forth in this Agreement to Franchisee's particular level of satisfaction, but as a function of Franchisor's experience, knowledge and judgment. Franchisor does not represent or warrant that any other services will be provided to Franchisee, other than as set forth in this Agreement. If any other services, or any specific level or quality of service is expected, Franchisee must obtain a commitment to provide this service or level of service in writing signed by an authorized officer of Franchisor, otherwise Franchisor will not be obligated to provide any other services or specific level or quality of services.

DocuSign Envelope ID: B95FB5BD-FB57-4DAE-B76F-B12C252B10AA

9. **FRANCHISEE'S DUTIES, OBLIGATIONS AND OPERATING STANDARDS**

9.1.    Franchisee will, consistent with the terms of this Agreement, diligently develop and operate the Business and use its best efforts to market and promote the Services and Products.

9.2.    Subject to the terms of this Agreement, including Section 8.3(e), during the Initial Term and any Interim Period, Franchisee will strictly comply with all present and future standards, specifications, processes, procedures, requirements, and instructions of the Franchisor regarding the operation of the Business and must comply with the following requirements:

a.    On or before the 90-day anniversary of this Agreement, Franchisee or Franchisee's Designated Business Manager must attend and successfully complete all initial training programs. Franchisee is responsible for airfare, meals, transportation costs, salaries, benefits, lodging and incidental expenses for all initial training program attendees.

b.    Before opening the Business, Franchisee must complete the renovations to the Office necessary to comply with Franchisor's standards and specifications; comply with Franchisor's opening procedures for the Office, as set forth in the Operations Manual; and, obtain Franchisor's written approval that Franchisee has complied with the foregoing requirements.

c.    Franchisee or a Designated Business Manager must attend mandatory annual conferences at locations the Franchisor may reasonably designate, and Franchisee will pay all salary and other expenses of persons attending, including any conference fees, travel expenses, meals, living expenses and personal expenses.

d.    Any additional required Service introduced into the System by the Franchisor must be offered for sale on a continuing basis at the Business at the time and in the manner required by the Franchisor. Franchisor will provide at least thirty (30) days' prior written notice of any new required Service introduced into the System. All equipment, products, supplies, and other items necessary to add the newly required Services must be acquired, installed, and utilized at the time and in the manner required by the Franchisor. The marketing of new Services must begin at the Business as reasonably required by the Franchisor.

e.    No service, except approved Services, may be offered for sale within the Territory, unless Franchisee receives the prior written consent of the Franchisor.

f.    Only advertising and promotional materials, service, equipment, tools, inventory,  products, signage, supplies, and uniforms that meet the Franchisor's standards and specifications is used at the Business. Advertising and promotional materials, services, equipment, inventory, products, signage, supplies and uniforms produced or approved by Franchisor for use by Franchisee may be used only in the manner and during the period specified by the Franchisor.

g.    Equipment, Services, inventory, supplies, signage, uniforms and other items must be added, eliminated, substituted and modified at the Business as soon as possible in accordance with changes in the Franchisor's specifications and requirements.

h.    The Business and everything related to the Business must be maintained in good condition and must be kept clean, neat and sanitary. All maintenance, repairs and replacements reasonably requested by the Franchisor or needed in connection with the Business must be promptly made. All employees must be clean and neat in appearance.

i.    No alterations of the Business materially affecting the image of the Business may be made except at the Franchisor's request or approval, and any alterations must strictly conform to specifications and requirements established or approved by the Franchisor.

j.    The Business and the Services provided by Franchisee must comply with all applicable federal, state, and local laws, ordinances, rules, regulations and other requirements applicable to real estate brokerage

DocuSign Envelope ID: B95FB5BD1FB5F4DAE-B76FD12C259B10AA

and sales laws. Franchisee must obtain all real estate, brokerage, and business licenses and permits required by federal, state and local laws, ordinances, rules and regulations before operating its Business. If Franchisee does not obtain all required permits and licenses necessary to operate it Business within six (6) months after the mutual execution of the Franchise Agreement, Franchisor may terminate this Franchise Agreement.

k.      The employees, Agents, equipment, supplies, products, and other items on hand at the Business, must be at all times be sufficient to efficiently meet the anticipated volume of business.

l.      The payment of all debts and taxes arising in connection with the Business, except those duly contested in a bona fide dispute, must be paid when due.

m.      Franchisee will use its best efforts to ensure customer satisfaction; use good faith in all dealings with customers, other real estate agents and brokers, potential customers, referral sources, suppliers and creditors; respond to customer complaints in a courteous, prompt and professional manner; use its best efforts to promptly and fairly resolve customer disputes in a mutually agreeable manner; and take any actions Franchisor deems necessary or appropriate to resolve customer disputes.

n.      Franchisee will accept all major credit cards and other the forms of payment specified by Franchisor in the Operations Manual as payment.

o.      Franchisee will comply with all terms and pay all fees that may be due in connection with any Software Franchisee is required to use in the operation of its Business as prescribed by the Franchisor.

p.      Franchisee will comply with the advertising requirements set out in Section 12.

q.      Franchisee will not use any materials that are false or misleading.

r.      Franchisee will ensure that all advertising and other materials associated with the  Services fully conform to all applicable laws and regulations.

s.      Franchisee will conduct its business operations in accordance with all applicable laws and regulations, including but not limited to, real estate brokerage and sales laws and regulations, and consumer protection laws and regulations. Franchisee will control the quality of the Services to avoid quality problems or liability claims that could reflect adversely on Franchisee or Franchisor in the minds of consumers.

t.      Franchise will maintain and require its Agents and employees to maintain a high ethical standard in the conduct of Franchisee's Business, and Franchisee will join and remain a member in good standing of any local board of realtors within the Territory and any applicable national association of realtors. In addition, Franchisee must enter into written agreements with all of its Agents that include a fee structure which entitles Franchisee to collect monthly fees, transaction fees, and other fees on all of the Agents' transactions. The fee structure and any changes or modifications to the fee structure must be approved by Franchisor prior to being implemented by Franchisee.

u.      Franchisee recognizes and acknowledges the importance of referrals between franchisees of Franchisor and agrees, if lawful and when reasonable and appropriate, to refer requests for real estate services to franchisees of Franchisor operating in territories in which Franchisee does not operate a Business or provide Services.

v.       Franchisee will provide each of its Agents with the supervision as a reasonable real estate broker would provide its agents in the proper conduct of its business as a real estate broker.

w.      Franchisee will not enter into any exclusive affiliated business relationships with Franchisee Affiliates or third parties to provide services related to the La Rosa Realty business.

9.3.    In prescribing standards, specifications, processes, procedures, requirements or instructions under Section 9.2 or any other provision of this Agreement, the Franchisor will provide guidance to Franchisee, as required in Franchisor's sole determination, including but not limited to, determining the fees to be charged by Franchisee for Services. Franchisor will not have control over the day-to-day managerial operations of the Business, and Franchisee is free to establish its own fees and other charges for Services. Notwithstanding Franchisor's right to require Franchisee to conduct its business in accordance with the System, Franchisee and Franchisor recognize that the sale and brokerage of real estate is a profession requiring independent judgment, skill and training and is governed in many particulars by state and federal authorities. Any inconsistency between the System or Franchisor's advice and the dictates of good real estate practice, or any legal requirement of that practice, is inadvertent and not an effort to cause Franchisee to deviate from proper practices. Therefore, Franchisee and Franchisor understand and agree that (i) in all cases, lawful, regulatory requirements take precedence over both any inconsistent advice, counsel or other guidance, whether written or oral, given by Franchisor on any topic and anything inconsistent in the System; (ii) no business advice given by Franchisor nor any part of the System is taken as advice in respect of the practice of the profession of real estate sales and brokerage, as defined by law; (iii) Franchisee's judgment, or the judgment of Franchisee's Designated Business Managers, governs in all matters pertaining to each and every aspect of the professional practice of real estate sales and brokerage; (iv) in any case in which Franchisee believes Franchisor's advice or the System contravene the practice of the profession of real estate sales and brokerage or any legal requirements of that practice, Franchisee will notify Franchisor, orally and in writing, immediately; and (v) Franchisee and Franchisee's Designated Business Managers are solely responsible for the operation of the Business and the results of that operation.

9.4.    Franchisor and Franchisor's representatives shall have the right during business hours to inspect the Business and all Offices. Franchisor and Franchisor's representatives will have the right to observe the manner in which Franchisee is rendering its Services and conducting its operations of the Business. Franchisor and Franchisor's representatives will have the right to discuss with Franchisee, or other personnel Franchisee may designate, all matters that may pertain to compliance with this Agreement and with the Franchisor's standards, specifications, requirements, instructions and procedures and the Franchisor may take photographs of Franchisee's completed work as it relates to the Business. Franchisor and Franchisor's representatives will have the right to have any of the Franchisor's required Services rendered by any employee at the Business. Franchisee will fully cooperate with the Franchisor's rights under this Section 9.4; provided, however, that the Franchisor's exercise of these rights will not unreasonably interfere with Franchisee's conduct of the Business.

9.5.    Franchisor may require Franchisee's compliance with the provisions of this Section 9 even if it does not require this compliance by all franchisees.

9.6.    If Franchisee is an individual, Franchisee must directly supervise the Business.  If Franchisee is a corporation or other business entity, or if Franchisee has, in the Franchisor's sole judgment, insufficient experience in a business similar to the franchise or experience in business management in general, then Franchisee will nominate a Designated Business Manager having required experience who will have direct responsibility for all operations of an Office. Any change in a Designated Business Manager will be subject to Franchisor's approval.

9.7.    Franchisee and its Agents are required to become a member of local, state and national real estate boards, associations or organizations which in the reasonable opinion of the Franchisor are useful in the operation of the Business. Franchisee will have the option to become a member of all benefit programs which are offered periodically by the Franchisor to all of its Franchisees. The costs of participating in these boards, associations and benefit programs is borne by Franchisee and its employees (if applicable to the employees). Nothing in this Section 9.7 limits Franchisee's freedom to join any franchise or franchisee's association of its choosing.

9.8.    Franchisee will at all times have sufficient computer skills to operate Franchisee's computer, understand how to utilize any Software Franchisor requires to be used in the Business, and to access email and the Internet. If Franchisor determines that Franchisee requires additional computer training, Franchisor will notify Franchisee in writing regarding the nature of the additional training required, and Franchisee will have ninety (90) days to complete this training at a local computer training school at Franchisee's sole cost and expense. Franchisor reserves the right to designate the computer training school at which Franchisee must attend (which may be an

Affiliate). At the end of the training program, Franchisee will present a certificate reasonably acceptable to Franchisor establishing that Franchisee passed the training course. Franchisee's failure to seek additional training or to pass the course constitutes a default of this Agreement.

9.9.    Franchisee acknowledges and understands that computer systems are vulnerable to computer viruses, bugs, power disruptions, communication line disruptions, Internet access failures, Internet content failures, date-related problems, and attacks by hackers and other unauthorized intruders. Franchisor does not guarantee that information or communication systems supplied by Franchisor or its suppliers will not be vulnerable to these problems. Franchisee acknowledges and agrees that Franchisee is solely responsible for protecting itself from these problems. Franchisee must also take reasonable steps to verify that Franchisee's suppliers, lenders, landlords, customers, and governmental agencies on which Franchisee relies, are reasonably protected. This may include taking reasonable steps to secure Franchisee's systems, including, firewalls, access code protection, anti-virus systems, and use of backup systems.

9.10.    Franchisee will acquire, maintain, and upgrade Hardware, Software, information processing and communication systems, and Internet and other network access providers, as prescribed in the Operations Manual and as modified periodically by Franchisor. Franchisee will comply with any license agreements that Franchisor or its designees use or require in connection with the System. Franchisee will utilize Franchisor's required Software, proprietary database management, equipment, and intranet system as the exclusive means for tracking and maintaining customer, vendor, and lead information, and for other uses as prescribed by Franchisor periodically in the Operations Manual. Monthly sales and Royalty Fee reporting may occur through mandatory Software including the automatic draft via electronic transfer of Royalty Fees, Required Software License and Support Fees and FMF funds.

9.11.    Franchisee will at all times maintain an active email account and will check the account several times per day. If available, Franchisee will maintain an email account on Franchisor's proprietary database management and intranet system.

9.12.    Franchisee may not open an Office until: (1) Franchisor notifies Franchisee in writing that all of Franchisee's obligations have been fulfilled; (2) the initial training program has been completed to Franchisor's satisfaction; (3) the Office has been renovated in accordance with Franchisor's standards and specifications; (4) all amounts due to Franchisor have been paid; (5) Franchisor has been furnished with copies of all insurance policies and certificates required by this Agreement, or other documentation of insurance coverage and payment of premiums that Franchisor may request; (6) Franchisee notifies Franchisor that all approvals and conditions set forth in this Agreement have been met; (7) Franchisee has obtained all necessary real estate brokerage licenses and permits and other applicable permits and licenses; (8) Franchisee has provided Franchisor with a fully signed copy of the Lease for the Office; (9) Franchisee has provided satisfactory evidence to Franchisor that all of Franchisee's Agents are licensed to sell Real Property in the Territory; and (10) Franchisee has ordered, received and installed all equipment, supplies, inventory, tools, products, uniforms and computer Hardware and Software required by Franchisor. Franchisee will begin operating the Business immediately after Franchisor determines that the Business is ready for opening. Franchisee must open the Central Office within six (6) months after signing the Franchise Agreement unless Franchisor otherwise consents in writing.

9.13.    Franchisee shall, prior to the opening of its Central Office and continuing throughout the Initial Term and any Interim Period, provide Franchisor with administrative log-in credentials for each MLS that Franchisee or its principals are a member of or for which they are paying Franchisor a MLS/RETS FEED Fee. Franchisee is responsible for the costs and fees associated with securing additional administrative log-in credentials on behalf of Franchisor.

9.14.    Franchisee shall:

(a)    Require any Agent who has not closed at least three (3) transactions within the twelve (12) month period prior to being engaged by Franchisee, to attend and successfully complete such real estate brokerage training programs then being conducted by La Rosa Coaching, LLC ("Coaching LLC"). Franchisee shall be responsible for payment of the then current training fees charged by Coaching LLC directly to Coaching LLC for

such training and will be responsible to pay for all salary and other expenses of Agents attending, including any travel expenses, meals, living expenses and personal expenses. All such Agents shall continue to participate in such coaching programs until their first three (3) transactions have closed.

(b)     Require all new Agents to attend and successfully complete a week long real estate brokerage orientation program conducted by Coaching LLC. Franchisee shall be responsible for payment of the then current orientation program fees charged by Coaching LLC directly to Coaching LLC for such orientation program and will be responsible to pay for all salary and other expenses of Agents attending, including any travel expenses, meals, living expenses and personal expenses.

(c)     Franchisee shall designate (subject to Coaching LLC's approval) one (1) or more Agents who have successfully completed the week long real estate brokerage orientation program to act as in-house "Real Estate Coach(es)" for all new Agents engaged by Franchisee. Such Real Estate Coaches shall conduct weekly coaching sessions at Franchisee's Central or Branch Office(s) in accordance with the training methods provided and overseen by Coaching LLC. Franchisee shall pay directly to Coaching LLC a fee equal to twenty percent (20%) of the Gross Commission Income of transactions participated in by the Real Estate Coach.

## 10.    PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES

10.1.    Franchisee must purchase all services, equipment, supplies and Hardware and Software from only those suppliers, manufacturers and distributors who have been designated or approved in advance by Franchisor. The standards and specifications for equipment, computer Hardware and Software, tools, vehicles, signage, supplies, and services required by the Franchisor is maintained in the Operations Manual. The Franchisor has the right to require Franchisee to discontinue purchasing any services, equipment, supplies, Hardware or Software from an approved or Designated Supplier, manufacturer or distributor and may designate new suppliers, manufacturers or distributors at any time.

10.2    Franchisee acknowledges and agrees that the Franchisor may receive from approved and Designated Suppliers of Franchisee's Services, equipment, tools, supplies and Hardware and Software, periodic volume rebates or other revenue as a result of Franchisee's purchases. Franchisee further acknowledges and agrees that the Franchisor is entitled to keep for its own use and account these rebates and this revenue.

10.3.    The names and addresses of the Franchisor's approved and Designated Suppliers, manufacturers and distributors is maintained in the Operations Manual. Franchisor reserves the right to approve all of the supplies, Services, equipment, Hardware and Software used in connection with Franchisee's Business.

10.4.    Franchisee acknowledges and agrees that certain approved or Designated Suppliers, distributors, and service providers may be Affiliates.

10.5.    Franchisee must use Franchisor's Affiliate, La Rosa Coaching LLC, for the purposes of training all new Agents and/or those Agents who have closed less than three (3) transactions within a preceding twelve (12) month period.

10.6.    Franchisee is not required to, but it is recommended that, Franchisee refer clients to Franchisor's Affiliate, La Rosa Title LLC, to act as the title agency for title and closing of transaction in which Franchisee is involved.

10.7.    Franchisee must use Franchisor's Affiliate, La Rosa CRE, LLC to oversee and assist in all commercial real estate transaction in which Franchisee is involved.

10.8.    Franchisee is not required to, but it is recommended that, Franchisee refer clients to Franchisor's Affiliate, La Rosa Insurance LLC, to provide homeowner's, auto, and health insurance and related services, subject to client approval.

10.9.    Franchisee must use Franchisor's Affiliate, La Rosa Property Management LLC, to provide all residential and commercial property management services to Franchisee's clients.

## 11.    MARKS, COPYRIGHTED WORKS AND OWNERSHIP OF IMPROVEMENTS.

11.1.    Franchisee acknowledges and agrees that:

a.    Franchisor is the sole and exclusive owner of all right, title and interest, together with all the goodwill, of the Marks. Franchisee further acknowledges that the Marks designate the origin or sponsorship of the System, the Business, and the Services, and that Franchisor desires to protect the goodwill of the Marks and to preserve and enhance the value of the Marks. In the event that Franchisee acquires any rights, title or interest in the Marks, Franchisee agrees to assign and hereby assigns all rights, title or interest to Franchisor.

b.    All right, title and interest in and to all materials, including but not limited to, all artwork and designs, created by Franchisor, and used with the Marks or in association with the Business ("Copyrighted Materials") are the sole and exclusive property of the Franchisor. Additionally, all Copyrighted Materials created by Franchisee or any other person or entity retained or employed by Franchisee are works made for hire within the meaning of the United States Copyright Act and are the sole and exclusive property of the Franchisor, who is entitled to use and license others to use the Copyrighted Materials unencumbered by moral rights. If the Copyrighted Materials are not works made for hire or rights in the Copyrighted Materials do not automatically accrue to the Franchisor, Franchisee irrevocably assigns and agrees to assign to the Franchisor, its successors and assigns, the entire right, title, and interest in perpetuity throughout the world in and to any and all rights, including all copyrights and related rights, in these Copyrighted Materials, which Franchisee and the author of these Copyrighted Materials warrant and represent as being created by and wholly original with the author. Where applicable, Franchisee agrees to obtain any other assignments of rights in the Copyrighted Materials from another person or entity necessary to ensure Franchisor's right in the Copyrighted Materials as required in this Section 11.1(b).

c.    Franchisee will never dispute, contest, or challenge, directly or indirectly, the validity or enforceability of the Marks or Copyrighted Materials or Franchisor's ownership of the Marks or Copyrighted Materials, nor counsel, procure, or assist anyone else to do the same, nor will it take any action that is inconsistent with Franchisor's ownership of the Marks or Copyrighted Materials, nor will it represent that it has any right, title, or interest in the Marks or Copyrighted Materials other than those expressly granted by this Agreement.

d.    Franchisor reserves the right to decide to apply to register or to register any trademarks or copyrights with respect to the Services, Products and any other products and services and the Copyrighted Materials. Failure of Franchisor to obtain or maintain in effect any of these applications or registrations is not a breach of this Agreement. Franchisee will not, before or after termination or expiration of the Agreement, register or apply to register any of the Marks or any trademark, service mark or logo confusingly similar or any Copyrighted Materials, anywhere in the world.

e.    Upon Franchisor's request, Franchisee will cooperate fully, both before and after termination or expiration of this Agreement, in confirming, perfecting, preserving, and enforcing Franchisor's rights in the Marks and Copyrighted Materials, including but not limited to, executing and limited to, assignments, powers of attorney, and copies of commercial documents showing sale and advertising of the Services and Products and other products and services. Franchisee hereby irrevocably appoints Franchisor as its attorney-in-fact for the purpose of executing these documents.

f.    All usage of the Marks by Franchisee and any goodwill established by Franchisee's use of the Marks will inure to the exclusive benefit of Franchisor. This Agreement does not confer any goodwill or other interests in the Marks to Franchisee upon expiration or termination of the Agreement.

g.    **FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE USE, EXCLUSIVE OWNERSHIP, VALIDITY OR ENFORCEABILITY OF THE MARKS OR COPYRIGHTED MATERIALS.**

11.2.    Franchisee acknowledges and agrees that:

a.    Franchisee's right to use the Marks and Copyrighted Materials are derived solely from this Agreement. Franchisee may only use the Marks and Copyrighted Materials in its operation of the Business and only incompliance with this Agreement and all applicable standards, specifications, and operating procedures prescribed by Franchisor in the Operations Manual and elsewhere periodically during the Initial Term and any Interim Period. Franchisee will make every effort consistent to protect, maintain, and promote the Marks as identifying the System and only the System.

b.    Any unauthorized use of the Marks or Copyrighted Materials by Franchisee constitutes a breach of this Agreement and an infringement of the rights of Franchisor and in and to the Marks and Copyrighted Materials.

c.    Franchisee will not use any Marks or portion of any Marks as part of a corporate or trade name, or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form. Franchisee will obtain any fictitious or assumed name registrations as may be required by Franchisor or under applicable law.

d.    To preserve the validity and integrity of the Marks and Copyrighted Materials licensed herein and to assure that Franchisee is properly employing the same in the operation of its Business, Franchisor or its agents will have the right of entry and inspection of Franchisee's Business and operating procedures pursuant to Section 9.4.

e.    Franchisee will safeguard and maintain the reputation and prestige of the System, Marks and Copyrighted Materials and will not do anything that would tarnish the image of or adversely affect the value, reputation or goodwill associated with the Marks. Franchisee will not do anything that would dilute, directly or indirectly, the value of the goodwill attached to the Marks, nor counsel, procure or assist anyone else to do the same.

f.    Franchisee will use the Marks and Copyrighted Materials only in lettering, logos, print styles, forms, and formats, including but not limited to, advertising and promotional materials, invoices, signage, business checks, business cards, invoices, stationery, and promotional items such as clothing, pens, mugs, etc., which have been approved by Franchisor in accordance with this Agreement, and promptly follow instructions regarding the Marks and Copyrighted Materials as provided in the Operations Manual and otherwise given by Franchisor periodically.

g.    Franchisee will use the following copyright notice at least once on each piece of advertising, promotional, or other material used in connection with the Products and Services:

h.    Franchisee will use the Marks with a superscript "**®**","**SM**"or "**TM**", as specified by Franchisor, unless and until advised by Franchisor to use a different notice.

11.3.    Franchisee acknowledges and agrees that:

a.    If, in Franchisor's reasonable determination, the use of Marks or Copyrighted Materials in connection with the Services, other products and services or the Business will infringe or potentially infringe upon the rights of any third party, weakens or impairs Franchisor's rights in the Marks or Copyrighted Materials, or it otherwise becomes advisable at any time for Franchisor to modify or discontinue of the Marks or Copyrighted Materials then, upon notice from Franchisor, Franchisee will immediately terminate or modify this use in the manner prescribed by Franchisor. Franchisor may require Franchisee to use one (1) or more additional or substitute trade names, trademarks, service marks or other commercial symbols or copyrighted materials. Franchisee will have no rights of damages, offset, or right to terminate this Agreement as a result thereof and Franchisor will have no liability or obligation whatsoever with respect to Franchisee's modification or discontinuance of any Marks or Copyrighted Materials.

DocuSign Envelope ID: B95FB5BD-FBBZ-4DAE-B76F-B12C259B10AA

b.    Franchisee will notify Franchisor within three (3) days after receiving notice of any claim, demand or cause of action based upon or arising from any attempt by any other person, firm or corporation to use the Marks or any colorable imitation thereof or the Copyrighted Materials. Upon receipt of timely notice of an action, claim or demand against Franchisee relating to the Marks or Copyrighted Materials, Franchisor will have the sole right, but not the duty, to defend any action. Franchisor will have the exclusive right to contest or bring action against any third party regarding the third party's use of any of the Marks or Copyrighted Materials. Franchisor will control all actions but not be obligated to take any action. In any defense or prosecution of any litigation relating to the Marks, Copyrighted Materials or components of the System undertaken by Franchisor, Franchisee will cooperate with Franchisor, execute any and all documents, and take all actions as may be desirable or necessary in the opinion of Franchisor's counsel, to carry out this defense or prosecution. At Franchisor's option, Franchisee will join in any action. If Franchisee joins in an action, then the recovery, if any, from this legal action is first applied to the total expenses associated therewith and the remainder going to the Franchisor.

11.4.    All provisions of this Agreement applicable to the Marks and Copyrighted Materials apply to any and all additional trademarks, service marks, commercial symbols and copyrighted materials authorized for use by and licensed to Franchisee by Franchisor after the date of this Agreement.

11.5.    If Franchisee during the Initial Term of the franchise relationship or any Interim Period or any Successor Term conceives or develops any improvements or additions to the System, Copyrighted Materials, website or any other documents or information pertaining to or relating to the System or the Business, or any new trade names, trade and service marks, logos, or commercial symbols related to the Business or any advertising and promotional ideas or inventions related to the Business (collectively, the "**Improvements**") Franchisee will fully disclose the Improvements to Franchisor, without disclosure of the Improvements to others, and will obtain Franchisor's written approval before using these Improvements. Any of these Improvements may be used by Franchisor and all other franchisees without any obligation to Franchisee for royalties or other fees. Franchisee will assign and does hereby assign to Franchisor, all right, title and interest in and to the Improvements, including the right to grant sublicenses to any of these Improvements. Franchisor reserves the right to make application for and own copyrights, patents, trade names, trademarks and service marks relating to any of these Improvements and Franchisee will cooperate with Franchisor in securing these rights. Franchisor may also consider these Improvements as the property and Trade Secrets of Franchisor. In return, Franchisor may authorize Franchisee to utilize any Improvement that may be developed by other franchisees and is authorized generally for use by other franchisees.

11.6.    Neither Franchisee nor its Designated Business Managers or Agents will attempt to register a top-level or second level domain name that contains any portion of the Marks without the prior written approval of Franchisor and subject to any conditions Franchisor may request.

## 12.    ADVERTISING AND PROMOTION

12.1.    Marketing Fees and Materials.

a.    If and when established, Franchisee agrees to pay to Franchisor continuing marketing fees ("**Marketing Fees**") equal to an amount 1% of Gross Commission Income. Once established, Franchisee shall pay Marketing Fees at the time and in the manner prescribed in Sections 6.6 and 6.7. Franchisor reserves the right to decrease the Marketing Fees and to increase the Marketing Fees to a maximum of 1.5% of Gross Commission Income by sending written notice to Franchisee. Any change in the Marketing Fees will be effective as of the first day of the month that is at least ninety (90) days after delivery of the notice of change to Franchisee. The Marketing Fees will be posted to the Franchise Marketing Fund ("**FMF**"). The FMF is accounted for separately by Franchisor, but the FMF funds will not be maintained in a separate or segregated account at a bank or other financial institution.

b.    Franchisor will use the FMF fees it collects from franchisees (i) to create marketing materials relating to the System, (ii) to pay for public relations projects intended to enhance the goodwill and public image of the System, (iii) to assist franchisees in developing local marketing programs in their respective Territories; (iv) to pay for the cost of placing marketing materials in various print, broadcast and Internet media; (v) to undertake any other marketing efforts as Franchisor deems necessary or beneficial to the System as determined by Franchisor;

and, (vi) to reimburse Franchisor (based on reasonable allocations calculated by Franchisor's management) for (a) salaries and other overhead expenses that are directly related to projects of a character described in clauses (i), (ii), (iii) and (iv), including the payment of a salary to a field marketing manager, and (b) for part of the cost of maintaining Franchisor's website, as authorized in Section 12.4. Franchisor will use the FMF in a manner that is reasonably designed to provide some level of marketing benefits to all Franchisees. However, Franchisor reserves the right to allocate the FMF funds to various permitted uses as it sees fit and does not guarantee that all Franchisees will receive equal benefits or identical coverage.

   c. If the FMF operates at a deficit or requires additional funds at any time, Franchisor may loan funds to the FMF in amounts and on the terms, including repayment terms, Franchisor deems necessary or advisable.

   d. Franchisor will furnish Franchisee upon request one slick, master or other "**suitable for reproduction**" sample of all newspaper inserts, direct mail flyers, television and radio commercials, and other marketing materials that Franchisor creates and approves for system-wide use. Franchisee must pay to reproduce and use these materials in Franchisee's Local Advertising campaigns.

   e. Franchisor will use commercially reasonable efforts to spend FMF contributions in a manner that provides advertising benefits to all participating real estate brokerage businesses. However, Franchisor does not guarantee that all participants will receive identical media exposure or advertising benefits in view of regional differences in media costs, varying degrees of market penetration in different DMAs, and other relevant factors.

12.2. Local Advertising.

   a. Franchisee agrees to spend money for Local Advertising and promotions in the Territory in accordance with local real estate brokerage marketing standards and practices.

   b. Franchisee will also pay its pro rata share of the cost of classified directory listings to be placed by Franchisor on behalf of all real estate brokerage businesses in Franchisee's market. If Franchisee operates the only real estate brokerage business in the market, Franchisee is responsible for full payment of the classified directory advertisement.

   c. Franchisee agrees to participate in all system-wide promotions and advertising campaigns that Franchisor requires. Except for Franchisee's commitments to participate in system-wide promotions and advertising campaigns and to pay its share of the cost of a classified directory advertisement, Franchisee will initially have discretion over the approach Franchisee takes to Local Advertising and promotions. This discretion will continue until an Area Cooperative is established in Franchisee's Designated Market Area ("**DMA**"), as defined by Neilson Rating Service. Franchisor reserves the right to approve in advance the use by Franchisee of any graphic or electronic materials or commercials developed by Franchisee that feature any of the Marks.

   d. Franchisee may, at its sole expense, plan and carry out a grand opening promotion relating to the opening of the Business.

   e. All advertising and promotion by Franchisee will be conducted in a dignified manner and will conform to the standards and requirements set forth in this Agreement and the Operations Manual or otherwise for use of the Marks. Franchisee will promptly discontinue use of any advertising or promotional plans or materials that do not meet the requirements of this Agreement or the Operations Manual, whether or not previously approved, upon notice from Franchisor.

   f. Within thirty (30) days after written request from Franchisor, Franchisee will submit a report to Franchisor showing the amount Franchisee spent for Local Advertising and promotions during the preceding year and documents substantiating that Franchisee incurred and paid particular expenditures during the year.

12.3. Area Cooperatives.

a.     At the time the DMA in which the Real estate brokerage business is located encompasses real estate brokerage businesses operated by at least two owners, the owners in the DMA will, at Franchisor's request and with its advice and assistance, form a cooperative advertising association among themselves ("**Area Cooperative**") for the purpose of jointly advertising and promoting their Businesses.

b.     If, in connection with an Area Cooperative's formation or functioning, its members are unable to reach agreement with respect to any disagreement over organization, administration, "spill" policy, contribution waivers or exceptions, budget or other matters that the members cannot resolve within 45 days, the issue will be referred to Franchisor for resolution. Franchisor's decision with respect to the issue's resolution will be binding on all members of the Area Cooperative. In addition, Franchisor reserves the right to review each Area Cooperative's contribution rate on an annual basis and to disapprove a rate of less than 1% of Gross Commission Income.

c.     Franchisee agrees (i) to join, participate in, and actively support any Area Cooperative established in the Real estate brokerage business's DMA, and (ii) to make contributions to each Area Cooperative on the payment schedule adopted by the Area Cooperative's members and at the contribution rate Franchisor approves.

d.     Franchisor will have the sole right to form, change, dissolve or merge any Area Cooperative.

12.4.   Internet Website.

a.     Franchisor has established an Internet website that provides information about the System and the services that real estate brokerage businesses offer. Franchisor will have sole control over the website's design and contents, except that the site will contain the pages that Section 12.4(b) describes. Franchisor may use part of the marketing fees it collects under Section 12.1 and part of the FMF's revenues to pay or reimburse itself for the costs of maintaining and updating the website, except that Franchisor may not use FMF revenues to pay for those components of the website that are devoted to publicizing the La Rosa Realty franchise program or the sale of La Rosa Realty franchises.

12.5.   The website will include a section that provides the address, telephone number and e-mail address of each real estate brokerage business in the La Rosa Realty chain, including Franchisee's real estate brokerage business. At Franchisee's request, Franchisor will also include at the website an interior page devoted to information about Franchisee's real estate brokerage business. The page must be developed by Franchisee, at Franchisee's expense, with a template that Franchisor provides and will be subject to Franchisor's approval before posting as to form, content and programming quality. The page will also be subject to Franchisor's policies regarding linking with and framing other websites, the use of so- called metatags and ghost script, and other aspects of electronic advertising and communication.

## 13.    INSURANCE AND INDEMNITY

13.1.   Franchisee and, with respect to automobile coverage, Franchisee's Agents, will upon commencement of the Initial Term, purchase and at all times maintain in full force and effect:

a.     Insurance policies, in the amounts and on the terms prescribed by the Operations Manual, issued by an insurance company acceptable to Franchisor at all times during the Initial Term of this Agreement and any Interim Period. Insurance coverage must include, but is not limited to, comprehensive general liability, combined single limit, automobile (including automobile coverage for Franchisee and Franchisee's Agents and other sales and marketing personnel who may have customers riding in the automobiles of these persons), bodily injury and all-risk property damage insurance, errors and omissions, business interruption and all other occurrences against claims of any person, employee, customer, agent or otherwise in an amount per occurrence of not less than the amount set forth in the Operations Manual and adjusted by Franchisor periodically, unemployment and workers compensation insurance and any other additional insurance required by the terms of any Lease or lender for the Business. Insurance policies must insure Franchisee, Franchisor, Franchisor's Affiliates, and Franchisor's and Franchisor Affiliates' respective officers, directors, shareholders, members and all other parties designated by Franchisor, as additional named insureds against any liability which may accrue against them because of the ownership, maintenance or

operation by Franchisee of the Business. The policies must also stipulate that Franchisor will receive thirty (30) day prior written notice of cancellation and must contain endorsements by the insurance companies waiving all rights of subrogation against Franchisor. Original or duplicate copies of all insurance policies, certificates of insurance, or other proof of insurance acceptable to Franchisor, including original endorsements effecting the coverage required by this Section, is furnished to Franchisor together with proof of payment within ten (10) days of issuance thereof. Franchisee will also furnish Franchisor with certificates and endorsements evidencing this insurance coverage within 10-days after each of the following events: (i) at all policy renewal periods, no less often than annually, and (ii) at all instances of any change to, addition to, or replacement of any insurance. The certificates and endorsements for each insurance policy are to be signed by a person authorized by that insurer to bind coverage on its behalf. All certificates and endorsements are subject to approval by Franchisor. Franchisor reserves the right to require complete, certified copies of all required insurance policies at any time. In the event Franchisee fails to obtain the required insurance and to keep the same in full force and effect, Franchisor may, but is not obligated to, purchase insurance on Franchisee's behalf from an insurance carrier of Franchisor's choice, and Franchisee will reimburse Franchisor for the full cost of this insurance, along with a reasonable service charge to compensate Franchisor for the time and effort expended to secure this insurance, within five (5) days of the date Franchisor delivers an invoice detailing these costs and expenses to Franchisee. Notwithstanding the foregoing, failure of Franchisee to obtain insurance constitutes a material breach of this Agreement entitling Franchisor to terminate this Agreement or exercise any or a combination of the other default remedies set forth in Section 18 of this Agreement. Franchisee will also procure and pay for all other insurance required by state or federal law. Franchisor reserves the right to modify minimum insurance requirements at any time by updating the Operations Manual.

b.      All liability insurance policies procured and maintained by Franchisee and Agents in connection with the Business will require the insurance company to provide and pay for attorneys to defend any legal actions, lawsuits or claims brought against Franchisee, Franchisor, Franchisor's Affiliates and their respective officers, directors, agents, employees, and all other entities or individuals designated by the Franchisor as additional insureds.

13.2.    Franchisee will, during the Initial Term and any Interim Period and after the termination or expiration of the Franchise Agreement, indemnify the Franchisor, its Affiliates and their respective officers, owners, directors and employees, and hold them harmless against all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses (including reasonable attorneys' fees and amounts paid in settlement or compromise) and liabilities of any kind, whether or not ultimately determined to be meritorious (and including damages suffered by Franchisee or any of its property) (collectively, "**Damages**") for which they are held liable, or which they incur (including travel, investigation and living expenses of employees and witness fees) in any litigation or proceeding as a result of or arising out of:

a.      a breach of this Agreement, or any other agreement between the parties, or any breach of a Lease or other instrument by which the right to occupy an Office or any other premises used by Franchisee to operate the Business is held, by Franchisee;

b.      any injury to or loss of property of any person in, or on, an Office or any other premises used by Franchisee to operate the Business, or in or on any Real Property shown to a customer by Franchisee or its Agents or employees, or in an automobile of those persons;

c.      Franchisee's taxes, liabilities, costs or expenses of its Business;

d.      any negligent or willful act or omission of Franchisee, its employees or Agents, agents, servants, contractors or others for whom it is, in law, responsible; and

e.      any advertising or promotional material distributed, broadcasted, or in any way disseminated by Franchisee or on its behalf unless this material has been produced, or approved in writing, by the Franchisor.

DocuSign Envelope ID: B95FB5BD-FB57-4DAF-B76F-D12C2F9B10AA

## 14. RELATIONSHIP

14.1.    Franchisee acknowledges that it is an independent contractor and is not an agent, partner, joint venturer or employee of the Franchisor and no training or supervision given by, or assistance from, the Franchisor is deemed to negate this independence. Neither party is liable or responsible for the other's debts or obligations, nor will either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business authorized by or conducted pursuant to this Agreement. The Franchisor and Franchisee agree that no partnership, fiduciary relationship, joint venture or employment relationship exists between them. Franchisee will conspicuously identify itself in all dealings with the public as a sole operator that is an entity separate from the Franchisor and state that the Franchisor has no liability for the Business being conducted from the Business location. It is expressly agreed that the parties intend by this Agreement to establish between the Franchisor and Franchisee the relationship of franchisor and franchisee. It is further agreed that Franchisee has no authority to create or assume in the Franchisor's name or on behalf of the Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of the Franchisor for any purpose whatsoever. Franchisee agrees that it will not hold itself out as the agent, employee, partner or co-venturer of the Franchisor. All Agents and employees hired by or working for Franchisee is the Agent or employees of Franchisee and will not, for any purpose, be deemed Agents or employees of the Franchisor or subject to the Franchisor control. Each of the parties agrees to file its own tax, regulatory and payroll reports with respect to its respective employees and operations, saving and indemnifying the other party of and from any liability of any nature whatsoever by virtue thereof.

14.2.    Neither party will make any agreements, representations or warranties (except by the Franchisor in advertising as provided herein) in the name of, or an behalf of, the other party; neither party is obligated by, nor have any liability for, any agreements, representations or warranties made by the other (except by the Franchisor in advertising as provided herein) nor will the Franchisor be liable for any damages to any person or property, directly or indirectly, arising out of the operation of Franchisee's Business, whether caused by Franchisee's or its Agents' negligent or willful action or failure to act.

14.3.    The Franchisor will have no liability for Franchisee's obligations to pay any third parties, including without limitation, any product vendors, or any value added, sales, use, service, occupation, excise, gross revenue, Gross Commission Income, income, property or other tax levied upon Franchisee, Franchisee's property, the Business or upon the Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes the Franchisor is required by law to collect from Franchisee with respect to purchases from the Franchisor).

## 15. RESTRICTIVE COVENANTS

15.1.    Franchisee acknowledges and agrees that:

a.    Franchisee's knowledge of the operation of the Business, the System, and the concepts and methods of promotion of the Business hereunder that it has now or obtains in the future is derived from Franchisor's Confidential Information and Trade Secrets. Franchisee further acknowledges and agrees that all of the Confidential Information and Trade Secrets are the sole property of the Franchisor, represent valuable assets of the Franchisor and that the Franchisor has the right to use the Confidential Information and Trade Secrets in any manner it wishes at any time.

b.    During the Initial Term and any Interim Period, Franchisee, and Franchisees' owners, Designated Business Managers, Agents, and employees who have access to the Confidential Information and Trade Secrets agree that they: (1) will not use the Confidential Information or Trade Secrets in any other business or capacity or for their own benefit; (2) will maintain the absolute confidentiality of the Confidential Information and Trade Secrets; (3) will not make unauthorized copies of any portion of the Confidential Information and Trade Secrets; and (4) will adopt and implement all reasonable procedures the Franchisor periodically requires to prevent unauthorized use or disclosure of the Confidential Information and Trade Secrets including requiring employees, Designated Business Managers, training class attendees, and Franchisee owners who have access to the Confidential Information and Trade Secrets to execute nondisclosure and non-competition agreements as the Franchisor may require periodically, and provide the Franchisor, at the Franchisor's request, with signed copies of each of those

DocuSign Envelope ID: B95FB5BD-FB57-4DAE-B76F-D12C252B10AA

agreements. Franchisor will be named as a third party beneficiary on these nondisclosure and non-competition agreements.

      c.    After the Agreement expires or is terminated, Franchisee, and Franchisees' owners, Designated Business Managers, Agents and employees who have access to the Confidential Information and Trade Secrets agree that for a period of five (5) years after the termination or expiration of the Agreement (unless this information is a Trade Secret in which case the requirements in this Section 15.1(c) will remain in place while this information constitutes a Trade Secret) they: (1) will not use the Confidential Information or Trade Secrets in any other business or capacity or for their own benefit; (2) will maintain the absolute confidentiality of the Confidential Information and Trade Secrets; (3) will not make unauthorized copies of any portion of the Confidential Information or Trade Secrets; and (4) will adopt and implement all reasonable procedures the Franchisor periodically requires to prevent unauthorized use or disclosure of the Confidential Information and Trade Secrets including requiring written non- disclosure and non-competition agreements for those individuals as the Franchisor may require and provide the Franchisor, at the Franchisor's request, with signed copies of each of those agreements. Franchisor will be named as a third party beneficiary on these nondisclosure and non-competition agreements.

      d.    Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to the following: (a) Confidential Information in the public domain after it was communicated to Franchisee through no fault of Franchisee, its owners, Designated Business Managers, Agents or employees; (b) Confidential Information in Franchisee's possession free of any obligation of confidence at the time it was communicated to Franchisee; or (c) the disclosure of the Confidential Information in judicial or administrative proceedings if Franchisee is legally compelled to disclose the information, if Franchisee has notified the Franchisor before disclosure and used Franchisee's best efforts, and afforded the Franchisor the opportunity to obtain an appropriate protective order or other assurance satisfactory to the Franchisor of confidential treatment for the information required to be so disclosed.

      15.2.    Franchisee covenants and agrees that during the Initial Term of this Agreement and any Interim Period thereof, Franchisee, its owners and Designated Business Managers will not, without the prior written consent of the Franchisor, either individually or in a partnership, corporation, limited liability company, joint venture or other business entity or jointly or in conjunction with any person, firm, association, syndicate or corporation, as principal, agent, shareholder, member, partner or in any manner whatsoever, carry on or be engaged in or be concerned with or interested in or advise, lend money to, guarantee the debts or obligations of or permit its name or any part thereof to be used or employed in any business operating in competition with a residential or commercial real estate brokerage business or any business similar to the Business ("**Competitive Business**") as carried on periodically during the Initial Term of this Agreement, including any Interim Period thereof.

      15.3.    During the Initial Term of this Agreement and for a period of twelve (12) months following the Initial Term, Franchisee, Franchisee owners, and the Designated Business Manager will not attempt to attain an unfair advantage over other franchisees or the Franchisor or any Affiliates thereof by soliciting for employment or as an agent, independent contractor, or business partner, any person who is, at the time of the solicitation, employed by or otherwise in a business relationship with the Franchisor, other La Rosa Realty franchisees or any Affiliates, nor will Franchisee make any effort to directly or indirectly induce or attempt to induce any person to leave his or her employment, agency, or business relationship with Franchisor, other La Rosa Realty franchisees or any Affiliates.

      15.4.    If any person restricted by this Section 15 refuses to voluntarily comply with the foregoing obligations, the twelve (12) month period stated in Section 15.3 and Section15.1(c) will commence with the entry of any order of a court or arbitrator enforcing this Section 15.

      15.5.    The parties have attempted in Section 15.2 above to limit Franchisee's right to compete only if necessary to protect the Franchisor from unfair competition. The parties hereby expressly agree that if the scope of enforceability of the provision of Section 15.2 is disputed at any time by Franchisee, a court or arbitrator, as the case may be, may modify Section 15.2 if it deems necessary to make the provision enforceable under applicable law. In addition, the Franchisor reserves the right to reduce the scope of said provision without Franchisee's consent, at any time or times, effective immediately upon notice to Franchisee. Franchisee expressly acknowledges that it possesses

skills and abilities of a general nature and has other opportunities to exploit these skills. Consequently, enforcement of the covenants set forth above will not deprive Franchisee of the ability to earn a living.

15.6.    Nothing in this Section 15 will prevent any active officer of Franchisee or member of Franchisee's family, either individually or collectively, from owning not more than a total of 5% of the stock of any company which is subject to the reporting requirements of the U.S. Securities and Exchange Act of 1934, provided that Franchisee is otherwise not actively involved in the management or operation of that business and does not serve that business in any capacity other than as a shareholder.

15.7.    Franchisor must be protected against the potential for unfair competition by Franchisee's use of Franchisor's training, assistance, Confidential Information and Trade Secrets in direct competition with Franchisor. Franchisee further acknowledges that Franchisor would not have entered into this Agreement or shared the Confidential Information, Trade Secrets and other information with Franchisee absent Franchisee's agreement to strictly comply with the provisions of this Section 15. Franchisee acknowledges that as a franchisee of Franchisor, it will have access to the Franchisor's Trade Secrets and Confidential Information and therefore be in a unique position to use the special knowledge gained as a franchisee. Franchisee acknowledges that a breach of the covenants contained in this Section 15 will be deemed to threaten immediate and substantial irreparable injury to the Franchisor. Accordingly, Franchisee agrees that the Franchisor will have the right, without prior notice to Franchisee, to obtain immediate injunctive relief for breach of this Section 15 without limiting any other rights or remedies and without posting a bond.

15.8.    In the event that Franchisee is not an individual, this Section 15 will also apply to the officers, directors, stockholders, partners, owners, members, trustees, beneficiaries and/or principals of Franchisee, Franchisee, and any persons controlled by, controlling or under common control with Franchisee.

## 16.    ASSIGNMENT

16.1.    Franchisee acknowledges that the Franchisor's obligations under this Agreement are not personal. Franchisor will have the absolute right to unconditionally transfer or assign this Agreement or any of its rights or obligation under this Agreement to any person, corporation or other party.

16.2.    Franchisor reserves the right to assign the System to anyone, including the operator of a competing franchise system. Franchisee acknowledges and agrees that the Franchisor may sell its assets, the Marks or the System to any third party of the Franchisor's choice; may offer its securities privately or publicly; may merge with or acquire other corporations or be acquired by another corporation; may undertake a refinancing, recapitalization, leverage buyout, or other economic or financial restructuring; or may terminate or cease to exist or dissolve, in any case without Franchisee's consent, and Franchisee will look only to the transferee to perform the Franchisor's obligations in all material respects, and Franchisor is free of any responsibility or liability whatsoever to Franchisee after the transaction occurs.

16.3.    With regard to any of the above sales, assignment and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages against the Franchisor arising from or related to the transfer of the Marks, assets or the System from the Franchisor to any other party.

16.4.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee. Accordingly, this Agreement, Franchisee's rights and interests hereunder, the property and assets owned and used by Franchisee in connection with the Business, and any shares, stock, membership or interest in any corporation, limited liability company, or other entity having an interest in the Business, will not be voluntarily or involuntarily, directly or indirectly, sold, pledged, assigned, transferred, shared, subdivided, sub-franchised, encumbered or transferred in any way (including, without limitation, in the event of the death of Franchisee if Franchisee is an individual), in whole or in part, in any manner whatsoever without the prior written approval of the Franchisor and compliance with all terms of this Section 16. Any unauthorized sale, assignment, transfer or other conveyance, by operation of law or otherwise, or any attempt to do so, is deemed void and grounds for termination of this Agreement by the Franchisor.

16.5.    Franchisee understands and acknowledges that transferee will be required to execute Franchisor's then current franchise agreement which may contain provisions substantially different from those contained herein, including a higher royalty and greater expenditures for advertising and promotion than are provided hereunder (and any other documents then customarily used by the Franchisor to grant franchises), all other documents as may be reasonably requested by the Franchisor.

16.6.    With and after each valid assignment of this Agreement pursuant to this Section 16, the assignee or assignees of Franchisee is deemed to be Franchisee under this Agreement and will be bound by and liable for all of Franchisee's existing and future obligations. No stockholder in any corporation, member in any limited liability company or partner in any partnership that becomes Franchisee will have any rights under this Agreement because of his, her, or its stock ownership, membership interest or partnership interest.

16.7.    If Franchisee, at any time determines to sell, in whole or in part, the Business, Franchisee will obtain a bona fide, signed, written offer ("**Purchase Offer**") for the Business together with all real or personal property, leasehold improvements and other assets used by Franchisee in its Business from a responsible, arms' length, and fully disclosed purchaser and will submit an exact copy of this Purchase Offer to the Franchisor. Franchisor will have a right of first refusal to purchase the Business as provided in Section 17.

16.8.    No transfer or assignment of this Agreement will be approved by the Franchisor or be effective unless and until all the following conditions are satisfied:

a.    Franchisee being then in full compliance herewith and having paid to the Franchisor all outstanding debts or amounts owing to the Franchisor before the transfer;

b.    The transferee executes Franchisor's then current franchise agreement, provided that the term of the transferee's franchise agreement will be the term remaining on the transferor's franchise agreement;

c.    Franchisee pays to the Franchisor a transfer fee in the amount of $5,000.00 (the "Transfer Fee");

d.    Franchisee's execution of a general release of the Franchisor, including its officers, directors, agents, employees, and Affiliates from the parties' obligations under the Agreement;

e.    The transferee purchasing all of Franchisee's assets used in the Business in accordance with all applicable bulk sales legislation and assuming all of the liabilities of the Business unless these liabilities have been paid before the closing of the transaction of purchase and sale or unless the sale is a sale of shares in the capital stock or membership interest of Franchisee;

f.    The transferee is an individual, corporation, limited liability company, partnership, or other business entity having adequate financial resources and who meets all criteria established by the Franchisor for franchisees. The transferee will also complete, at its expense, the Franchisor's then current training program established by the Franchisor for franchisees before the transfer unless: (i) the transferee is a current franchisee in good standing in the System, or (ii) the transferee is or has been a Designated Business Manager for a period of one (1) year or more of a Business in good standing;

g.    The parties to the proposed transaction will have entered into a binding agreement subject only to the rights of the Franchisor set out in Section 17. Franchisor is furnished a copy of this binding agreement, and this agreement is subject to the Franchisor's approval in writing. Franchisee must advise each prospective transferee of this provision and the other terms of this Agreement;

h.    The proposed transferee or the stockholders, partners, members or owners of a beneficial interest in a proposed corporation, partnership, limited liability company or other entity transferee, providing jointly and severally those personal guarantees which the Franchisor may request, guaranteeing the proposed transferee's performance of its obligations under the agreements to be entered into;

i. The proposed transferee will have demonstrated to the Franchisor's satisfaction that it, he or she will meet in all respects the Franchisor's standards applicable to new franchisees regarding experience, personal and financial reputation and stability, willingness and ability to devote its, his or her full time and best efforts to the operation of the Business, and any other conditions as the Franchisor may reasonably apply in evaluating new franchisees. Franchisor must be provided all information about the proposed transferee as the Franchisor may reasonably require. Because of the Confidential Information and Trade Secrets available to a franchisee, no assignment to a competitor of the Franchisor will be permitted; and

j. The transferee paying all costs of: (i) the Franchisor with respect to the granting of its approval, as hereinbefore contemplated, including but not limited to all of its legal costs with respect to the preparation and execution of the above noted Franchise Agreement, and all other documents then customarily used by the Franchisor to grant franchises; and (ii) the transfer, including but not limited to all professional fees (attorney's fees, broker fees, and the like), leasing expenses, document preparation costs and due diligence.

16.9. Notwithstanding anything to the contrary herein contained, if Franchisee is an individual, the Franchisor will, upon Franchisee's compliance with any requirements as may periodically be prescribed by the Franchisor (including the obtaining of all necessary approvals to the assignment of leases, if any, of Franchisee's Office(s)), consent to an assignment of Franchisee's right, title and interest in and to this Agreement, and the property and assets owned and used by Franchisee in connection therewith and any other agreement then in effect between Franchisee and the Franchisor to a corporation, limited liability company or other business entity which is wholly owned and controlled by Franchisee, subject to the following (provided that this assignment will in no way release Franchisee from any liability under this Agreement):

a. Contemporaneously with this assignment and upon the appointment or election of any person as director, officer, partner or manager of the corporation, limited liability company or other business entity, the corporation, limited liability company, partnership or other business entity will cause each shareholder, partner, member, manager, director(s) and officer(s) of the corporation, limited liability company, partnership or other business entity to execute a written agreement with the Franchisor under seal, personally guaranteeing full payment and performance of Franchisee's obligations to the Franchisor and individually undertaking to be bound, jointly and severally, by all the terms of this Agreement or any new current form of Franchise Agreement and jointly and severally liable;

b. No shares or interest in the capital of the corporation, limited liability company, partnership or other business entity is issued nor will Franchisee directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, sell, assign, transfer, convey, donate, pledge, mortgage or otherwise encumber any shares or interest or offer or attempt to do so or permit the same to be done without the Franchisor's prior written consent;

c. The corporation will maintain stop transfer instructions against the transfer of shares on its records subject to the restrictions of this Section and will have all outstanding shares endorsed with the following legend printed conspicuously upon the face of each certificate:

"The transfer of this certificate is subject to the terms and conditions of a certain Franchise Agreement with La Rosa Franchising, LLC. Reference is made to said Franchise Agreement and to the restrictive provisions of the articles of this corporation."

d. The articles of incorporation, articles of organization, operating agreement, partnership agreement, shareholder agreement, and by-laws of the corporation, limited liability company, partnership or other business entity will provide that its objectives or business is confined exclusively to the operation of the Business as provided for in this Agreement, and recite that the issuance and transfer of any shares, membership interest, partnership interest or other interest is restricted by the terms of this Agreement, and copies thereof is furnished to the Franchisor upon request;

68

e.    he Franchisor's consent to a transfer of any interest subject to the restrictions of this Section will not constitute a waiver of any claim it may have against the assignor, nor will it be deemed a waiver of the Franchisor's right to demand exact compliance with any of the terms of this Agreement by the assignee;

f.    The corporation, partnership, limited liability company or other business entity will advise the Franchisor and keep the Franchisor current as to the names and addresses of the directors, officers, members, partners and shareholder of and those persons financially involved in the corporation, partnership, limited liability company or other business entity; and

g.    Franchisee agrees to devote its full time and best efforts to manage the day-to-day operations of the La Rosa Realty business unless it has an operational partner or Designated Business Manager approved by the Franchisor.

16.10.    Upon the death of Franchisee, shareholder, partner, or member the rights granted by this Agreement may pass to the next of kin or legatees, provided that Franchisee's legal representatives will within ninety (90) calendar days of Franchisee's death apply in writing to the Franchisor for the right to transfer to the next of kin or legatee Franchisee's rights under this Agreement. Franchisor will not unreasonably withhold its permission so long as the proposed transferees meet each of the requirements set forth in this Section 16 within thirty (30) days of the receipt of a conditional permission for the transfer.

16.11.    Any attempt by Franchisee to transfer any of its rights or interest under this Agreement or the License, without having received the Franchisor's prior written consent, will constitute a material breach of this Agreement. However, if Franchisee dies and its personal representative does not desire to sell the Business, and if under controlling local law Franchisee's interest in the Business, the License and Agreement are distributable to heirs or legatees who are members of his or her immediate family and who otherwise would qualify as assignees, then this attempted assignment by operation of law will not be deemed in violation of this Agreement, provided that these heirs or legatees accept the conditions imposed on otherwise permitted assignees.

16.12.    Franchisee will not have the right to grant a subfranchise.

## 17.    OPTION TO PURCHASE; RIGHT OF FIRST REFUSAL

17.1.    Unless otherwise explicitly provided by this Agreement, the Franchisor is entitled to exercise the rights provided in this Section immediately upon:

a.    The expiration without the extension of Franchisee's rights to operate the Business or the termination for any reason of the License or this Agreement;

b.    Any breach, default or other event that gives the Franchisor the right to terminate the License or this Agreement, after expiration of any applicable notice and cure period; or

c.    The receipt by the Franchisor of a copy of a Purchase Offer.

17.2.    Upon any event described in Section 17.1, the Franchisor will have the option to purchase all of Franchisee's rights, title and interest in the Business, and all its improvements, furniture, fixtures, equipment, and all of Franchisee's accounts, contract rights, customer and vendor lists, work in progress and all other business assets. The right and option granted to Franchisor by this Section 17 is assignable by Franchisor to any other person or entity.

17.3.    The purchase price for the assets described in Section 17.2 will be, subject to Section 17.4: (a) the current fair market value if Section 17.1(a) or 17.1(b) is applicable; or (b) the price specified in the Purchase Offer received by Franchisee if Section 17.1(c) is applicable. If Franchisee and the Franchisor cannot agree on fair market value within a reasonable time, an independent appraiser will be designated by each of Franchisee and the Franchisor and an average of the two (2) appraised values will be binding. Appraised values will exclude any and all consideration for goodwill or going concern value created by the Marks and business system licensed to Franchisee.

17.4.     If the Franchisor elects to exercise any option to purchase provided in this Section 17, the Franchisor will have the right to set off all amounts due from Franchisee to Franchisor or its Affiliates under the Franchise Agreement or any other agreements between these parties, any commissions or fees payable to any broker, agent or other intermediary and the cost of the appraisal, if any, against any payment. Franchisor will also have the right to substitute cash for any other form of consideration specified in the Purchase Offer and to pay in full the entire purchase price at the time of closing.

17.5.     Franchisor will notify Franchisee of its intention to exercise or to not exercise its rights to purchase ("**Notice of Intent**") within sixty (60) days following an event described in Section 17.1(a) or 17.1(b) or within fifteen (15) days following an event described in Section 17.1(c). The Notice of Intent will specify the assets to be purchased, and the current fair market value as determined by the Franchisor if Section 17.1(a) or 17.1(b) is applicable. In the event the Franchisor is purchasing the assets pursuant to Sections 17.1(a) or 17.1(b), Franchisee will have fourteen (14) days following receipt of the Franchisor's Notice of Intent to object to any of the prices specified therein, and any disputes over pricing is resolved through appraisal as specified by Section 17.3. If the Franchisor declines to exercise its rights under this Section or fails to notify Franchisee within the fifteen (15) or sixty (60) day period described above, as applicable, Franchisee may sell or dispose of the Business to any third party in the event of a sale under Section 17.1(a) or 17.1(b) or to the third party identified in the Purchase Offer in the event of a sale under Section 17.1(c), but not at a lower price nor on more favorable terms than set forth in the Purchase Offer, if any, or the Notice of Intent and subject to the prior written permission of the Franchisor and satisfaction of the other conditions to assignment set forth in Section 16. If the sale to this third party purchaser is not completed within ninety (90) days after Franchisor delivers or is deemed to have delivered the Notice of Intent not to purchase the assets to Franchisee, the Franchisor will again have the right of first refusal herein provided.

17.6.     If the Franchisor provides Franchisee with its Notice of Intent to exercise its rights under this Section 17, the purchase and sale contemplated in this Section is consummated as soon as possible. In the event the Franchisor is purchasing the assets pursuant to Sections 17.1(a) or 17.1(b), following the delivery of a Notice of Intent as specified in Section 17.5, the Franchisor or the Franchisor's assignee or designee will have the immediate right to take possession of the Business and to carry on and develop the Business for the exclusive benefit of the Franchisor, or its assignee or designee.

## 18.     DEFAULT AND TERMINATION

18.1.     The Franchisor will have the right, at its option, to (i) suspend performance of certain or all of its services to Franchisee during the time period Franchisee is in default of this Agreement; or (ii) terminate this Agreement and all rights granted Franchisee hereunder, (subject to the provisions of applicable state law governing franchise termination and renewal), effective upon receipt of notice by Franchisee, addressed as provided in Section 19, upon the occurrence of any of the following events:

a.     Franchisee intentionally or negligently discloses to any unauthorized person the contents of or any part of the Franchisor's Operations Manual, Confidential Information or Trade Secrets of the Franchisor;

b.     Franchisee voluntarily abandons the Business for a period of five (5) consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Business, unless this abandonment is due to a Force Majeure Event, as defined in Section 21.6 and not related to the availability of funds to Franchisee;

c.     Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee under any insolvency, bankruptcy or reorganization act, or if Franchisee makes an assignment for the benefit of creditors, or a receiver is appointed for Franchisee;

d.     Any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for thirty (30) days or longer (unless a supersede as or other appeal bond has been filed); or if execution is levied against Franchisee's Business or any of the property used in the operation of the Business and is not discharged within five (5) days; or if the real or personal property of Franchisee's Business is sold after levy thereupon by any sheriff, marshal or constable;

e.      Franchisee or any owner of greater than 20% of Franchisee entity or operator has its real estate broker license terminated or suspended for a period of greater than thirty (30) days or is charged or convicted of a felony, a crime involving moral turpitude, a civil claim or charge brought by a governmental entity alleging fraud or misrepresentations, or any crime or offense that is reasonably likely, in the sole opinion of the Franchisor, to materially and unfavorably affect the System, Marks, goodwill or reputation thereof;

f.      Franchisee fails to pay any amounts due the Franchisor or its Affiliates within thirty (30) days after receiving notice that these fees or amounts are overdue;

g.      Franchisee misuses or fails to follow the Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within thirty (30) days after notification from the Franchisor;

h.      Franchisee has received two (2) notices of default with respect to Franchisee's obligations hereunder from the Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee;

i.      Franchisee sells, transfers or otherwise assigns the Business, an interest in the Business or Franchisee entity, this Agreement, the Business or a substantial portion of the assets of the Business owned by Franchisee without complying with the provisions of Section 16 and Section 17;

j.      Franchisee submits on two (2) or more occasions during the Initial Term or any Interim Period a report, financial statement, tax return, schedule or other information or supporting record which understates its Gross Commission Income by more than $1,000.00, unless Franchisee demonstrates that this understatement resulted from inadvertent error;

k.      Franchisee fails, or refuses, to submit any report, financial statement, tax return, schedule or other information or supporting records required herein, or submits these reports more than thirty (30) days late on two (2) or more occasions during the Initial Term or any Interim Period unless due to circumstances beyond the control of Franchisee;

l.      Franchisee sells or offers for sale any unauthorized merchandise, product or service, engages in any unauthorized business or practice or sells any unauthorized product or service under the Marks or under a name or mark which is confusingly similar to the Marks;

m.      Franchisee contests in any court or proceeding the validity of, or the Franchisor's ownership of the Marks or copyrighted materials;

n.      Franchisee is a corporation, limited liability company, partnership or other business entity and any action is taken which purports to merge, consolidate, dissolve or liquidate this entity without the Franchisor's prior written consent;

o.      Franchisee or its Designated Business Manager fails to successfully complete the Franchisor's training or retraining course(s);

p.      Franchisee receives from the Franchisor during the Initial Term and any Interim Period three (3) or more notices of default regardless whether these notices of default relate to the same or different defaults, or whether these defaults have been remedied by Franchisee; or

q.      Any misrepresentation under Section 2.10 or any violation of Anti-Terrorism Laws by Franchisee, Designated Business Manager, its owners, agents or employees.

18.2.      Franchisor will have the right, at its option, to (i) suspend performance of certain or all of its services to Franchisee during the time period Franchisee is in default of this Agreement; or (ii) terminate this Agreement (subject to any state laws to the contrary, where state law will prevail), effective upon thirty (30) days written notice

to Franchisee, if Franchisee breaches any other provision of this Agreement and fails to cure the default during such thirty (30) day period. In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the thirty (30) day period. Defaults include, but are not limited to, the following:

   a. Franchisee fails to maintain the then-current operating procedures and standards established by the Franchisor as set forth herein or in the Operations Manual or otherwise communicated to Franchisee;

   b. Franchisee fails, refuses or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement;

   c. Franchisee fails or refuses to comply with the then-current requirements of the Operations Manual;

   d. Franchisee, or any partnership, joint venture, limited liability company, corporation or other business entity in which Franchisee has a controlling equity interest, defaults under any term of the Lease of an Office or any other premises used by Franchisee to operate the Business, any other franchise agreement with the Franchisor or any other agreement material to the Business and such default is not cured within the time specified in this Lease, other franchise agreement or other agreement;

   e. Franchisee fails, refuses or neglects to submit a statement of monthly revenues accompanying the Royalty Fee or FMF funds or any other report required under the Agreement when due;

   f. Franchisee fails, refuses or neglects to accurately report Gross Commission Income, sales information or other information required by Franchisor to be reported; or

   g. Franchisee fails to comply with any other provision of this Agreement or any specification, standard or operating procedure prescribed by the Franchisor and does not correct this failure within thirty (30) days after written notice from the Franchisor (which will describe the action that Franchisee must take) is delivered to Franchisee.

  18.3. Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within this thirty (30) day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach during this thirty (30) day period, Franchisee is given an additional reasonable period of time to cure the same, but in no event longer than thirty (30) additional days.

  18.4. A termination of this Agreement by Franchisee for any reason or no reason at all is deemed to be a termination without cause, and a breach hereof, by Franchisee. Franchisee agrees that it will not, on grounds of an alleged nonperformance by Franchisor of any of its obligations or any other reason, withhold payment of any amount due to Franchisor whatsoever or set off amounts owed to Franchisor under this Agreement, against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

  18.5. No endorsement or statement on any check or payment of any sum less than the full sum due to the Franchisor is construed as an acknowledgment of payment in full or an accord and satisfaction, and the Franchisor may accept and cash this check or payment without prejudice to its right to recover the balance due or pursue any other remedy provided herein or by law. Franchisor may apply any payments made by Franchisee against any past due indebtedness of Franchisee as the Franchisor may see fit. Franchisor may set off against any payment due to Franchisee hereunder any outstanding debts of Franchisee to Franchisor, and may, at Franchisor's option, pay Franchisee's trade creditors out of any sum otherwise due to Franchisee.

  18.6. Franchisee agrees to pay within five (5) days of the effective date of termination or expiration of the Franchise all amounts owed to Franchisor, Franchisor's Affiliates, the landlord of an Office or other premises used in the Business, and Franchisee's trade and other creditors which are then unpaid.

18.7.    All royalty and advertising contributions, all amounts due for goods purchased by Franchisee periodically from the Franchisor or its Affiliates and any other amounts owed to the Franchisor or its Affiliates by Franchisee pursuant to this Agreement or any other agreement will bear interest after the due date at the rate of 18% per annum or the highest rate permitted by law, whichever is lower, both before and after default, with interest on overdue interest at the aforesaid rate. The acceptance of any interest payment will not be construed as a waiver by Franchisor of its rights in respect of the default giving rise to this payment and is without prejudice to Franchisor's right to terminate this Agreement in respect of this default.

18.8.    Should Franchisee, or any partnership or joint venture or corporation in which Franchisee has a controlling equity interest, be a franchisee pursuant to another franchise agreement with Franchisor, respecting another La Rosa Realty business using the Marks, a default under this Agreement constitutes a default under any other Franchise Agreement and vice versa, with like remedies available to the Franchisor. Should any other Franchise Agreement cease to be valid, binding and in full force and effect for any reason then the Franchisor may, at its option terminate this Agreement and this Agreement is forthwith surrendered by Franchisee and terminated, and likewise should this Agreement cease to be valid binding and in full force and effect for any reason, the Franchisor may at its option terminate the other Franchise Agreement and the other Franchise Agreement is forthwith surrendered and terminated. In the event that there is more than one Franchisee, or if Franchisee should consist of more than one legal entity, Franchisee's liability hereunder is both joint and several. A breach hereof by one of these entities or Franchisee is deemed to be a breach by both or all.

18.9.    Franchisee agrees that upon termination or expiration of this Agreement, it will take the following action:

a.    Immediately discontinue the use of all Marks, signs, structures, forms of advertising, telephone listings, facsimile numbers, e-mail addresses, the Operations Manual, and all materials, Services of any kind which are identified or associated with the System and return all these materials to Franchisor;

b.    Immediately turn over to Franchisor all materials, including the Operations Manual, agent lists, customer lists, records, files, instructions, brochures, advertising materials, agreements, Confidential Information, Trade Secrets and any and all other materials provided by Franchisor to Franchisee or created by a third party for Franchisee relating to the operation of the Business (all of which are acknowledged to be Franchisor's property). Under no circumstances will Franchisee retain any printed or electronic copies of the Operations Manual, Confidential Information or Trade Secrets or portions thereof upon expiration or termination of this Agreement;

c.    Franchisee hereby acknowledges that all telephone numbers, facsimile numbers and Internet addresses used in the operation of the Business constitute assets of the Franchisor; and upon termination or expiration of this Agreement, Franchisee will take action within five (5) days to cancel or assign to Franchisor or its designee as determined by Franchisor, all Franchisee's right, title and interest in and to Franchisee's telephone numbers, facsimile numbers and Internet addresses and will notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any telephone number and Internet and e-mail addresses, and any regular, classified or other telephone directory listing associated with the Marks and to authorize a transfer of same to or at the direction of Franchisor. Franchisee acknowledges that, as between Franchisor and Franchisee, Franchisor has the sole rights to, and interest in, all telephone numbers, facsimile numbers, directory listings and Internet addresses used by Franchisee to promote the Business and/or associated with the Marks. Franchisee hereby irrevocably appoints Franchisor, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest, to execute these directions and authorizations as may be necessary or prudent to accomplish the foregoing. **Attachment 7** evidences this appointment;

d.    Make no representation nor state that Franchisee is in any way approved, endorsed or licensed by the Franchisor or associated or identified with the Franchisor or the System in any manner;

DocuSign Envelope ID: B95FB5BD-FB57-4DAE-B76F-D12C259B10AA

   e. Immediately take all steps necessary to amend or terminate any registration or filing of any d/b/a or business name or fictitious name or any other registration or filing containing the Marks so as to delete the Marks and all references to anything associated with the System;

   f. Provide Franchisor the option to purchase as set forth in Section 17; and

   g. Comply with the provisions of Sections 11.1(c), 11.1(d), and 15.

  18.10. If, within thirty (30) days after termination or expiration of this Agreement by the Franchisor, Franchisee fails to remove all displays of the Marks from the Business, the Franchisor may enter the Business to effect removal. In this event, Franchisor will not be charged with trespass nor be accountable or required to pay for any displays or materials.

  18.11 If, within thirty (30) days after termination or expiration of this Agreement, Franchisee has not taken all steps necessary to amend or terminate any registration or filing of any business name or d/b/a or any other registration or filing containing the Marks, Franchisee hereby irrevocably appoints the Franchisor as Franchisee's true and lawful attorney for Franchisee, and in Franchisee's name, place and stead and on Franchisee's behalf, to take action as may be necessary to amend or terminate all registrations and filings, this appointment being coupled with an interest to enable the Franchisor to protect the System.

  18.12. Termination or expiration of this Agreement will not affect, modify or discharge any claims, rights, causes of action or remedies which the Franchisor may have against Franchisee, whether these claims or rights arise before or after termination or expiration.

  18.13. All obligations of the parties which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect notwithstanding this expiration or termination. In particular, but without limiting the generality of the foregoing, the provisions of Sections 11, 13, 15 and 17, hereof will survive termination or expiration of this Agreement.

  18.14. In the event that this Agreement expires or is terminated for any reason whatsoever and the Franchisor is the lender under any loan agreement ("**Loan**") or the holder of any promissory note ("**Note**") or the holder of any personal property, security interest, chattel mortgage, debenture or mortgage of any nature whatsoever ("**Security Interest**") from Franchisee concerning assets used at any time by Franchisee in the Business or which are situated on the Business premises, this Loan, Note or Security Interest will, upon the effective date of termination or expiration, immediately become fully due and payable as to all principal and interest so loaned and secured.

  18.15. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of this Agreement than is required hereunder, the prior notice or other action required by that law or rule is substituted for the notice requirements hereof. Those modifications to this Agreement is effective only in that jurisdiction and is enforced as originally made and entered into in all other jurisdictions.

  18.16. In the event of termination of the Agreement for any reason whatsoever the parties will accept the default remedies contained herein as full and final satisfaction of all claims. The parties waive, if permitted by law, any claim against the other for punitive or exemplary damages; except for punitive or exemplary damages for violation of the Lanham Act, trademark infringement or dilution, unauthorized dissemination of the Confidential Information or Trade Secrets or arising under the indemnification set out in Section 13.

  18.17. The rights of the parties are cumulative and no exercise or enforcement by a party of any right or remedy hereunder will preclude the exercise or enforcement by that party of any other right or remedy herein contained, or to which it is entitled by law.

  18.18. Nothing herein will prevent the Franchisor or Franchisee from seeking injunctive relief to prevent irreparable harm, in addition to all other remedies. If it is necessary for the Franchisor to seek preliminary or permanent injunctive relief, the Franchisor may do so without a bond.

18.19.   **THE PARTIES ACKNOWLEDGE THAT IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, THE STATE OR FEDERAL LAW WILL GOVERN THE FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

## 19.   NOTICES

19.1.    Any notice of default under this Agreement is delivered personally or by courier to the appropriate location. Any other notice, request, demand, approval, consent or other communication which the parties may be required or permitted to be given under this Agreement is in writing and may be given to the party for whom it is intended by personal delivery, electronic mail (return receipt requested) or delivering it to the party by mailing it by prepaid registered mail or by sending it through a nationally recognized overnight courier service as follows:

| | |
|---|---|
| To Franchisor: | La Rosa Franchising, LLC |
| | 1420 Celebration Blvd., Suite 200 |
| | Celebration, FL 34747 |
| | Attn: Joseph La Rosa |
| To Franchisee: | La Rosa Realty Puerto Rico, PSC |
| | _____ |
| | |
| Attention: | Ana Ivelisse Morales |
| E-Mail: | larosarealtypuertorico@gmail.com |

with a copy (which will not constitute notice) to:

_____
_____
_____

Attention:    _____

Any notice or other document delivered personally or by electronic mail (return receipt requested) is deemed to have been received by and given to the addressee on the day of delivery and any other notice or other document mailed as aforesaid, is deemed to have been received by and given to the addressee on the 3rd business day following the date of mailing or the first day following the day the notice is deposited with a nationally recognized overnight courier service. Any party may at any time give notice in writing to any other party of any change of address.

## 20.   ARBITRATION

20.1.    Except as otherwise provided in this Section, any controversy or dispute arising out of, or relating to the franchise or this Agreement including, any claim by Franchisee or any person in privity with or claiming through, on behalf of or in the right of Franchisee, concerning the entry into, performance under, or termination of, this Agreement or any other agreement entered into by the Franchisor, or its subsidiaries or Affiliates, and Franchisee, any claim against a past or present employee, officer, director, member, shareholder or agent of the Franchisor; any claim of breach of this Agreement; and any claims arising under state or federal laws, is submitted to final and binding arbitration as the sole and exclusive remedy for any controversy or dispute. "Persons in privity" with or claiming through, on behalf of or in the right of Franchisee include but are not limited to, spouses and other family members, heirs, executors, representatives, successors and assigns. Subject to this Section, the right and duty of the parties to this Agreement to resolve any disputes by arbitration is governed exclusively by the Federal Arbitration Act, as amended, and arbitration will take place according to the commercial arbitration rules of the American Arbitration Association in effect as of the date the demand for arbitration is filed. The arbitration is held in Celebration, Florida. However, arbitration will not be required to be used for any dispute which involves Franchisee's or Franchisor's continued usage of any of the Marks, the System, or business concept; any issue where injunctive relief against Franchisee or the Franchisor is an appropriate remedy; disputes solely involving the payment of money; or, any issues related to disclosure or misuse of Confidential Information or Trade Secrets, all of which issues may be submitted to a state or federal court within the State of Florida. The parties expressly consent to

personal jurisdiction in the State of Florida and agree that its court(s) will have exclusive jurisdiction over any of these issues not subject to arbitration.

20.2.    The parties will select one arbitrator from a panel of neutral arbitrators provided by the American Arbitration Association and this arbitrator is chosen by the striking method. The parties will each bear all of their own costs of arbitration; however, the fees of the arbitrator is divided equally between the parties. The arbitrator will have no authority to amend or modify the terms of this Agreement. The award or decision by the arbitrator is final and binding on the parties and may be enforced by judgment or order of a court having subject matter jurisdiction in the state where the arbitration took place. The parties consent to the exercise of personal jurisdiction over them by these courts and to the propriety of venue of these courts for the purpose of carrying out this provision; and they waive any objections that they would otherwise have concerning these matters.

20.3.    Parties to arbitration under this Agreement will include, by consolidation, joinder or in any other manner, any person other than Franchisee and any person in privity with or claiming through, in the right of or on behalf of Franchisee or the Franchisor, unless both parties consent in writing. If permitted by applicable law, no issue of fact or law is given preclusive or collateral estoppel effect in any arbitration hereunder, except if this issue may have been determined in another proceeding between the Franchisor and Franchisee or any person in privity with or claiming through, in the right of or on behalf of Franchisee or the Franchisor.

20.4.    The parties agree that any arbitration arising out of a dispute relating to this Agreement is only a matter between the Franchisor and Franchisee and no other franchisees. Franchisee agrees not to join or attempt to join other franchisees or licensees in any arbitration or attempted litigation against the Franchisor.

20.5.    Franchisor's and Franchisee's rights hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee or any right or remedy hereunder will preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder or which Franchisor or Franchisee are entitled by law to enforce.

20.6.    Except with respect to Franchisee's obligation to indemnify Franchisor pursuant to Section 13.2, Franchisor and Franchisee waive, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between Franchisor and Franchisee, the party making a claim is limited to recovery of any actual damages sustained by it.

20.7.    Nothing contained in this Agreement will bar Franchisor or Franchisee from obtaining a temporary restraining order or preliminary injunctive relief against threatened or actual conduct that would cause Franchisor or Franchisee irreparable loss or damages. The sole remedy of the enjoined party, in the event of the entry of an injunction, will be the dissolution of the injunction, if warranted, after a hearing is held (all claims for damages by reason of the wrongful issuance of any this injunction being expressly waived by this Agreement). Franchisee also agrees that the court may issue a temporary restraining order or preliminary injunction that is mandatory in nature if this order or relief is necessary to ensure the operation of Franchisee's Business as a La Rosa Realty real estate brokerage business pursuant to the terms of this Agreement. Any action is brought as provided in Section 21.1.

## 21.    MISCELLANEOUS

21.1.    Except if governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other applicable federal law, this Agreement is interpreted under the laws of the State of Florida, and any dispute between the parties is governed by and determined in accordance with the substantive laws of the State of Florida, which laws will prevail in the event of any conflict of law. Franchisee and the Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving Franchisee, its officers or directors and the Franchisor, its officers, directors, shareholders, members, employees or Affiliates, both parties agree that the exclusive venue for disputes between them is in Osceola County, the State of Florida and each waive any objection either may have to the personal jurisdiction of or venue in Osceola County, the State of Florida. Franchisee irrevocably submits to the jurisdiction of its courts and waives any objection Franchisee may have to either the jurisdiction or venue in its court.

DocuSign Envelope ID: B95FB5BD-FBB7-4DAE-B76F-B12C2F9B10AA

21.2.    All provisions of this Agreement are severable and this Agreement is interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein; all partially valid and enforceable provisions is enforced if they are valid and enforceable.

21.3.    If either party institutes a legal proceeding, including court proceedings or arbitration, and prevails entirely or in part in any action at law or in equity against the other party based entirely or in part on the terms of this Agreement, the prevailing party is entitled to recover from the losing party, in addition to any judgment, reasonable attorneys' fees, court costs and all of the prevailing party's expenses in connection with any action at law.

21.4.    No failure, forbearance, neglect or delay of any kind on the part of the Franchisor in connection with the enforcement or exercise of any rights under this Agreement will affect or diminish the Franchisor's right to strictly enforce and take full benefit of each provision of this Agreement at any time, whether at law for damages, in equity for injunctive relief or specific performance, or otherwise. No custom, usage or practice with regard to this Agreement by Franchisee or the Franchisor's other franchisees will preclude the strict enforcement of this Agreement in accordance with its literal terms. No waiver by the Franchisor of performance of any provision of this Agreement constitutes or be implied as a waiver of the Franchisor's right to enforce that provision at any future time. No interpretation, change, termination or waiver of any provision of this Agreement, and no consent or approval under this Agreement, is binding upon Franchisee or the Franchisor or effective unless in writing signed by Franchisee and the Franchisor's CEO, or a Vice President, except that a waiver need be signed only by the party waiving.

21.5.    This Agreement, together with the Operations Manual, any written related agreements, all Exhibits, Attachments, and the State Addenda attached to the Disclosure Document as Exhibit E, constitutes the entire understanding and agreement between Franchisee and the Franchisor and supersedes all prior understandings, whether oral or written, pertaining to this Agreement, License, System or Business. However, nothing in this Agreement or any related Agreement is intended to disclaim the representations made in the Franchise Disclosure Document.

21.6.    Neither party is liable for any loss or damage due to any delay in the due performance of the terms hereof (except for the payment of money) by reason of strikes, lockouts and other labor relations, fires, riots, wars, embargoes and civil commotion, or acts of God ("**Force Majeure Event**"). Any delay will extend performance only so long as this event is in progress except this Force Majeure Event will not affect or change Franchisee's obligation to pay Royalty Fees or FMF contributions when due. Notwithstanding the foregoing, if there is a Force Majeure Event, Franchisor may elect to waive the Royalty Fees or FMF contributions during the period of delay caused by the Force Majeure Event or a shorter period.

21.7.    Franchisee will sign and deliver any further instruments, contracts, forms and other documents, and will perform any further acts, as may be necessary or desirable, to carry out, complete and perform all terms, covenants and obligations herein contained. Franchisee hereby irrevocably appoints the Franchisor as its attorney, and hereby empowers it to sign any instruments regarding the Marks for and in Franchisee's name to give full effect to Sections 11, 13, 16, and 18 of this Agreement. Franchisee hereby declares that the powers of attorney herein granted may be exercised during any subsequent legal incapacity on its part.

21.8.    This Agreement is binding upon, and subject to Section 16 hereof, will inure to the benefit of, Franchisee's successors and permitted assigns.

21.9.    This Agreement may only be modified or amended by a written document signed by Franchisee and the Franchisor. Franchisee acknowledges that the Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent in which the Franchisor deems necessary to protect, promote, or improve the Marks, and the quality of the System, but under no circumstances will these modifications be made arbitrarily without this determination. Notwithstanding anything herein to the contrary, The Franchisor will have the right unilaterally to reduce the scope of any covenants of Franchisee contained in this Agreement upon notice to Franchisee, whereupon Franchisee will comply therewith as so modified.

21.10. Periodically, the Franchisor will have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents of the Franchisor or independent contractors which the Franchisor has contracted with to provide these services. Franchisee agrees in advance to any delegation by the Franchisor of any portion or all of its obligations and duties under this Agreement.

21.11.  This Agreement will be executed in multiple copies, each of which will be deemed an original. The preambles are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between Franchisor and Franchisee relating to the subject matter of this Agreement. Nothing in this Agreement is intended, nor will be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto. The headings of the several sections and paragraphs of this Agreement are for convenience only and do not define, limit or construe the contents of such sections or paragraphs. The following provisions apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties:

      a.     The term "**Franchisee**" as used herein is applicable to one or more persons, a corporation, limited liability company, a partnership or other business entity, as the case may be, and the singular usage (where applicable) includes the plural and the masculine and neuter usages (where applicable) include the other and the feminine. The term "**Lease**" will include a sublease, and a renewal or extension of a lease or sublease.

      b.     Subject to Franchisor's rights under trademark laws, the parties' rights under this Agreement and the relationship between the parties are governed by, and will be interpreted in accordance with Section 21.1. Franchisee and its Affiliates waive, to the fullest extent permitted by law, the rights and protections that might be provided through the laws of any other country or other jurisdiction.

      c.     When calculating the date upon which or the time within which any act is to be done pursuant to this Agreement, the date which is the reference date in calculating this period is excluded; if the last day of this period is a non-business day, the period in question will end on the next business day.

      d.     The parties recognize, and any referee, arbitrator and judge, is affirmatively advised, that certain provisions of this Agreement reflect rights of Franchisor and Franchisee to take (or refrain from taking) certain actions in exercise of its business judgment based on its assessment of the long term interests of the System or Business as a whole. Where such right has been exercised, and is supported by the business judgment of Franchisor or Franchisee ("**Business Judgment**"), a referee, arbitrator or judge, cannot substitute his or her judgment for the judgment so exercised by Franchisor or Franchisee, even if another reasonable or even arguably preferable alternatives are available.

      e.     Whenever this Agreement provides that Franchisor has a certain right, that right is absolute and the parties intend that its exercise of that right will not be subject to any limitation or review. Franchisor has the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement.

      f.     Time is of the essence of this Agreement and of every part thereof.

## 22.    ACKNOWLEDGEMENT

BEFORE SIGNING THIS AGREEMENT, THE FRANCHISEE SHOULD READ IT AND THE DISCLOSURE DOCUMENT SUPPLIED TO THE FRANCHISEE CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.

THE FRANCHISEE ACKNOWLEDGES THAT:

    **1.**    **NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY DISCLOSURE DOCUMENT SUPPLIED TO THE FRANCHISEE, IS BINDING ON THE FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT, AND**

2.      **FRANCHISEE HAD A COMPLETE COPY OF THIS AGREEMENT, WITH ALL BLANKS FILLED IN, IN ITS POSSESSION FOR A PERIOD OF TIME NOT LESS THAN TEN (10) DAYS, DURING WHICH TIME THE FRANCHISEE HAD THE OPPORTUNITY TO SUBMIT THIS AGREEMENT FOR PROFESSIONAL REVIEW AND ADVICE OF THE FRANCHISEE'S CHOOSING BEFORE FREELY EXECUTING THIS AGREEMENT. FRANCHISEE ACKNOWLEDGES THAT IT HAS HAD AMPLE TIME AND OPPORTUNITY TO INVESTIGATE THE FRANCHISOR'S BUSINESS AND TO CONSULT WITH LEGAL AND FINANCIAL ADVISORS OF ITS CHOICE.**

3.      **FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE SYSTEM AND RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT AND ITS SUCCESS INVOLVES SUBSTANTIAL BUSINESS RISK AND WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS. FRANCHISEE HEREBY ASSUMES THE RESPONSIBILITY FOR THE SUCCESS OR FAILURE OF THE BUSINESS VENTURE.**

4.      **FRANCHISEE UNDERSTANDS THAT FRANCHISOR HAS AFFILIATES, SOME OF WHICH OPERATE A LA ROSA REALTY BUSINESS, AND FRANCHISEE REPRESENTS THAT FRANCHISEE HAS NOT BEEN PROVIDED WITH ANY FINANCIAL OR OPERATING INFORMATION ABOUT ANY AFFILIATE OF FRANCHISOR, NOR HAS FRANCHISEE RELIED UPON ANY OTHER INFORMATION FRANCHISEE MAY HAVE OBTAINED FROM ANY OTHER SOURCE WITH REGARD TO THE FINANCIAL OR OPERATING CONDITIONS OF ANY AFFILIATE OF FRANCHISOR.**

5.      **FRANCHISOR HAS NOT PROVIDED ANY STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION OF ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL PURCHASES, SALE, EARNINGS, INCOME OR PROFITS TO FRANCHISEE.**

6.      **FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY ASSURANCE, WARRANTY OR GUARANTEE, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS, EARNINGS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the first date set forth above.

**FRANCHISOR**

LA ROSA FRANCHISING, LLC

By: _Joseph La Rosa_          Joseph La Rosa

DocuSigned by:
9F4237666000465...

Title: CEO

**FRANCHISEE**

La Rosa Realty Puerto Rico, PSC

By: Ana Ivelisse Morales

_Ana Ivelisse Morales_

DocuSigned by:
D3A8A73C84714E2...

Title: President

DocuSign Envelope ID: B95FB5BB-FBB7-4D9E-B7BF-B12C252B10AA

**ATTACHMENT 1**
**TO FRANCHISE AGREEMENT**

<u>**TERRITORY**</u>

The Territory is described as follows:

San Juan, Puerto Rico

**ATTACHMENT 2**
**TO FRANCHISE AGREEMENT**

**GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS**

In consideration of, and as an inducement to, the execution of the Franchise Agreement signed between and La Rosa Franchising, LLC ("**Franchisor**") _____12/3/2019_____, 20___ ("**Agreement**"), each of the undersigned hereby personally and unconditionally.

Guarantees to the Franchisor and its successors and assigns, for the Initial Term, including any Interim Period thereof, that La Rosa Realty Puerto Rico, PSC ("**Franchisee**") will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and

Agrees to be personally bound by and personally liable for the breach of, each and every provision in the Agreement, including but not limited to the terms of Section 15.

Each of the undersigned waives the following:

12.     Acceptance and notice of acceptance by the Franchisor of the foregoing undertaking;

13.     Notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

14.     Protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

15.     Any right he or she may have to require that any action be brought against Franchisee or any other person as a condition of liability; and

16.     Any and all other notices and legal or equitable defenses to which he or she may be entitled. Each of the undersigned consents and agrees that:

17.     His or her direct and immediate liability under this guaranty is joint and several;

18.     He or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so;

19.     This liability will not be contingent or conditioned upon pursuit by the Franchisor of any remedies against Franchisee or any other person; and

20.     This liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which the Franchisor may periodically grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this guaranty, which is continuing and irrevocable during the Initial Term, including any Interim Period thereof.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature effective on the same day and year as the Agreement was signed.

**GUARANTORS**

La Rosa Realty Puerto Rico, PSC

Date: _12/3/2019_____

Printed Name: _Ana Ivelisse Morales_____

Address: _____

P.O. Box 361390

San Juan, PR 00936-1390

Date: _____

Printed Name: _____

Address: _____

_____

_____


Date: _____

Printed Name: _____

Address: _____

_____

_____

Date: _____

Printed Name: _____

Address: _____

_____

_____


_____

**ATTACHMENT 3**
**TO FRANCHISE AGREEMENT**

**CONSENT OF SPOUSE**

The undersigned is the spouse of the Guardian identified in the Guaranty and Assumption of Franchisee's Obligations dated as of _____, between his or her spouse and Franchisor (the "**Guaranty Agreement**") to which this Consent of Spouse I attached.  The undersigned hereby declares that he or she has read the Guaranty Agreement in its entirety and, being fully convinced of the wisdom and equity of the terms of the Guaranty Agreement, and in consideration of the premises and of the provisions of the Guaranty Agreement, the undersigned hereby expresses his or her acceptance of the same and does agree to its provisions.

The undersigned further agrees that in the event of the death of his or her spouse, the provisions of this Guaranty Agreement will be binding upon him or her.

The undersigned further agrees that he or she will at any time make, execute, and deliver such instruments and documents that may be necessary to carry out the provisions of the Guaranty Agreement.

This instrument is not a present transfer or release of any rights which the undersigned may have in any of the community property of his or her marriage.


_____     **SPOUSE:**

_____
                                       Signature

_____
                                       Printed Name

_____
                                       Date

83

**ATTACHMENT 4**
**TO FRANCHISE AGREEMENT**

**ACKNOWLEDGMENT**

Franchisee, and its shareholders and partners, as applicable, jointly and severally acknowledge that they have carefully read this Agreement and all other related documents to be executed concurrently or in conjunction with the execution hereof, that they have obtained the advice of counsel in connection with entering into this Agreement, that they understand the nature of this Agreement, and that they intend to comply herewith and be bound hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the first date set forth above.

ACCEPTED on this _____ day of _____, 20_____.
<br>12/3/2019

**FRANCHISOR:**

LA ROSA FRANCHISING, LLC

_Joseph La Rosa_
_9F423766600465..._
Signature

Joseph La Rosa
Printed Name

12/3/2019
Date

**FRANCHISEE:**

_Ana Ivelisse Morales_
_D3A8A73C84714E2..._
Signature

Ana Ivelisse Morales
Printed Name

12/3/2019
Date

INDIVIDUALS WITH AN INTEREST IN
FRANCHISEE

_____
Signature

_____
Printed Name

_____
Date

INDIVIDUALS WITH AN INTEREST IN
FRANCHISEE

_____
Signature

_____
Printed Name

_____
Date

**ATTACHMENT 5**
**TO FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP**

Franchisee: <u>La Rosa Realty Puerto Rico, PSC</u>_____

Trade Name (if different from above): _____

Form of Ownership
(Check One)

_____ Individual      _____ Partnership      _____Corporation      _____Limited Liability Company

If a Partnership, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a Corporation, give the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a Limited Liability Company, give the state and date of formation, the name and address of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

_____

_____

_____

_____

Franchisee acknowledges that this Statement of Ownership applies to the Real estate brokerage business authorized under the Franchise Agreement.

Use additional sheets if necessary. Any and all changes to the above information must be reported to the Franchisor in writing.

Date: ___12/3/2019_____      Name: _____*Ana Ivelisse Morales*_____
                                                                              D3A8A73C84714E2

                                                                     Ana Ivelisse Morales

                                                                     La Rosa Realty Puerto Rico, PSC

**ATTACHMENT 6**
**TO FRANCHISE AGREEMENT**

**AUTHORIZATION AGREEMENT FOR PREARRANGED PAYMENTS**
**(DIRECT DEBITS)**
**BY AND BETWEEN LA ROSA FRANCHISING, LLC AND**

**La Rosa Realty Puerto Rico, PSC_ ("Franchisee")**

The undersigned depositor ("**Depositor**") hereby authorizes La Rosa Franchising, LLC ("**Company**") to initiate debit entries and/or credit correction entries to the undersigned's checking and/or savings account(s) indicated below and the depository designated below ("**Depository**") via Automated Clearing House ("**ACH**") transfers or transactions to debit this account pursuant to Company's instructions.

| | |
|---|---|
| Depository | Branch |
| Address | City, State, Zip Code |
| Bank Transit/ABA Number | Account Number |

This authority is to remain in full force and effect until Depository has received joint written notification from Company and Depositor of the Depositor's termination of this authority in a time and manner as to afford Depository a reasonable opportunity on which to act. If an erroneous debit entry is initiated to Depositor's account, Depositor will have the right to have the amount of the entry credited to this account by Depository, if (a) within fifteen (15) calendar days following the date on which Depository sent to Depositor a statement of account or a written notice pertaining to the entry or (b) forty-five (45) days after posting, whichever occurs first, Depositor will have sent to Depository a written notice identifying the entry, stating that the entry was in error and requesting Depository to credit the amount to this account. These rights are in addition to any rights Depositor may have under federal and state banking laws.

| | |
|---|---|
| Depositor | Depository |
| By: Ana Ivelisse Morales | By: |
| Title: | Title: |
| Date: | Date: |

DocuSign Envelope ID: B95FB5B8-EBB7-4D9E-B785-B12C252B10AA

## ATTCHMENT 7
## TO FRANCHISE AGREEMENT

### COLLATERAL ASSIGNMENT OF TELEPHONE NUMBERS AND
### TELEPHONE LISTINGS AND INTERNET ADDRESSES

THIS ASSIGNMENT s entered into this _____ day of _____, 20___, in accordance with the terms of the La Rosa Franchising, LLC Franchise Agreement ("**Franchise Agreement**") between ("**Franchisee**") and La Rosa Franchising, LLC ("**Franchisor**"), executed concurrently with this Assignment, under which Franchisor granted Franchisee the right to own and operate a real estate brokerage business ("**Franchise Business**") located _____.

FOR VALUE RECEIVED, Franchisee hereby assigns to Franchisor (1) those certain telephone numbers and regular, classified or other telephone directory listings (collectively, the ("Telephone Numbers and Listings") and (2) those certain Internet website addresses ("URLs") associated with Franchisor's trade and service marks and used periodically in connection with the operation of the Franchise Business at the address provided above. This Assignment is for collateral purposes only and, except as specified herein, Franchisor will have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment, unless Franchisor will notify the telephone company and/or the listing agencies with which Franchisee has placed telephone directory listings (all of these entities are collectively referred to herein as "Telephone Company") and/or Franchisee's internet service provider ("ISP") to effectuate the assignment pursuant to the terms hereof.

Upon termination or expiration of the Franchise Agreement (without the extension of Franchisee's rights to operate the Franchise Business), Franchisor will have the right and is hereby empowered to effectuate the assignment of the Telephone Numbers and Listings and the URLs, and, in this event, Franchisee will have no further right, title or interest in the Telephone Numbers and Listings and URLs, and will remain liable to the Telephone Company and the ISP for all past due fees owing to the Telephone Company and the ISP on or before the effective date of the assignment hereunder.

Franchisee agrees and acknowledges that as between Franchisor and Franchisee, upon termination or expiration of the Franchise Agreement, Franchisor will have the sole right to own and interest in the Telephone Numbers and Listings and URLs, and Franchisee irrevocably appoints Franchisor as Franchisee's true and lawful attorney-in-fact, which appointment is coupled with an interest, to direct the Telephone Company and the ISP to assign same to Franchisor, and sign any documents and take any actions as may be necessary to effectuate the assignment. Upon such event, Franchisee will immediately notify the Telephone Company and the ISP to assign the Telephone Numbers and Listings and URLs to Franchisor. If Franchisee fails to promptly direct the Telephone Company and the ISP to assign the Telephone Numbers, Listings, and URLs to Franchisor, Franchisor will direct the Telephone Company and the ISP to make the assignment contemplated under this Agreement to Franchisor. The parties agree that the Telephone Company and the ISP may accept Franchisor's written direction, the Franchise Agreement or this Assignment as conclusive proof of Franchisor's exclusive rights in and to the Telephone Numbers and Listings and URLs upon the termination or expiration and that this assignment is made automatically and effective immediately upon Telephone Company's and ISP's receipt of this notice from Franchisor or Franchisee. The parties further agree that if the Telephone Company or the ISP requires that the parties sign the Telephone Company's or the ISP's assignment forms or other documentation at the time of termination or expiration of the Franchise Agreement, Franchisor's execution of these forms or documentation on behalf of Franchisee will effectuate Franchisee's consent and agreement to the assignment. The parties agree that at any time after the date hereof they will perform any acts and sign and deliver any documents that may be necessary to assist in or accomplish the assignment described herein upon termination or expiration of the Franchise Agreement.

**[Signature Page to Follow]**

**ASSIGNEE:**

**LA ROSA FRANCHISING, LLC**

_____
Signature

By: _____
Its: _____

**ASSIGNOR:**

_____

_____
Signature

By: _____
Its: _____

**ATTACHMENT 8**
**TO FRANCHISE AGREEMENT**
**BRANCH OFFICE AUTHORIZATION**

THIS BRANCH OFFICE AUTHORIZATION is entered into this _____ day of _____, 20___, in accordance with the terms of the La Rosa Franchising, LLC Franchise Agreement ("Franchise Agreement") between ("Franchisee") and     La Rosa Franchising, LLC ("Franchisor"), under which Franchisor granted Franchisee the right to open a Branch Office for Franchisee's Real estate brokerage business within its Territory, as set forth on Attachment 1 to the Franchise Agreement.

Franchisee has proposed to open a Branch Office at: _____, which is operated under the terms and conditions of the Franchise Agreement.

The Branch Office will open for business on or about: _____, 20____.

Franchisor authorizes Franchisee to operate a Branch Office at the location set forth above.

All capitalized terms not otherwise defined in this Attachment will have the same meanings as in the Franchise Agreement.

Except as set forth in this Attachment, nothing contained herein will modify or amend the Franchise Agreement.


**ASSIGNEE:**                                          **FRANCHISEE:**

**LA ROSA FRANCHISING, LLC**              _____

_____            _____
Signature                                               Signature

By: _____            By: _____
Its: _____           Its: _____

DocuSign Envelope ID: B95FB5B9-FBB7-4D9E-B78F-B12C252B10AA

## FRANCHISEE REQUIRED AGREEMENT

**Please print and sign two copies and return both full, original copies to La Rosa Franchising, LLC.**

**Signature required on the following pages:**

- o Franchise Agreement

- o Legal Representation

- o Witness

- o Attachment 1 Territory and Branch Offices

- o Attachment 2 Guaranty and Assumption of Franchisee's Obligations

- o Attachment 3 Consent of Spouse

- o Attachment 4 Acknowledgement

- o Attachment 5 Statement of Ownership

- o Attachment 6 Direct Debits

- o Attachment 7 Telephone Numbers, Listings & Internet Addresses

- o Attachment 8 Branch Office Authorization (not required at signing of Agreement)

La Rosa Franchising, LLC
1420 Celebration Blvd.,
Suite 200
Celebration, FL 34747

**Exhibit C to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**LIST OF CURRENT FRANCHISEES AND**
**FRANCHISEES WHO HAVE LEFT THE SYSTEM**

DocuSign Envelope ID: B95FB5BD-FBB7-4D9E-B76F-B12C252B10A0

## FRANCHISED LOCATIONS AS OF 12/31/2018

| Location | Owner | Address | City / State / Zip | Office # | Contact Email |
|---|---|---|---|---|---|
| NONE | | | | | |

## CORPORATE OWNED

| Location | Owner | Address | City / State / Zip | Office # | Contact Email |
|---|---|---|---|---|---|
| NONE | | | | | |

**Franchisees whose Franchise Agreements were terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year.**

| Company Name | Owner Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|---|
| NONE | | | | | | |

**Franchisees Who Signed a Franchise Agreement but did not open as of December 31, 2018:**

**Signed in 2018 – Not opened**

| Location | Owner | Address | City / State / Zip | Office # | Contact Email |
|---|---|---|---|---|---|
| NONE | | | | | |

92

**Exhibit D to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**LIST OF STATE AGENCIES AND**
**AGENTS FOR SERVICE OF PROCESS**

## LIST OF STATE ADMINISTRATORS AND
## AGENTS FOR SERVICE OF PROCESS

| STATE | STATE ADMINISTRATOR | AGENT FOR SERVICE OF PROCESS |
|---|---|---|
| CALIFORNIA | Department of Corporations<br>One Sansome Street, Suite 600<br>San Francisco, CA 94104<br>415-972-8559<br>1-866-275-2677 | Corporations Commissioner<br>320 West 4th Street, Suite 750<br>Los Angeles 90013-2344<br>1-866-275-2677 |
| CONNECTICUT | Securities and Business Investment Division<br>Connecticut Department of Banking<br>260 Constitution Plaza<br>Hartford, CT 06103<br>860-240-8230 | Connecticut Banking Commissioner<br>Same Address |
| FLORIDA | Department of Agriculture<br>& Consumer Services<br>Division of Consumer Services Mayo Building,<br>Second Floor Tallahassee, FL 32399-0800<br>850-245-6000 | Same |
| GEORGIA | Office of Consumer Affairs<br>2 Martin Luther King Drive, S.E. Plaza Level,<br>East Tower<br>Atlanta, GA 30334<br>404-656-3790 | Same |
| HAWAII | State of Hawaii<br>Business Registration Division<br>Securities Compliance Branch<br>Dept. of Commerce and Consumer Affairs<br>335 Merchant Street, Room 205<br>Honolulu, HI 96813<br>808-586-2722 | Hawaii Commissioner of Securities<br>Same Address |
| ILLINOIS | Franchise Division<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, IL 62706<br>217-782-4465 | Illinois Attorney General<br>Same Address |
| INDIANA | Securities Commissioner<br>Indiana Securities Division<br>302 West Washington Street, Room E 111<br>Indianapolis, IN 46204<br>317-232-6681 | Indiana Secretary of State<br>201 State House<br>200 West Washington Street<br>Indianapolis, IN 46204 |
| IOWA | Iowa Securities Bureau<br>Second Floor<br>Lucas State Office Building<br>Des Moines, IA 50319<br>515-281-4441 | Same |

| STATE | STATE ADMINISTRATOR | AGENT FOR SERVICE OF PROCESS |
|---|---|---|
| KENTUCKY | Kentucky Attorney General's Office Consumer Protection Division 1024 Capitol Center Drive Frankfort, KY 40602 502-696-5389 | Same |
| LOUISIANA | Department of Urban & Community Affairs Consumer Protection Office 301 Main Street, 6th Floor One America Place Baton Rouge, LA 70801 504-342-7013 (gen. info.) 504-342-7900 | Same |
| MAINE | Department of Business Regulations State House - Station 35 Augusta, ME 04333 207-298-3671 | Same |
| MARYLAND | Office of the Attorney General Securities Division 200 St. Paul Place Baltimore, MD 21202 410-576-6360 | Maryland Securities Commissioner Same Address |
| MICHIGAN | Michigan Department of Attorney General Consumer Protection Division Antitrust and Franchise Unit 525 W. Ottawa Street G. Mennen Williams Building, 1st Floor Lansing, MI 48913 517-373-7117 | Michigan Department of Commerce Corporations and Securities Bureau Same Address |
| MINNESOTA | Minnesota Department of Commerce 85 7th Place East, Suite 500 St. Paul, MN 55101 651-296-4026 | Minnesota Commissioner of Commerce Same Address |
| NEBRASKA | Department of Banking and Finance 1230 "O" Street, Suite 400 Lincoln, NE 68508 P.O. Box 95006 Lincoln, Nebraska 68509-5006 Tele: 402-471-2171 | Same |
| NEW HAMPSHIRE | Attorney General Consumer Protection and Antitrust Bureau State House Annex Concord, NH 03301 603-271-3641 | Same |
| NEW YORK | Bureau of Investor Protection and Securities New York State Department of Law 120 Broadway, 23rd Floor New York, NY 10271 212-416-8222 | Secretary of State of New York New York Department of State One Commerce Plaza, 99 Washington Avenue, 6th Floor Albany, NY 12231-0001 (518) 473-2492 |

| STATE | STATE ADMINISTRATOR | AGENT FOR SERVICE OF PROCESS |
|---|---|---|
| NORTH CAROLINA | Secretary of State's Office/Securities Division<br>2 South Salisbury Street<br>Raleigh, NC 27601<br>919-733-3924 | Secretary of State<br>Secretary of State's Office<br>Same Address |
| NORTH DAKOTA | North Dakota Securities Department<br>600 East Boulevard Avenue State Capitol,<br>Fifth Floor Bismarck, ND 58505-0510<br>701-328-4712; Fax: 701-328-0140 | North Dakota Securities Commissioner<br>Same Address |
| OHIO | Attorney General<br>Consumer Fraud & Crime Section<br>State Office Tower<br>30 East Broad Street, 15th Floor<br>Columbus, OH 43215<br>614-466-8831 or 800-282-0515 | Same |
| OKLAHOMA | Oklahoma Securities Commission<br>2915 Lincoln Blvd. Oklahoma City, OK 73105<br>405-521-2451 | Same |
| OREGON | Department of Insurance and Finance<br>Corporate Securities Section Labor and<br>Industries Building Salem, OR 96310<br>503-378-4387 | Director<br>Department of Insurance and Finance<br>Same Address |
| RHODE ISLAND | Rhode Island Department of Business<br>Regulation<br>Securities Division<br>John O. Pastore Center – Building 69-1<br>1511 Pontiac Avenue<br>Cranston, RI 02920 | Director, Rhode Island Department of<br>Business Regulation<br>Same address |
| SOUTH CAROLINA | Secretary of State<br>P.O. Box 11350<br>Columbia, SC 29211<br>803-734-2166 | Same |
| SOUTH DAKOTA | Division of Insurance<br>Securities Regulation<br>124 S. Euclid, Suite 104<br>Pierre, SD 57501<br>605-773-3563 | Director<br>Division of Insurance<br>Securities Regulation<br>124 S. Euclid, Suite 104<br>Pierre, SD 57501<br>605-773-3563 |
| TEXAS | Secretary of State<br>Statutory Documents Section<br>P.O. Box 12887<br>Austin, TX 78711-2887<br>512-475-1769 | Same |

| STATE | STATE ADMINISTRATOR | AGENT FOR SERVICE OF PROCESS |
|---|---|---|
| UTAH | Utah Department of Commerce Consumer Protection Division 160 East 300 South (P.O. Box 45804) Salt Lake City, UT 84145-0804 TELE: 801-530-6601 FAX:801-530-6001 | Same |
| VIRGINIA | State Corporation Commission Division of Securities and Retail Franchising Tyler Building, 9th Floor 1300 E. Main Street Richmond, VA 23219 804-371-9051 | Clerk of the State Corporation Commission Tyler Building, 1st Floor 1300 E. Main Street Richmond, VA 23219 804-371-9733 |
| WASHINGTON | Department of Financial Institutions Securities Division 150 Israel Rd S.W. Tumwater, WA 98501 360-902-8762 | Director, Dept. of Financial Institutions Securities Division 150 Israel Rd S.W. Tumwater, WA 98501 |
| WISCONSIN | Wisconsin Dept. of Financial Institutions Division of Securities 345 W. Washington Avenue, 4th Floor Madison, WI 53703 608-266-8557 | Wisconsin Commissioner of Securities Same Address |

Exhibit E to Franchise Disclosure Document
LA ROSA FRANCHISING, LLC
STATE-SPECIFIC ADDENDA

**STATE LAW ADDENDA**
**TO FRANCHISE DISCLOSURE DOCUMENT AND**
**FRANCHISE AGREEMENT**

12/3/2019

The Franchise Disclosure Document and the Franchise Agreement dated _____, 20____, are amended as specified for each state as follows:

**CALIFORNIA**

The California Franchise Investment Law requires a copy of all proposed agreements relating to the sale of the franchise be delivered together with the Franchise Disclosure Document.

California Business and Professions Code Sections 20000 through 20043 provide rights to you concerning termination or non-renewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement contains a covenant not to compete which, in the case of the Franchise Agreement extends beyond the termination of the franchise. This provision may not be enforceable under California law.

The Franchise Agreement requires you to sign a general release of claims if you transfer your franchise or your Area Development Agreement. California corporations code § 31512 voids a waiver of your rights under the franchise investment law (California corporations code §§ 31000 through 31516). Business and professions code § 20010 voids a waiver of your rights under the franchise relations act (business and professions code §§ 20000 through 20043).

Section 31125 of the California Franchise Investment Law requires us to give to you a disclosure document approved by the Commissioner of Corporations before we ask you to consider a material modification of the Franchise Agreement.

Neither the franchisor, any person or franchise broker in ITEM 2 of the Franchise Disclosure Document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling persons from membership in association or exchange.

The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Section 101 and the following).

The Franchise Agreement requires binding arbitration. The arbitration will occur in Celebration, Florida and each party will bear all of its own costs and attorneys' fees and one-half of the arbitrator's expenses. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a Franchise Agreement restricting venue to a forum outside the State of California.

The Franchise Agreement requires application of the laws of Florida. This provision may not be enforceable under California law.

The following URL address is for the franchisor's website:

www.larosafranchising.com

98

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF CORPORATIONS AT www.corp.ca.gov.

Item 5 of the Franchise Disclosure Document is amended for California residents or La Rosa Realty businesses located in California as follows:

Payment of Initial Franchise Fees will be deferred until Franchisor has met all of its pre-opening obligations to Franchisor and Franchisee has commenced doing business under the Marks. This financial assurance requirement was imposed by the California Department of Business Oversight due to Franchisor's current financial condition.

Section 6.1 of the Franchise Agreement is deleted in its entirety and replaced with the following: Franchisee will pay a non-recurring initial franchise fee of $10,000 ("**Initial Franchise Fee**") The Initial Franchise Fee will be paid by means of cashier's check, money order or wire transfer. The Initial Franchise Fee is deemed fully earned by the Franchisor when paid. The Initial Franchise Fee is non-refundable once paid except as provided for in Section 6.1. Any fee paid by Franchisee to Franchisor in connection with Franchisee's application to Franchisor for approval to become a franchisee will be credited, in full, towards the Initial Franchise Fee. The Initial Franchise Fee will be non-refundable unless the Franchisor elects to refund all or a portion of the Initial Franchise Fee to Franchisee.

Payment of Initial Franchise Fees will be deferred until Franchisor has met all of its pre-opening obligations to Franchisor and Franchisee has commenced doing business under the Marks. This financial assurance requirement was imposed by the California Department of Business Oversight due to Franchisor's current financial condition.

**NEW YORK**

ITEM 3 of the Franchise Disclosure Document is modified to read as follows:

Neither La Rosa Franchising, LLC, its predecessor, a person identified in ITEM 2, or an Affiliate offering franchises under La Rosa Franchising, LLC's principal trademark has been convicted of a felony or pleaded nolo contendere to a felony charge or within the ten-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging a violation of a franchise, antifraud or securities law; fraud, embezzlement fraudulent conversion or misappropriation of property, or unfair or deceptive practices or comparable allegations.

Neither La Rosa Franchising, LLC, its predecessor, a person identified in ITEM 2, or an Affiliate offering franchises under La Rosa Franchising, LLC's principal trademark is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunction or restrictive order relating to any business activity as a result of an action brought by a public agency or department, including without limitation, an action affecting a license as a real estate broker or sales agent.

ITEM 4 of the Franchise Disclosure Document is modified to read as follows:

Neither La Rosa Franchising, LLC, its Affiliate, its predecessor, officers or general partner during the ten (10) year period immediately before the date of the Franchise Disclosure Document: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer or a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code during or within 1 year after the officer or general partner of the franchisor held this position in the company or partnership.

DocuSign Envelope ID: B95FB5BD-FB57-4D8E-B7BF-B12Q952B1QA0

The following sentence is added to the end of the first paragraph of ITEM 5 of the Franchise Disclosure Document:

We use the proceeds from your payment of the initial franchise fee to defray our costs and expenses for providing training and assistance to you and for other expenses.

The first paragraph of ITEM 17 of the Franchise Disclosure Document is modified to read as follows:

THESE TABLES LIST CERTAIN IMPORTANT PROVISIONS OF THE FRANCHISE AND RELATED AGREEMENTS PERTAINING TO RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION. YOU SHOULD READ THESE PROVISIONS IN THE AGREEMENTS ATTACHED TO THIS FRANCHISE DISCLOSURE DOCUMENT.

ITEM 17(w) of the Franchise Disclosure Document is revised to read as follows:

The foregoing choice of law should not be considered a waiver of any right conferred upon either the Franchisor or upon the Franchisee by the GBL of the State of New York, Article 33. This language has been included in this Franchise Disclosure Document as a condition of registration. The Franchisor and Franchisee do not agree with the above language and believe that each of the provisions of the Franchise Agreement including all choice of law provisions, are fully enforceable. The Franchisor and the Franchisee intend to fully enforce all of the provisions of the Franchise Agreement and all other documents signed by them, including but not limited to, all venue, choice-of-law provisions and other dispute resolution provisions.

Section 13.3 is added to the Franchise Agreement as follows:

Notwithstanding Section 13.2, Franchisee will not be required to indemnify Franchisor for any liabilities that arose as a result of Franchisor's breach of this Agreement or other civil wrongs committed by Franchisor.

The following is added to the end of Section 21.1 of the Franchise Agreement:

Provided however, that all rights enjoyed by the Franchisee and any causes of action arising in the Franchisee's favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder will remain in force; it being the intent of this proviso that the non- waiver provision of GBL 687.4 and 687.5 be satisfied.

However, the foregoing choice of law will not be considered a waiver of any right conferred upon Franchisee by the provisions of Article 33 of the New York State General Business Law. This language has been included in this Franchise Disclosure Document as a condition of registration. Franchisor and Franchisee do not agree with the above language and believe that each of the provisions of the Franchise Agreement including all choice of law provisions, are fully enforceable. Franchisor and Franchisee intend to fully enforce all of the provisions of the Franchise Agreement and all other documents signed by them, including but not limited to, all venue, choice-of-law provisions and other dispute resolution provisions.

FRANCHISOR REPRESENTS THAT IT HAS NOT KNOWINGLY OMITTED FROM THE PROSPECTUS ANY MATERIAL FACT, NOR DOES THE PROSPECTUS CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT.

DocuSign Envelope ID: B95FB5BD-EB67-4D8E-B76F-B12C252B10A0

**Exhibit F to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**OPERATIONS MANUAL TABLE OF CONTENTS**

DocuSign Envelope ID: B95FB5BD-FB57-4D8E-B7BF-B12C352B10A0

**Exhibit G to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**NONDISCLOSURE AND**
**NONCOMPETITION AGREEMENT**

## NONDISCLOSURE AND NONCOMPETITION AGREEMENT

This Nondisclosure and Noncompetition Agreement ("Agreement") is made and entered into this _____ day of _____, 20___, by and between La Rosa Franchising, LLC, a Florida limited liability company ("Company"), located at 1420 Celebration Blvd., Suite 200, Celebration, Florida 34747, _____ ("Associate"), who resides or has a principal place of business at _____.

12/3/2019

Ana Ivelisse Morales

500 Munoz Rivera Avenue, Suite 243
San Juan, PR 00918

### RECITALS

A.       The Company is engaged in the business of selling franchises for the operation of a business offering real estate brokerage services ("**Franchise Business**"). The Franchise Business is operated under the Company's trademark "**LA ROSA REALTY™**" and other service marks, trademarks, logo types, designs, and other commercial symbols (collectively "**Marks**");

B.       The Company has developed methods for establishing, operating and promoting Franchise Businesses pursuant to the Company's distinctive business format, plans, methods, data, processes, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, Marks and information and know-how of the Company ("**Confidential Information**" and "**Trade Secrets**") and any Confidential Information and Trade Secrets as may be further developed from periodically by the Company;

C.       The Company and its Affiliates have established substantial goodwill and an excellent reputation with respect to the quality of its System, which goodwill and reputation have been and will continue to be of major benefit to the Company;

D.       Associate desires to become involved with the Company or a franchisee of the Company in the capacity of an officer, partner, director, agent, manager, employee, Designated Business Manager or as a beneficial owner of the Franchise Business, or is an immediate family member of a principal owning an interest in the Franchise Business, and will become privileged as to certain Confidential Information and Trade Secrets. Associate may or may not have signed the Franchise Agreement or Guaranty and Assumption of Franchisee's Obligations form; and

E.       Associate and the Company have reached an understanding with regard to nondisclosure by Associate of Confidential Information and Trade Secrets and with respect to noncompetition by Associate with the Company and other franchisees of the Company. Associate agrees to the terms of this Agreement as partial consideration for the Company's willingness to allow Associate to engage in a business relationship with Company or a franchisee of the Company using the Company's Confidential Information and Trade Secrets.

**NOW THEREFORE**, in consideration of the foregoing, the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Associate and the Company, intending legally to be bound, agree as follows:

1.       Definitions.

        (a)       "**Associate**" means the individual or entity described on page 1 of this Agreement and the Associate's managers, officers, beneficial owners, directors, employees, partners, members, principals and immediate family members.

(b)     "**Competitive Business**" as used in this Agreement means any business operating in competition with or similar to the Franchise Business; provided, however, Associate will not be prohibited from owning not more than a total of 5% of the stock of any company which is subject to the reporting requirements of the U.S. Securities and Exchange Act of 1934.

(c)     "**Confidential Information**" means all knowledge, know-how, standards, formulas, methods and procedures related to the establishment and operation of the Franchise Business and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, the Franchise Business including, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, mail lists, manuals, promotional and marketing materials, marketing strategies and any other data and information which the Company or its Affiliates designates as confidential including all information contained in the Company's Operations Manual, which may be provided as one or more separate manuals, written instructional guides, CD Rom, or other communications from the Company or its Affiliates, which may be changed or supplemented from periodically.

(d)     "**Franchise Agreement**" means the franchise agreement between Company and _____ La Rosa Realty Puerto Rico, 12/3/2019 _____, as amended or renewed from periodically.

(e)     "**Territory**" has the meaning defined in the Franchise Agreement.

(f)     "**Term**" has the meaning defined in the Franchise Agreement.

(g)     "**Trade Secret(s)**" means information, including a formula, pattern, compilation, program, device, method, technique or process related to the Franchise Business that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.     **Confidential Information and Trade Secrets.**   Associate and the Company acknowledge that the Confidential Information and Trade Secrets which are developed and utilized in connection with the operation of the Franchise Business are unique and the exclusive property of the Company or its Affiliates. Associate acknowledges that any unauthorized disclosure or use of the Confidential Information and Trade Secrets would be wrongful and would cause irreparable injury and harm to the Company or its Affiliates. Associate further acknowledges that the Company or its Affiliates has expended a great amount of effort and money in obtaining and developing the Confidential Information and Trade Secrets, that the Company or its Affiliates has taken numerous precautions to guard the secrecy of the Confidential Information and Trade Secrets, and that it would be very costly for competitors to acquire or duplicate the Confidential Information and Trade Secrets.

3.     **Nondisclosure of Confidential Information and Trade Secrets.**   During the Term and any renewal Term of the Franchise Agreement and for a period of 2 years after the expiration or termination of the Franchise Agreement (unless the information is a Trade Secret in which case the requirements in this Section 3 will remain in place for as long as the information constitutes a Trade Secret), Associate will not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the Franchise Business, any of the Confidential Information or Trade Secrets of the Company or its Affiliates.

4.     **Exceptions to Disclosing Confidential Information.**   Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to the following: (a) information that was in the public domain before being communicated to the Associate through no fault of the Associate; (b) information that entered the public domain after it was communicated to the Associate through no fault of the Associate; (c)

information that was in the Associate's possession free of any obligation of confidence at the time it was communicated to the Associate; or (d) the disclosure of the Confidential Information in judicial or administrative proceedings if the Associate is legally compelled to disclose the information, if the Associate has notified the Franchisor before disclosure and used the Associate's best efforts, and afforded the Franchisor the opportunity, to obtain an appropriate protective order or other assurance satisfactory to the Franchisor of confidential treatment for the information required to be so disclosed.

5.      **Noncompetition Covenant.** Associate acknowledges that the Company must be protected against the potential for unfair competition by Associate's use of the Confidential Information and Trade Secrets in direct competition with the Company. Associate further acknowledges that the Confidential Information and Trade Secrets would not have been divulged to the Associate absent the Associate's agreement to strictly comply with the provisions of this Agreement. Associate therefore agrees that other than the Franchise Business licensed under the Franchise Agreement, Associate will not during the Term and renewal Term of the Franchise Agreement:

        (a)      have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business;

        (b)      perform services as a manager, officer, beneficial owner, director, principal, employee, partner, member, consultant, representative, agent or otherwise for a Competitive Business; or

        (c)      divert or attempt to divert any business related to, or any customer or account of the Franchise Business, the Company's business, the business of any Affiliate of the Company or any other franchisee's business, by direct inducement or otherwise, or divert or attempt to divert the employment of any employee of the Company or another franchisee licensed by Company, to any Competitive Business by any direct inducement or otherwise.

6.      **Non-Solicitation.** During the Term of the Franchise Agreement, including any renewal or extension thereof and for a period of two (2) years thereafter, the Associate, will not attempt to attain an unfair advantage over the franchisee, other franchisees, the Franchisor or any Affiliates thereof by soliciting for employment any person who is, at the time of the solicitation, employed by the Franchisor, other franchisees or any Affiliates, nor will the Associate directly or indirectly induce or attempt to induce any person to leave his or her employment as aforesaid.

THE PARTIES HAVE ATTEMPTED IN THIS AGREEMENT TO LIMIT THE ASSOCIATE'S RIGHTS ONLY AS NECESSARY TO PROTECT THE COMPANY FROM UNFAIR COMPETITION. THE PARTIES HEREBY EXPRESSLY AGREE THAT IF THE SCOPE OF ENFORCEABILITY OF THE PROVISION OF SECTIONS 5 AND 6 ARE DISPUTED AT ANY TIME BY THE ASSOCIATE, A COURT OR ARBITRATOR, AS THE CASE MAY BE, MAY MODIFY SECTIONS 5 AND 6 IF IT DEEMS NECESSARY TO MAKE THESE PROVISIONS ENFORCEABLE UNDER APPLICABLE LAW. THE ASSOCIATE EXPRESSLY ACKNOWLEDGES THAT THE ASSOCIATE POSSESSES SKILLS AND ABILITIES OF A GENERAL NATURE AND HAS OTHER OPPORTUNITIES TO EXPLOIT THESE SKILLS. CONSEQUENTLY, ENFORCEMENT OF THE COVENANTS SET FORTH ABOVE WILL NOT DEPRIVE ASSOCIATE OF THE ABILITY TO EARN A LIVING.

7.      **Injunction.** Associate hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company will be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company may be entitled. Associate agrees that the Company may obtain this injunctive relief without posting a bond or bonds. Associate's sole remedy, in the event of the entry of injunctive relief, will be dissolution of the injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any injunction are expressly waived by Associate.  In any litigation, arbitration or other proceeding concerning the entry of any requested injunction against Associate, Associate, for value, voluntarily waives any defenses Associate might otherwise have under the law of the jurisdiction in which the matter is being litigated, arbitrated or otherwise relating to any claimed "prior breach" on the part of the Company; it being specifically

understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit the Associate to disclose any Confidential Information and Trade Secrets in any circumstances.

8.      **Effect of Waiver.** The waiver by Associate or the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach thereof.

9.      **Binding Effect.** This Agreement is binding upon and inure to the benefit of Associate and the Company and their respective heirs, executors, representatives, successors and assigns.

10.     **Entire Agreement.** This instrument contains the entire agreement of Associate and the Company relating to the matters set forth herein. It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

11.     **Governing Law.** This instrument is governed by and will be construed under the laws of the State of Florida.

12.     **Jurisdiction and Venue.** In the event of a breach or threatened breach by Associate of this Agreement, Associate hereby irrevocably submits to the jurisdiction of the state and federal courts of Florida, and irrevocably agrees that venue for any action or proceeding will be in the state and federal courts of Florida. Both parties waive any objection to the jurisdiction of these courts or to venue in the state and federal courts of Florida. Notwithstanding the foregoing, in the event that the laws of the state where the Associate resides prohibit the aforesaid designation of jurisdiction and venue, then that other state's laws will control.

13.     **Severability.** If any provision of this Agreement is held, declared or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, that holding, declaration or pronouncement will not affect adversely any other provisions of this Agreement which will otherwise remain in full force and effect.

14.     **Attorneys' Fees.** In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in the litigation, as determined by the court in a final judgment or decree, will pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by the successful party or parties (including without limitation those costs, expenses and fees on any appeals), and if the successful party recovers judgment in any action or proceeding, the costs, expenses and attorneys' fees will be included as part of the judgment.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date first above written.

**COMPANY:**                                          **ASSOCIATE:**

By: _Joseph La Rosa_____              By: _Ana Ivelisse Morales_____
Title: CEO                                          Title: President
Date: 12/3/2019                                     Date: 12/3/2019

       12/3/19                                            La Rosa Realty Puerto Rico, PSC

DocuSign Envelope ID: B95FB5BD-EB57-4D2E-B7BF-B12C852B10A0

**Exhibit H to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**STATEMENT OF FRANCHISEE**

## STATEMENT OF FRANCHISEE

[Note: Dates and Answers Must be Completed in the Prospective Franchisee's Own Handwriting]

To make sure that no misunderstanding exists between you, the Franchisee, and us, La Rosa Franchising, LLC (also called "La Rosa Realty," the "Franchisor" or "we"), and to make sure that no violations of law might have occurred, and understanding that we are relying on the statements you make in this document, you assure us as follows:

A.      The following dates are true and correct:

Date                                                          Initials

1.      OCTOBER 29,  2019                           _AM_      The date on which I received a Franchise Disclosure Document regarding the La Rosa Realty business.

2.      OCTOBER 22, 2019                           _AM_      The date of my first meeting with Sales Director to discuss a possible purchase of a La Rosa Realty business

3.      OCTOBER 28, 2019                          _AM_      The date on which I received a completed copy (other than signatures) of the Franchise Agreement which I later signed.

4.      12/3/2019                                          _AM_      The date on which I signed the Franchise Agreement.

5.      NOVEMBER 18, 2019                        _AM_      The earliest date on which I delivered cash, check or other consideration to the Sales Director or an officer of Franchisor.

B.      Representations.

1.      No oral, written, visual or other promises, agreements, commitments, representations, understandings, "side agreements," options, right-of-first-refusal or otherwise have been made to or with me with respect to any matter (including but not limited to advertising, marketing, site location, operational, marketing or administrative assistance, exclusive rights or exclusive or protected territory or otherwise), nor have I relied in any way on same, except as expressly set forth in the Franchise Agreement or an attached written Addendum signed by me and Franchisor, except as follows:

NONE
_____
(If none, you should write NONE in your own handwriting and initial.)

2.      No oral, written, visual or other promises, agreements, commitments, representation, understandings, "side agreements" or otherwise which expanded upon or were inconsistent with the Franchise Disclosure Document or the Franchise Agreement or any attached written addendum signed by me and an officer of Franchisor, were made to me by any person or entity, nor have I relied in any way on same, except as follows:

NONE

_____
(If none, you should write NONE in your own handwriting and initial.)

3.      No oral, written, visual or other claim or representation (including but not limited to charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a combination of variables, such as multiples of price and quantity to reflect gross sales, or otherwise,) which stated or suggested a specific level or range of actual or potential sales, income, profits, cash flow, tax effects or otherwise (or from which these items might be ascertained) from the La Rosa Realty businesses, was made to me by any person or entity, nor have I relied in any way on any claim or representation, except as follows:

NONE

_____
(If none, you should write NONE in your own handwriting and initial.)

4.      No contingency, prerequisite, reservation or otherwise exists with respect to any matter (including but not limited to my obtaining financing, or my fully performing any of my obligations), nor have I relied in any way on same, except as expressly set forth in the Franchise Agreement or any attached written Addendum signed by me and Franchisor:

NONE

_____
(If none, you should write NONE in your own handwriting and initial.)

5.      The individuals signing for me constitute all of the executive officers, partners, shareholders, investors and/or principals. Each of these individuals has reviewed the Franchise Disclosure Document and all exhibits and carefully read, discussed, understands and agrees to the Franchise Agreement, each attached written Addendum and any personal guaranties.

6.      I have had an opportunity to consult with an independent professional advisor, such as an attorney or accountant, before signing any binding documents or paying any sums, and Franchisor has strongly recommended that I obtain this independent advice. I have also been strongly advised by Franchisor to discuss my proposed purchase of a La Rosa Realty business with any existing Franchisor franchisees before signing any binding documents or paying any sums and Franchisor has supplied me with a list of all existing franchisees if any exist.

7.      I understand that a) entry into any business venture necessarily involves some unavoidable risk of loss or failure; b) while the purchase of a franchise may improve the chances for success, the purchase of a La Rosa Realty business or any other franchise is a speculative investment; c) investment beyond that outlined in the Franchise Disclosure Document may be required to succeed; d) there exists no guaranty against possible loss or failure in this or any other business; and e) the most important factors in the success of any La Rosa Realty business, including the one to be operated by me, are my personal business skills, which include marketing, sales, and management, and require sound judgment and extremely hard work.

I understand that Franchisor has Affiliates, including, La Rosa Realty New York, La Rosa Realty California, LLC, La Rosa Realty South Carolina, LLC , and La Rosa Realty Georgia, LLC, which operate a La Rosa Realty business, and I have not been provided with any financial or operating information about any Affiliate of Franchisor, nor have I relied upon any other information I may have obtained from any other source with regard to the financial or operating conditions of any Affiliate of Franchisor.

If there are any matters inconsistent with the statements in this document or if anyone has suggested that you sign this document without all of its statements being true, correct and complete, immediately inform La Rosa Franchising, LLC  (Phone: 321-939-3748) and our President.

You understand and agree that we do not furnish, or authorize our salespersons, brokers or others to furnish any oral or written information concerning actual or potential sales, income, profits, cash flow, tax effects or otherwise (or

information from which these items might be ascertained), from Affiliate-owned, franchised or non-franchised units, that no results can be assured or estimated, and that actual results will vary from unit to unit.

You understand and agree to all of the foregoing and represent and warrant that all of the above statements are true, correct and complete.

**PROSPECTIVE FRANCHISEE:**

*Ana Ivelisse Morales*
DocuSigned by:
D3A8A73C84714E2...

La Rosa Realty Puerto Rico, PSC

12/3/2019
_____
Date

**SALES DIRECTOR:**

_____
_____
Date

**REVIEWED BY FRANCHISOR:**

By: *Joseph La Rosa*
DocuSigned by:
9F4237666000465...
_____

Its: CEO
_____

Date: 12/3/2019
_____

108

DocuSign Envelope ID: B95FB5BD-FB57-4D8E-B7BF-B12C352B1DA0

Exhibit I to Franchise Disclosure Document
LA ROSA FRANCHISING, LLC
FORM OF GENERAL RELEASE

GENERAL RELEASE

THIS GENERAL RELEASE ("Release") is executed on ___12/3/2019___, 20____ by
___La Rosa Realty Puerto Rico, PSC___ ("Franchisee") and by ___Ana Ivelisse Morales___ ("Guarantors") as a
condition of [PICK ONE: the transfer of a La Rosa Realty franchise between Franchisee and La Rosa Franchising,
LLC ("Franchisor") [or] the transfer or renewal of a La Rosa Realty Franchise Agreement dated___12/3/2019___
("Franchise Agreement") between Franchisee and Franchisor [or] between dated ___12/3/2019___
("Franchise Agreement") between Franchisee and La Rosa Franchising, LLC.

1.      **Release by Franchisee and Guarantors.** Franchisee (if Franchisee_____ an entity, on behalf of
itself and its parent, subsidiaries and Affiliates and their respective past and present officers, directors, shareholders,
agents and employees, in their corporate and individual capacities and, if Franchisee is an individual, on behalf of
himself/herself and his/her heirs, representatives, successors and assigns) and Guarantors (on behalf of themselves
and their respective heirs, representatives, successors and assigns) (collectively, "Franchisee Releasors") freely and
without any influence forever release and covenant not to sue Franchisor and its parent, subsidiaries and Affiliates
and their respective past and present officers, directors, members, shareholders, agents and employees, in their
corporate and individual capacities, (collectively "Franchisor Releasees") with respect to any and all claims,
demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or
contingent, suspected or unsuspected (collectively, "Claims"), which any Franchisee Releasor ever owned or held,
now owns or holds or may in the future own or hold, including, without limitation, claims arising under federal, state
and local laws, rules and ordinances and claims arising out of, or relating to the Franchise Agreement and all other
agreements between any Franchisee Releasor and any Franchisor Releasee, arising out of, or relating to any act,
omission or event occurring on or before the date of this Release, unless prohibited by applicable law.

IF FRANCHISEE OR GUARANTORS ARE BASED IN CALIFORNIA: Franchisee and Guarantors (on behalf of
the Franchisee Releasors) expressly agree that, with respect to this release, any and all rights granted under Section
1542 of the California Civil Code are expressly waived, to the extent applicable. That Section reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
> CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR
> AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY
> HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH
> THE DEBTOR.

2.      Risk of Changed Facts. Franchisee and Guarantors understand that the facts in respect of which the Release
in Section 1 above is given may turn out to be different from the facts now known or believed by them to be true.
Franchisee and Guarantors hereby accept and assume the risk of the facts turning out to be different and agree that
the Release shall nevertheless be effective in all respects and not subject to termination or rescission by virtue of any
such difference in facts.

3.      **No Prior Assignment.** Franchisee and Guarantors represent and warrant that the Franchisee Releasors are
the sole owners of all Claims and rights released hereunder and that the Franchisee Releasors have not assigned or
transferred, or purported to assign or transfer, to any person or entity, any Claim released under Section 1 above.

4.      **Covenant Not to Sue.** Franchisee and Guarantors (on behalf of the Franchisee Releasors) covenant not to
initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or
administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of

cross-claim, defense, or counterclaim, against any person or entity released under Section 1 above with respect to any Claim released under Section 1 above.

5.      **Complete Defense.** Franchisee and Guarantors: (A) acknowledge that this Release shall be a complete defense to any Claim released under Section 1 above; and (B) consent to the entry of a temporary or permanent injunction to prevent or end the assertion of any such Claim.

6.      **Successors and Assigns.** This Release will inure to the benefit of and bind the successors, assigns, heirs and personal representatives of Franchisor and each Franchisee Releasor.

7.      **Governing Law.** This Release and all claims relating to this Release shall be governed by and construed under the law of the State of Florida. Franchisor, Franchisee and Guarantor shall file any controversy or claim whatsoever arising out of or relating to this Release or the enforcement of the promises in this Release or with regard to the interpretation, formation, or breach of this Release in the court where Franchisor's principal offices are located. Franchisor may file any controversy or claim whatsoever arising out of or relating to this Release or the enforcement of the promises in this Release or with regard to the interpretation, formation, or breach of this Release in the court where its principal offices are located, where Franchisee or Guarantors reside or do business, or where the claim arose.

8.      **Miscellaneous**

A.      This Release constitutes the entire, full and complete agreement between the parties concerning the release of Claims by the parties and supersedes all prior or contemporaneous negotiations, discussions, understandings or agreements. Except as expressly set forth in this Agreement, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed in writing.

B.      The masculine gender shall be deemed to refer to and include the feminine and neuter, and the singular to refer to and include the plural, and vice versa.

C.      The terms of this Release shall remain confidential and may not be disclosed except when and to the extent necessary to comply with applicable federal, state, or local laws, court orders or regulations.

D.      All terms not defined in this Release shall have the meaning given to them in the

E.      Franchise Agreement.

F.      All captions in this Release are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

G.      This Release may be executed in counterparts, and each copy so executed and delivered shall be deemed an original.

**[Signature Page to Follow]**

**IN WITNESS WHEREOF**, Franchisee and Guarantors have executed this Release as of the date shown below.

**FRANCHISEE:**

**(IF FRANCHISEE IS AN ENTITY)**

Signature: _Ana Ivelisse Morales_
            DocuSigned by:
            D3A8A73C84714E2...

Print Name: Ana Ivelisse Morales          La Rosa Realty Puerto Rico, PSC

Title: President

Date: 12/3/2019

(IF FRANCHISEE IS AN INDIVIDUAL)

Signature: _____

Print Name: _____

Date: _____

GUARANTOR:

Signature: _____

Print Name: _____

Date: _____

GUARANTOR:

Signature: _____

Print Name: _____

Date: _____

[Attach additional signature pages as needed]

111

Exhibit J to Franchise Disclosure Document
APSA Purchase Agreement

EXHIBIT J
APSA PURCHASE AGREEMENT

This Asset Purchase and Sale Agreement ("APSA") is entered into on _____, 20__, between La Rosa Realty, LLC, a Florida limited liability company (the "Seller"), and _____, a [STATE] [CORPORATION/LIMITED LIABILITY COMPANY] [AN INDIVIDUAL](the "Buyer").

The Seller owns and operates a residential and commercial real estate brokerage business known as "La Rosa Realty" located at _____ (the "Business").

The Seller has agreed to sell and the Buyer has agreed to purchase the Purchased Assets (as defined below).

Therefore, the parties agree as follows:

1.      Sale of the Purchased Assets; Assumption of the Assumed Contracts. Subject to the provisions set forth in this agreement, as of midnight at the beginning of the date of this agreement (the "Effective Time"), the Seller hereby sells, conveys, assigns, and transfers to the Buyer the assets set forth on Schedule 1 (the "Purchased Assets") free and clear of any and all liens and encumbrances, and the Buyer hereby accepts the sale, conveyance, assignment, and transfer of the Purchased Assets and assumes the Buyer's obligations under the contracts listed on Schedule 1 (the "Assumed Contracts"). Buyer acknowledges that this sale does not include any right to the use of Seller's trade name, trademarks or other intellectual property, and that this sale is conditioned upon Buyer contemporaneously entering into a franchise relationship with La Rosa Franchising, LLC, which franchise relationship separately licenses the use of the "La Rosa Realty" trade name, trademarks and other intellectual properties.

2.      No Other Assumption of Liabilities. Except for the Assumed Contracts, the Buyer does not assume any obligation or liability of the Seller, and the Seller or the Owner or both, as applicable, will continue to be liable for any and all liabilities of the Seller. The Buyer does not assume any liability under the Assumed Contracts arising before the Effective Time. The Seller will not be responsible for any liability that arises from the Buyer's operation of the Business after the Effective Time.

3.      Purchase Price. The purchase price is $_____ (the "Purchase Price"). The parties agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax purposes) in accordance with the allocation schedule attached to this agreement as Schedule 3. The Buyer shall pay the Purchase Price as follows:

(1) $_____ deposit, which has already been paid, will be credited to the Buyer.

(2) $_____ will be paid at the Closing by wire transfer.

4.      Representations and Warranties. The Seller represents and warrants to the Buyer that all of the representations and warranties set forth on Schedule 4 are true and correct in all respects as of the date of this agreement.

5.      Reserved.

6.      Proration of Expenses. Any costs associated with operating the Business in the ordinary course, including but not limited to payroll expenses and utility or similar charges, payable with respect to the period in which the Effective Time falls will be prorated based on the actual number of days applicable to the pre-Effective Time and post-Effective Time occupancy and use. The Seller will be liable for the prorated amount of all such expenses during

112

the period through the Effective Time, and the Buyer will be liable for the prorated amount of all such expenses during the period after the Effective Time.

7.      Survival. Except as otherwise provided in this agreement, the representations and promises of the parties contained in this agreement will survive (and not be affected in any respect by) the Effective Time for the applicable statute of limitations as well as any investigation conducted by any party and any information which any party may receive.

8.      Further Actions. At any time and from time to time after the date of this agreement: (1) the Seller shall execute and deliver or cause to be executed and delivered to the Buyer such other instruments and take such other action, all as the Buyer may reasonably request, in order to carry out the intent and purpose of this agreement; and (2) the Buyer shall execute and deliver or cause to be executed and delivered to the Seller such other instruments and take such other action, all as the Seller may reasonably request, in order to carry out the intent and purpose of this agreement.

9.      Governing Law; Venue. This agreement and the transactions contemplated hereby will be construed in accordance with and governed by the internal laws (without reference to choice or conflict of laws principles) of the State of _____. Any suit, action, or other proceeding brought against any of the parties to this agreement or any dispute arising out of this agreement or the transactions contemplated hereby must be brought either in the courts sitting in _____ County, _____, or in the United States District Court for the District of _____ and by its execution and delivery of this agreement, each party accepts the jurisdiction of such courts and waives any objections based on personal jurisdiction or venue.

10.     Assignment. No party may assign either this agreement or any of its rights, interests, or obligations hereunder without the prior written approval of each other party, except that the Buyer may assign any or all of its rights under this agreement, in whole or in part, without obtaining the consent or approval of any other party, (1) to any current or future affiliate of the Buyer, (2) to any entity into which the Buyer may be merged or consolidated, (3) in connection with any acquisition, restructuring, merger, conversion, or consolidation to which the Buyer may be a party, or (4) to a lender to the Buyer or its affiliates as collateral security for current or future obligations owed by the Buyer or its affiliates to the lender.

11.     Notices. All notices and other communications under this agreement must be in writing and given by first class mail, return receipt requested, nationally recognized overnight delivery service, such as Federal Express, or personal delivery against receipt to the party to whom it is given, in each case, at the party's address set forth in this section 11 or such other address as the party may hereafter specify by notice to the other parties given in accordance with this section. Any such notice or other communication will be deemed to have been given as of the date the applicable delivery receipt for such communication is executed as received or in the case of mail, three days after it is mailed.

If to the Seller:      _____
Attention:             _____
If to the Buyer        _____
                       _____
                       _____
                       _____
Attention:             _____

12.     Miscellaneous. This agreement contains the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations, writings, and understandings relating to the subject matter of this agreement are merged in and are superseded and canceled by, this agreement. This agreement may not be modified or amended except by a writing signed by the parties. This agreement is not intended to confer upon any person or entity not a party (or their successors and permitted assigns) any rights or remedies hereunder. This agreement may be signed in any number of counterparts, each of which will be an original with the same effect as if the signatures were upon the

same instrument, and it may be signed electronically. The captions in this agreement are included for convenience of reference only and will be ignored in the construction or interpretation hereof. If any date provided for in this agreement falls on a day which is not a business day, the date provided for will be deemed to refer to the next business day. Any provision in this agreement that is held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction will be ineffective only to the extent of such invalidity, illegality, or unenforceability without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to reform this agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent. The Exhibits and Schedules to this agreement are a material part of this agreement and are incorporated by reference herein.

Each of the undersigned has caused this bill of sale and assignment and assumption agreement to be duly executed and delivered as of the date first written above.

BUYER:
By:      _____
Name:    _____

Title:   _____
SELLER:
La Rosa Realty, LLC
By:      _____
Name:    _____
Title:   _____

114

Schedule 1
Purchased Assets

"Purchased Assets" means all of the assets of the Seller used or useful in the operation of the Business, including the following assets, but specifically excluding the Excluded Assets:

a) all customer lists related to the Business;

b) all computers equipment (excluding any software other than the operating system) and related office equipment, and office supplies used by the Seller in the Business;

c) fixtures and furniture used by the Seller in the Business;

d) phone system and any other technological equipment used by the Business;

e) the telephone number _____;

f) the "Inventory," as set forth on Exhibit A to this Schedule 1,

"Excluded Assets" means the following:

a) all cash of the Seller;

b) all accounts receivable of the Seller outstanding at the Effective Time; and

c) _____.

"Assumed Contracts" means the following contracts: _____

Exhibit A to Schedule 1

Inventory

[See attached.]

Schedule 3

Tax Allocation Schedule

Furniture Fixtures and Equipment $_____

Inventory $_____

Schedule 4

Representations and Warranties

1.      Capitalization. The Seller is the owner of the Business and no person has any existing right to purchase any equity of the Seller.

115

2.      Consents. The Seller is not required to obtain the consent of any party to a contract or any governmental entity in connection with the execution, delivery, or performance by it of this agreement or the consummation of the transactions contemplated in this agreement, other than _____.

3.      Compliance with Laws. With respect to the operation of the Business by the Seller before the Effective Time, the Seller and its employees and officers are and at all times have been in compliance in all material respects with each law applicable to the Seller or to the operation of the Business.

4.      Taxes. The Seller has, in respect of the Business, filed all tax returns that are required to be filed and has paid all taxes that have become due under the tax returns or under any assessment that has become payable or for which the Buyer may otherwise have any transferee liability. All monies required to be withheld by the Seller from employees for income taxes and social security and other payroll taxes have been collected or withheld and either paid to the respective governmental bodies or set aside in accounts for such purpose.

5.      Litigation. There are no claims or suits pending or, to the Seller's knowledge, threatened by or against the Seller (1) relating to or affecting the Business or Purchased Assets or (2) by or against any employee of the Seller relating to or affecting the Business or Purchased Assets. There are no judgments, decrees, orders, writs, injunctions, rulings, decisions, or awards of any court or governmental body to which the Seller is a party or is subject with respect to any of the Purchased Assets is subject.

6.      Financial Information; Ordinary Course. The financial information the Seller provided to the Buyer is accurate, correct, and complete, is in accordance with the books and records of the Seller, and presents fairly the results of operation and financial condition of the Seller's Business. The Seller has operated the Business in the ordinary course before the Effective Time.

7.      Title; Condition of Purchased Assets. The Seller has good and marketable title to all of the Purchased Assets free and clear of all liens and encumbrances. Pursuant to this agreement, the Seller conveys to the Buyer good and marketable title to all of the Purchased Assets, free and clear of all liens and encumbrances. All equipment and signs are in working order and the premises will pass all inspections necessary to conduct the Business.

**Exhibit K to Franchise Disclosure Document**
**LA ROSA FRANCHISING, LLC**
**RECEIPTS**

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If franchisor offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an Affiliate in connection with the proposed franchise sale.

If franchisor does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington DC 20580 and the appropriate state agency/

The issuance date for this Franchise Disclosure Document is July 19, 2019. I have received a disclosure document dated June 6, 2019 that included the following Exhibits:

| | |
|---|---|
| A. Financial Statements | F. Operations Manual Table of Contents |
| B. Franchise Agreement | G. Nondisclosure and Noncompetition |
| C. List of Current Franchisees/Who Have Left The System | Agreements |
| | H. Statement of Franchisee |
| D. List of State Agencies and Administrators | I. General Release |
| E. State-Specific Addenda | J. APSA Purchase Agreement |
| | K. Receipts |

| | | | |
|---|---|---|---|
| Ana Ivelisse Morales | La Rosa Realty Puerto Rico, PSC | Ana Ivelisse Morales | La Rosa Realty Puerto Rico, PSC |
| Prospective Franchisee (Print Name) | | Prospective Franchisee (Print Name) | |
| *Ana Ivelisse Morales* | | *Ana Ivelisse Morales* | |
| DocuSigned by: D3A8A73C84714E2... | | DocuSigned by: D3A8A73C84714E2... | |
| Signature | | Signature | |
| 12/3/2019 | | 12/3/2019 | |
| Date | | Date | |

Instructions for returning the receipt: If the disclosure document is not delivered in person, the prospective franchisee must sign both copies of this Receipt, retaining one (1) for the prospective franchisee's records. The other copy must be sent via certified mail to the franchisor: Aileen Guzman, Sales Director, La Rosa Franchising, LLC, 1420 Celebration Blvd., Suite 200, Celebration, FL 34747.

Franchise Seller's Name:       La Rosa Franchising, LLC

Attention:       Aileen Guzman, Sales Director

Principal Business Address:       1420 Celebration Blvd., Suite 200, Celebration, FL 34747

Email:       info@larosafranchising.com

Telephone Number:       321-939-3748

**(Retain this copy for your records)**

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If franchisor offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an Affiliate in connection with the proposed franchise sale.

If franchisor does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington DC 20580 and the appropriate state agency/

The issuance date for this Franchise Disclosure Document is July 19, 2019. I have received a disclosure document dated June 6, 2019 that included the following Exhibits:

| | |
|---|---|
| A. Financial Statements | F. Operations Manual Table of Contents |
| B. Franchise Agreement | G. Nondisclosure and Noncompetition |
| C. List of Current Franchisees/Who Have Left The System | Agreements |
| | H. Statement of Franchisee |
| D. List of State Agencies and Administrators | I. General Release |
| E. State-Specific Addenda | J. APSA Purchase Agreement |
| | K. Receipts |

_____          _____
Prospective Franchisee          (Print Name)          Prospective Franchisee          (Print Name)


_____          _____
Signature          Signature


_____          _____
Date          Date

Instructions for returning the receipt: If the disclosure document is not delivered in person, the prospective franchisee must sign both copies of this Receipt, retaining one (1) for the prospective franchisee's records. The other copy must be sent via certified mail to the franchisor: Aileen Guzman, Sales Director, La Rosa Franchising, LLC, 1420 Celebration Blvd., Suite 200, Celebration, FL 34747.

| | |
|---|---|
| Franchise Seller's Name: | La Rosa Franchising, LLC |
| Attention: | Aileen Guzman, Sales Director |
| Principal Business Address: | 1420 Celebration Blvd., Suite 200, Celebration, FL 34747 |
| Email: | info@larosafranchising.com |
| Telephone Number: | 321-939-3748 |



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: B95FB5BDFBB74D9EB76FB12C252B10A0 | | Status: Completed |
| Subject: Please DocuSign: La Rosa Realty Franchise Agreement San Juan Puerto Rico | | |
| Source Envelope: | | |
| Document Pages: 119 | Signatures: 13 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 5 | Mark Gracy |
| AutoNav: Enabled | | 26 NE 27th Dr |
| EnvelopeId Stamping: Enabled | | nil |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Wilton Manors, FL  33334 |
| | | mark@larosarealtycorp.com |
| | | IP Address: 216.53.133.209 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Mark Gracy | Location: DocuSign |
|     11/19/2019 8:33:53 AM |     mark@larosarealtycorp.com | |

## Signer Events / Signature / Timestamp

| Signer Events | Signature | Timestamp |
|---|---|---|
| Ana Ivelisse Morales<br>ivelissemoralesbienesraices@gmail.com<br>President<br>La Rosa Realty Puerto Rico, PSC<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Ana Ivelisse Morales*<br>D3A8A73C84714E2...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.72.178.17 | Sent: 11/19/2019 9:34:43 AM<br>Resent: 12/2/2019 11:18:39 AM<br>Viewed: 12/3/2019 6:41:41 AM<br>Signed: 12/3/2019 7:06:24 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 11/19/2019 10:14:12 AM<br>    ID: 5a60cac1-bf45-499a-a4de-a8367227eaed | | |
| Joseph La Rosa<br>Joe@Larosarealtycorp.com<br>CEO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Joseph La Rosa*<br>9F4237666000465...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 216.53.133.209 | Sent: 12/3/2019 7:06:32 AM<br>Viewed: 12/3/2019 7:30:33 AM<br>Signed: 12/3/2019 7:31:16 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 12/3/2019 7:30:33 AM<br>    ID: 345cc019-893b-4fa8-8a36-8d7db2ed1947 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/3/2019 7:06:32 AM |
| Certified Delivered | Security Checked | 12/3/2019 7:30:33 AM |
| Signing Complete | Security Checked | 12/3/2019 7:31:16 AM |
| Completed | Security Checked | 12/3/2019 7:31:16 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 8/11/2019 8:54:34 AM
Parties agreed to: Ana Ivelisse Morales, Joseph La Rosa

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, La Rosa Realty International (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact La Rosa Realty International:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: mark@larosarealtycorp.com

**To advise La Rosa Realty International of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at mark@larosarealtycorp.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from La Rosa Realty International**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to mark@larosarealtycorp.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with La Rosa Realty International**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to mark@larosarealtycorp.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify La Rosa Realty International as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by La Rosa Realty International during the course of your relationship with La Rosa Realty International.